No. 2023-2092

# United States Court of Appeals
# for the Federal Circuit

KERRY GROUP SERVICES INTERNATIONAL LTD.,

*Appellant*

v.

FLORIDA FOOD PRODUCTS, LLC,

*Appellee*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2022-00006 for U.S. Patent No. 11,071,304 B2

## APPEAL BRIEF OF APPELLANT
## KERRY GROUP SERVICES INTERNATIONAL LTD.

Mark Boland
Raja N. Saliba
SUGHRUE MION, PLLC
2000 Pennsylvania Avenue, NW
Suite 9000
Washington, DC 20006
Tel: (202) 293-7060
Fax: (202) 293-7860

*Attorneys for Appellant
Kerry Group Services Int'l Ltd.*

October 6, 2023

## REPRESENTATIVE PATENT CLAIM AT ISSUE

<u>U.S. Patent No. 11,071,304 B2 (Appx623)</u>

1.    A process for preserving a meat or meat product comprising contacting the meat or meat product to be preserved with a curing agent comprising a plant-based nitrite and an added organism, the plant-based nitrite being derived from a plant material comprising at least about 50 ppm nitrate and the organism, wherein the plant material is heat treated prior to addition of the organism so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material, the organism inactivated, wherein the organism was capable of converting nitrate to nitrite before the inactivation, and preserving the contacted meat or meat product.

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Appellant certifies the following:

1. The full name of every party represented by me is:

    KERRY GROUP SERVICES INTERNATIONAL LTD.

2. The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3 below) represented by me is:

    None.

3. All parent corporations and publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    KERRY GROUP PLC.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    SUGHRUE MION, PLLC:   Mark Boland, Raja N. Saliba, Michael G. Raucci, and L. Roman Rachuba

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal:

    None.

6. Information required under Fed. R. App. P. 26.1(b) and 26.1(c) and Fed. Cir. R. 47.4(a)(6).

    None/Not Applicable.


October 6, 2023                                  /s/ Mark Boland
                                                 Mark Boland
                                                 *Counsel for Appellant Kerry Group Services International Ltd.*

# TABLE OF CONTENTS

Page

REPRESENTATIVE PATENT CLAIM AT ISSUE ................................................i

CERTIFICATE OF INTEREST ............................................................. ii

TABLE OF CONTENTS ................................................................... iii

TABLE OF AUTHORITIES ................................................................vi

TABLE OF ABBREVIATIONS ...........................................................x

STATEMENT OF RELATED CASES ...................................................xi

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED......................................................................4

STATEMENT ...............................................................................4

    I.       Background ......................................................4

           A.    The '304 Patent .............................................4

           B.    The '304 Patent Prosecution ....................................11

    II.      Proceedings Below.................................................12

           A.    The Petition .............................................12

           B.    Kerry's Preliminary Response .................................15

           C.    The PTAB's Institution Decision .............................17

           D.    Kerry's Patent Owner Response .............................19

           E.    FFP's Reply and Kerry's Sur-Reply .........................25

           F.    The PTAB's Final Written Decision .......................26

SUMMARY OF ARGUMENT ............................................................30

ARGUMENT ...............................................................................31

I.     The PTAB's New Theory Of Unpatentability Was
Clear Legal Error, And Infected Its Analysis
Of Actual Ground I...............................................................31

     A.     Standard of Review................................................31

     B.     The PTAB Introduced And Relied On A New Theory
Of Unpatentability—Voorde Alone...........................32

     C.     The PTAB's New Theory Is Not Supported
By Substantial Evidence ...........................................37

II.    The PTAB's 'Even if' Analysis Was Flawed
For Multiple Reasons ...........................................................38

     A.     Standard of Review................................................38

     B.     The PTAB's Ex-Petition Reliance On Voorde Infected
The Analysis Of The Actual Ground In The Petition..............38

     C.     The PTAB Never Provided A Sound Rationale
To Combine................................................................41

     D.     The PTAB Failed To Address Kerry's "Teaching Away"
Arguments And Evidence ...........................................46

     E.     The Combination Analysis Is Fraught With Hindsight ............51

     F.     Numerous Findings Lack Substantial Evidence ......................53

III.   The PTAB's Analysis Fails the APA's Notice and Reasoned
Decision-Making Requirement ............................................62

     A.     Standard of Review................................................62

     B.     Ex-Petition Theory and Findings..............................63

     C.     Motivation to Combine Findings Were Not Made ..................63

     D.     Teaching Away  Was Not Addressed .......................................64

  E. Lack of Substantial Evidence
    Pervaded the PTAB's Findings.................................................65

CONCLUSION ...................................................................................................66

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Apple Inc. v. Samsung Elecs. Co.*,
  839 F.3d 1034 (Fed. Cir. 2016) (en banc). ..........................................32

*Aqua Prods., Inc. v. Matal*,
  872 F.3d 1290 (Fed. Cir. 2017) ................................................. 62, 65

*Ariosa Diagnostics v. Verinata Health, Inc.*,
  805 F.3d 1359 (Fed. Cir. 2015) ..................................................34

*ATD Corp. v. Lydall, Inc.*,
  159 F.3d 534 (Fed. Cir. 1998) ...................................................52

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) ............................................. 34, 43

*Chemours Co. FC, LLC v. Daikin Indus.*,
  4 F.4th 1370 (Fed. Cir. 2021) ........................................ 48, 49, 50, 66

*Consol. Edison Co. v. N.L.R.B.*,
  305 U.S. 197 (1938) ............................................................32

*Cutsforth, Inc. v. MotivePower, Inc.*,
  636 Fed. App'x 575 (Fed. Cir. 2016) ..............................................44

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ..................................................50

*Emera-Chem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
  859 F.3d 1341 (Fed. Cir. 2017) ........................................ 34, 35, 36, 63

*Henny Penny Corp. v. Frymaster LLC*,
  938 F.3d 1324 (Fed. Cir. 2019) ..................................................34

*In re Enhanced Security Research, LLC*,
  739 F.3d 1347 (Fed. Cir. 2014) ..................................................52

*In re Fine*,
    837 F.2d 1071 (Fed. Cir. 1988) ..........................................................46

*In re Fulton*,
    391 F.3d 1195 (Fed. Cir. 2004) ..........................................................49

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ..........................................................32

*In re Gorman*,
    983 F.2d 982 (Fed. Cir. 1991) ............................................................52

*In re Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) ........................................... 43, 44, 63

*In re Lintner*,
    458 F.2d 1013 (CCPA 1972) ......................................................... 45, 46

*In re Magnum Oil Tools Int'l, Ltd.*,
    829 F.3d 1364 (Fed. Cir. 2016) ........................................... 35, 36, 66

*In re NuVasive, Inc.*,
    842 F.3d 966 (Fed. Cir. 2016) ............................................................34

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) ..........................................................43

*Koninklijke Philips N.V. v. Google LLC*,
    948 F.3d 1330 (Fed. Cir. 2020) ..........................................................36

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ...........................................................................32

*LG Electronics, Inc. v. Immervision Inc.*,
    2021 Pat. App. LEXIS 5001 (PTAB May 11, 2021) ...........................34

*M&K Holdings, Inc. v. Samsung Elecs. Co., Ltd.*,
    985 F.3d 1376 (Fed. Cir. 2021) ..................................................... 36, 63

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017) ............................................................43

*Morall v. DEA*,
412 F.3d 165, 178 (D.C. Cir. 2005) ....................................................64

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...............................................................................44

*OSI Pharmaceuticals, LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ............................................................32

*Pers. Web Techs., LLC v Apple, Inc.*,
848 F.3d 987 (Fed Cir. 2017) ....................................................... 31, 62

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ......................................... 44, 45, 48, 50

*Pride Mobility Prods. Corp. v. Permobil, Inc.*,
818 F.3d 1307 (Fed. Cir. 2016) ............................................................62

*Princeton Vanguard, LLC v. Frito-Lay North Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) ....................................................... 63, 65

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) ....................................................... 63, 65

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ............................................................32

*SAS Inst. Inc. v. Iancu*,
138 S. Ct. 1348 (2018) .........................................................................36

*Sirona Dental Sys. GmbH v. Institut Straumann AG*,
892 F.3d 1349 (Fed. Cir. 2018) ............................................................33

*Spectralytics Inc. v. Cordis Corp.*,
649 F.3d 1336 (Fed. Cir. 2011) ............................................................47

*Synopsys, Inc. v. Mentor Graphics Corp.*,
   814 F.3d 1309 (Fed. Cir. 2016) ..................................................... 42, 65

*Trivascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ...........................................................49

## Statutes

28 U.S.C. § 1295(a)(4)(A) ...........................................................................4

35 U.S.C. § 141(c) .......................................................................................4

35 U.S.C. § 319 ...........................................................................................4

5 U.S.C. § 706(2)(A) ..................................................................................62

5 U.S.C. § 706(2)(E) ..................................................................................62

## Regulations

37 C.F.R. §42.23(b) ...................................................................................34

## Other Authorities

https://www.kerry.com/about/our-company/expertise/clean-label/
   clean-label-preservation.html ...................................................................1

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '304 | U.S. Patent No. 11,071,304 (at issue) (Appx616-623) |
| APA | Administrative Procedure Act |
| FFP | Florida Food Products (Petitioner) (Appellee) |
| FWD | Final Written Decision (04/26/2023) |
| Hara | U.S. Patent No. 3,911,146 to Hiramasa Hara et al. (Ground I) |
| ID | Decision Granting Institution of IPR (04/26/2022) |
| IPR | *Inter Partes* Review |
| Kerry | Kerry Group Services Int'l Ltd. (Patent Owner) (Appellant) |
| Kurihara | JPS48-082054 to Michihiko Kurihara et al. |
| l. | line |
| ll. | lines |
| p. | page |
| pp. | pages |
| Petition or Pet. | FFP's Corrected Petition for *Inter Partes* Review (01/25/2022) |
| POPR | Kerry's Patent Owner Preliminary Response (01/27/2022) |
| POR | Kerry's Patent Owner Response (07/19/2022) |
| POSA or POSITA | person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| Reply | FFP's Reply Brief (10/11/2022) |
| Sur-Reply | Kerry's Sur-Reply (11/22/2022) |
| Voorde | BE1014557A6 to Dimitri Van De Voorde et al. (Ground I) |

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceedings below. Appellant is not aware of a case pending in any court directly affecting or affected by this appeal.

# INTRODUCTION

Appellant, Kerry, is a worldwide leader in food ingredient products. Kerry holds patents in several global markets in natural meat curing, including U.S. Patent No. 11,071,304 ("'304 patent") at issue, covering its innovative Accel™ technology. *See* https://www.kerry.com/about/our-company/expertise/clean-label/clean-label-preservation.html.

Prior to the '304 patent and Accel™, there was a long-standing need for a commercially viable process for preserving meat using a natural, plant-based product that did not introduce harmful nitrates from the plant into the meat, that did not use the plant's bacteria/organisms (which convert the nitrate to desired nitrite), and which eliminated problems inherent to prior processes. The '304 patent's solution is a "pre-generated" curing agent prepared via controlled conversion of the plant's nitrate to nitrite outside of the meat curing process. The curing agent is derived from *heat-treated plant material*, which then undergoes the conversion reaction using added organisms, and inactivation of the organisms when their job is done, all before the curing agent is applied to meat. A key to a consistently unique product, reflected in the '304 claims,[1] is the initial heat-treating step to reduce the

---

[1] The heat-treating step discussed throughout is recited in both of independent claims 1 and 5. Appx623. Kerry does not assert separate patentability of dependent claims 2-4.

plant's microbial load, and relying on added organisms—where amounts and other reaction conditions can be controlled—to convert the plant's nitrate to nitrite.

Appellee, FFP, markets a competing pre-generated curing agent, VegStable® Natural Cure, which it touts as a "clean label, functional alternative to synthetic chemical additives including sodium nitrite." FFP states it is proud of its "innovative research and product development capabilities — delivering uniquely natural, functional, and plant based ingredients to our customers." However, these "innovations" are based on Kerry's '304 patented technology.[2]

FFP filed its Petition for IPR shortly after issuance of Kerry's '304 patent. Ground I of FFP's Petition challenges claims 1-5 based on a combination of two patent documents, Voorde (BE1014557A6) and Hara (US3,911,146). Conceding that the critical claimed heat-treating step to reduce the microbial load is ***not*** disclosed in Voorde, the Petition relied on Hara's initial boiling/steaming (100ºC+) to arrive at the subject matter of the '304 claims, in contradiction of the express direction of Voorde not to heat the plant material to temperatures that excessively reduce the plant's natural enzymes and microbes required in Voorde's conversion reaction. This is the precise combination that was litigated by the parties below.

---

[2] Kerry commenced a patent infringement action in 2022 against FFP in the Federal Court of Canada with respect to FFP's sale of VegStable® products based on the Canadian counterpart to the '304 patent.

The PTAB's Final Written Decision ("FWD") found the '304 claims obvious, but markedly deviated from Ground I by finding that Voorde taught the key heat-treating step—despite the Petition's unequivocal concession to the contrary. In short, the PTAB asserted a new theory of unpatentability based on Voorde alone, neither set forth in the Petition nor addressed by the parties below.

Specifically, the PTAB's new theory of unpatentability erroneously cited to aspects of Voorde outside the Petition to allegedly teach the claimed heat-treating. Then, by its own admission, the PTAB improperly considered the actual ground in the Petition—Voorde+Hara—as an *alternative*, but its ex-Petition findings on Voorde tainted its analysis. Indeed, having erroneously found that Voorde taught the key step, the PTAB concluded that the combination did as well. But in its two-page cursory analysis, with its foregone conclusion in hand, the PTAB failed to make findings on motivation to combine, failed to address substantive arguments and evidence demonstrating a clear teaching away by Voorde, and used hindsight to recreate the prior art, all while making numerous findings unsupported by substantial evidence.

Fundamentally, the PTAB's decision was based on legal errors and findings unsupported by substantial evidence. It also fell well short of reasoned decision-making, was arbitrary and capricious, and failed to meet the standards imposed by the Administrative Procedure Act.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319. The PTAB issued its Final Written Decision in IPR2022-00006 on April 26, 2023. Kerry appealed on June 23, 2023.

## ISSUES PRESENTED

1.     Whether the PTAB legally erred in determining obviousness by asserting a theory of unpatentability outside the Petition, relying on aspects of the primary reference outside the Petition, providing no rationale to combine, failing to address an explicit teaching away, and relying on hindsight and findings not supported by substantial evidence. *See* Argument §§ I, II, *infra*.

2.     Whether the PTAB's analysis is arbitrary, capricious, otherwise not in accordance with law, and in violation of the APA. *See* Argument § III, *infra*.

## STATEMENT

### I.   BACKGROUND

#### A.   The '304 Patent

The '304 patent recognized a need "for a commercially viable process for preserving or curing meat" because prior processes lead to "variable curing of the meat" and "an inconsistent product." Appx618(1:18-30); Appx4568-4569(¶¶45-

47)).[3]  The '304 patent solved these problems with an innovative method of preserving meat using a specially derived, natural plant-based curing agent.  *See* Appx4557(¶25); Appx7415(¶34).

Meat curing is a specialized application of knowledge derived from chemistry, biology, biochemistry, and animal science among others, which continues to evolve as increased scientific knowledge has been translated into better ability to control the curing process.  Appx4559-4560(¶¶28-29).

Formation of cured meat in a consistent and uniform manner is dependent on multiple factors including the curing ingredients, time, temperature, and mixing or mechanical action applied to the meats.  *Id.*  There are also regulatory requirements ensuring toxicological and microbial safety.  *Id.*

Historically, saltpeter (potassium nitrate) was used to obtain the characteristic pink color and microbial pathogen protection of cured meats.  *Id.* The nitrate in saltpeter chemically reduced to nitrite, and nitrite was reduced to nitric oxide to react with the myoglobin and hemoglobin pigments in meat to, after cooking, produce the pink pigment known as nitrosohemochrome.  *Id.*

---

[3]  Kerry's expert Dr. Milkowski has over 44 years of experience in food and meat science, including 30 years in industry as a scientist with Oscar Mayer specializing in meat products, and more than 14 years as an Adjunct Professor in the Meat Science & Animal Biologics Discovery Program of the Department of Animal and Dairy Sciences at University of Wisconsin-Madison.  Appx336(n.3); Appx7404-7409(¶¶8-20); Appx4633-4637(CV)).

In the early 2000's, an approach to curing meat developed to fulfill consumer desires for products that do not utilize synthetic nitrite (sodium nitrite) to facilitate "clean labeling" and "natural" products. Appx4561-4564(¶¶32-36). This involved mixing the meat with a vegetable source of nitrate and a starter culture to convert the nitrate to nitrite directly on the meat ("*in situ*" curing). *Id.*

Prior to the '304 patent, no curing agent containing pre-generated plant-based nitrite was used by meat processors. Appx4565(¶38). While Voorde (Appx718-734) (relied on by FFP) and Kurihara (JPS48-082054) (Appx4661-4675) (considered during prosecution) disclose compositions obtained using the natural enzymes and microbes of fresh vegetables, such approaches were not practical (*e.g.*, slow), may have had safety risks, were inconsistent (*e.g.*, variable amounts of nitrate in the plant material; accumulation of microbial generated byproducts), and therefore were not pursued by meat processors. Appx4565(n.3); Appx4577(n.8); Appx4557-4558(¶26); Appx4582-4584(¶¶82-88); Appx4604-4605(¶128).

Accordingly, at the time of the '304 patent application in 2007, the industry continued to use synthetic nitrite, and research focused on resolving the problems of *in situ* curing for clean label products. Appx7410-7413(¶¶21-27); Appx4561-4564(¶¶31-37); Appx7411(¶23); *see* Appx332-340(§§_II.A-II.B). The '304 patent introduced innovative technology that, for the first time, provided meat processors

with a commercially viable pre-generated curing agent for clean label meat products—Kerry's Accel™ curing agent technology.

The curing agent used in the '304 claims includes (1) a plant-based nitrite derived from a plant material (a) having a minimum of 50 ppm nitrate and (b) having been *heat treated* to have a reduced microbial load relative to a naturally occurring microbial load of the plant material; and (2) an added inactivated organism capable of converting nitrate to desired nitrite during fermentation, before inactivation of the added organism. Appx4602(¶123); *see* Appx619('304_3:37-40). Claim 1 requires that the plant material has the reduced microbial load due to heat treating prior to adding the organism. Appx4602(¶123).

The '304 patent describes parameters for conducting the fermentation after the heat treatment, including pH, conversion temperature, salt concentration, and aeration. Appx619-21('304_3:41-4:36; 6:20-8:33). Different organisms are also described (Appx619('304_3:15-40)), with *M. varians* being used in each Example Appx620-622('304_5:55-10:52). The '304 patent also describes techniques for closely monitoring nitrite levels during the conversion, and then inactivating the added organism when a predetermined level of nitrite is reached. Appx619('304_4:33-45).[4]

---

[4] In contrast, as discussed below (pp.14-15, *infra*), Voorde only mentions an optional "starter culture" in a single sentence as an *addition* to the plant's

Heat treating the plant material to reduce microbial load prior to conducting the fermentation, per the '304 patent, advantageously provides a curing agent that gives meat products consistently unique and predictable flavor, smell, and/or color characteristics, which are expected by consumers and meat processors. Appx7442-7443(¶¶102-104); Appx4604-4607(¶¶127-131); Appx4630(¶181). FFP touts similar qualitative features of its VegStable® product.[5]

The claimed initial heat treating to reduce microbial load also goes against what was "normally done" when culturing food products. Appx7429-7430(¶¶63-66); *see* Appx350-352. For culturing food, a person of ordinary skill in the art ("POSA") would have been aware of numerous food fermentations where bacteria is added to *non-sterilized* (*i.e.*, not heat-treated) media, including *in situ* meat curing, natural cheese, traditional bread, cocoa processing, and sauerkraut. Appx7430-7431(¶¶67-70); Appx4469-4470(121:18-123:13). In contrast, the Examples of the '304 patent used plant material sterilized at 121ºC before adding the organism and before fermentation. *See, e.g.*, Appx620-621('304_5:64-6:2,

_____

uncontrolled amounts of enzymes/microbes which Voorde uses for the conversion reaction.

[5] FFP asserts VegStable® has "low-color impact, low turbidity and zero off notes" (Appx4677) and refers to its "innovative research and product development capabilities—delivering uniquely natural, functional, and plant based ingredients to our customers" (Appx4676). However, these "innovations" are based on Kerry's technology covered by the '304 patent. Appx4566-4566(¶42); Appx4606(¶130); Appx7443(¶104).

6:29-35, 6:63-7:2). Prior to the '304 patent, growing bacteria in a sterile medium was not used for food culturing, but for growing and observing a bacterial strain in a controlled environment. Appx7429-7430(¶66).

Moreover, heat treating was added to the '304 claims during prosecution for distinguishing Kurihara's use of fresh vegetables, and their endogenous enzymes and microbes used for nitrate to nitrite conversion, and low conversion temperature, as explained further below. *See* Appx4557-4558(¶26); Appx4594-4595(¶109); Appx4577(n.8); Appx4595(n.17); Appx4605(n.21); Appx4459(80:3-20); p. 11, *infra*.

Dr. Milkowski explained the science behind Kurihara's and Voorde's use of a low temperature to promote conversion and how the order of steps matters. When plant material is subjected to boiling/steaming, the medium is changed—cell proteins denature, cell structures break, and the naturally compartmentalized subcellular structures are destroyed, leaving a soup having everything mixed. Appx4470-4471(123:15-127:5). As Dr. Milkowski elaborated, the enzyme required by Kurihara and Voorde "falls apart" at high temperatures, rendering their conversion processes inoperable if subjected to initial boiling/steaming (Appx4470-4471(125:14-126:3)) and the "salts are breaking down and everything is leaching out and the cofactors involved in the reduction chemistry are diffusing away." Appx4471(126:10-127:5).

Accordingly, initial heat treating as claimed in the '304 patent cut against conventional wisdom of simply using a low temperature to promote conversion by the plant's native enzymes and microbes. Appx4459(80:3-20) (a POSA would have understood Voorde's temperatures to be "warm"; not heat treating).

The invention of the '304 patent has seen widespread adoption by the industry. *See* Appx4557(¶25); Appx7412(¶25); Appx7415(¶34) (quoting Appx7541, "[m]eat processors are now provided with an innovative vegetable juice powder containing pre-generated nitrite (natural source)").

Scientific research published after the filing of the '304 patent confirms that a pre-generated plant-based nitrite curing agent was considered innovative. Appx7413-7415(¶¶28-34); *see* Appx340-344(§_II.C). A dissertation by Dr. Djeri (Appx7486), published in 2010, investigated FFP's VegStable™ product. Appx7501. Dr. Djeri stated—three years after the '304 patent's filing—that "[m]eat processors are now provided with an ***innovative*** vegetable juice powder containing pre-generated nitrite (natural source)." Appx7541 (emphasis added).[6] Dr. Milkowski confirmed the industry's understanding at the time. Appx7413(¶28); Appx7415(¶34).

---

[6] The Djeri dissertation was not among the literature given to Dr. Baldwin by FFP for his "crash course" education in meat science and curing. *See* Appx7451-7452(17:8-19:19).

## B.    The '304 Patent Prosecution

The claims of the '304 patent were allowed after the PTAB reversed a rejection based on Fast (EP0805205A1) (Appx3423), which teaches how to totally eliminate nitrate and nitrite from polluted water and vegetables.  *See* Appx4584-4590(¶¶89-96).  Prior to the rejection based on Fast, the Office applied Kurihara (JP S48-082054) (Appx4661-4675) as the primary reference (Action, Aug. 10, 2017).  Appx1651-1653('304-File-History).

Kurihara disclosed converting plant-based nitrates to nitrite "using essentially the same process as Voorde."  Appx4582(¶82).  Both Kurihara and Voorde: (i) use the endogenous enzymes and microbes of fresh vegetables to make nitrite; (ii) use a low temperature (10ºC-50°C) to promote the conversion reaction; and (iii) recognized that excessive heating (*e.g.*, 70ºC) will stop the enzymatic/microbiological reaction.  *Compare* Appx4577-4581(¶¶74-78) *with* Appx4582-4584(¶¶82-88); Appx4605(n.21).

Kerry distinguished Kurihara by adding the claimed heat treating.  Appx1691-1693; Appx1729-1730; Appx1734-1736; *see* Appx4595(n.17).  The Office agreed and withdrew the rejection.  Appx1782.

## II.   PROCEEDINGS BELOW

### A.   The Petition

FFP's Petition sets forth four grounds of unpatentability, but only Ground I is before the Court.  Ground I challenges claims 1-5 based on a combination of Voorde (BE1014557A6) (Appx718-734) and Hara (US3,911,146) (Appx3507-3513).

Hara discloses a process of preserving the color of meat by applying to the meat so-called "water-soluble ingredients of vegetal matter" (vegetable juice containing plant nitrates) obtained by pressure or liquid extraction, where the meat's own enzymes convert the plant nitrate to nitrite.  *See* Appx4572-4575(¶¶63-71).  Voorde cites to and then departs from Hara (Appx720-723(Voorde_pp.1-4)), disclosing a process of preserving the color of meat by pre-converting plant nitrates present in fresh plant material to nitrite by "allowing the natural enzymatic and/or microbiological conversion processes to run their course for a certain period of time" (Appx726(Voorde_p.7)).  *See* Appx4576-4582(¶¶72-81).

In Ground I, FFP proposes significant modifications to the primary document, Voorde, based on disclosure of Hara and testimony of Dr. Baldwin (Appx624) to arrive at Kerry's claimed invention.  No claim construction issue was raised as to the heat-treating step.  The Petition read the '304 claims as requiring

sterilization temperatures of 100ºC or higher. This is the Petition ground and evidence that defined the IPR proceeding.

The Petition gave weight to the process aspects of the '304 claims. Kerry responded accordingly. The PTAB ultimately considered the claims in the same manner. The Petition treats the curing agent aspect of claim 1, and claim 5, as including method steps [c] to [f]. Appx87-92; Appx98. It argues that that Voorde would have been modified by a POSA based on Hara to arrive at the claimed curing agent. The actual Ground I set forth in the Petition and argued by FFP throughout the IPR required *modifying* Voorde's process by:

- first boiling/steaming (100ºC+) the vegetable material as in Hara,

- allowing the thus *heat-treated* vegetable material to cool to 50-60ºC (not disclosed by either reference), and

- adding starter culture at that temperature range of 50-60ºC (not disclosed by either reference).

*See* Appx89-90; Appx410-412; Appx675-676(¶¶123-24).

FFP's stated rationale for these modifications is "routine sanitization," relying on Dr. Baldwin and Hara's disclosure of an initial heating by boiling/steaming/etc. to 100ºC+ (which Hara undisputedly used for making juice, not reducing microbial load—e.g., Appx3511(Hara_5:13-14) ("9 ml juice were extracted by boiling")). Appx89-90. FFP interpreted the heat-treating step in

13

claim 1: "A POSITA would understand that this claim refers to blanching/heating/boiling/steaming the vegetable material …" as in Hara. Appx88.  So, while Hara's initial heating is not to "kill germs," the only rationale given in the Petition is Dr. Baldwin's testimony (Appx89-90), which was ultimately not adopted in the Final Written Decision.

The Petition relies on Voorde's single sentence of optional use of "starter culture" *in addition to* the plant's natural enzymes and microbes, for reducing nitrate to nitrite.  Appx89, citing Appx725(Voorde_p.6).  After discussing Hara's boiling/steaming, the Petition states:

> Thus, ***although the step of first heating, boiling, or steaming vegetables to kill germs was not explicitly stated in Voorde***, a POSITA would have found it obvious and routine to do, ***as evidenced by Hara***. … ***The combination*** merely adds the known step of heating the vegetable to predictably kill germs.

> So, ***after boiling the plant material as in Hara***, a POSITA would have found it obvious to let the plant material cool before adding starter culture, as instructed in Voorde.

Appx90, emphasis added, citation removed. Thus, the Petition ***concedes*** that the claimed heat-treating step to reduce the microbial load is ***not*** disclosed in Voorde, and relies on Hara for that step.

In the next paragraph, the Petition cites Voorde's preferred temperature range of 50ºC-60°C for stimulating conversion of nitrate to nitrite.  *Id.*  No starter culture was used in Voorde's Examples.  Voorde's low temperature heating, and

the Examples, are not heat treating to reduce the microbial load as claimed in the '304 patent, and the Petition concedes this; Voorde's heating is a different step unrelated to the '304 claims.

## B. Kerry's Preliminary Response

Kerry argued from its very first paper, Patent Owner Preliminary Response ("POPR"), that the Petition's proposed modifications to Voorde are unrealistic, not viable, and not obvious because: (1) Voorde teaches away from heat treating its fresh plant material to "kill germs," as this would kill the very same enzymes and microbes Voorde requires for its conversion (Appx175-180(§_VI.A.2)); (2) killing those enzymes and microbes would frustrate Voorde's purpose, fundamentally change its principle of operation, and render its process inoperable as intended (Appx180-183(§_VI.A.3-4)); and (3) FFP's rationale to "kill germs" is inconsistent with Hara and Voorde because the initial heating in Hara relied on by FFP was only performed to make juice (extract water-soluble ingredients from plants) and not for killing germs (Appx183-186(§_VI.A.5)). *See* Appx4591-4607(¶¶100-131).

Regarding Voorde's teaching away, Kerry explained (1) Voorde does not teach relying only on the optional starter culture to perform the conversion, let alone provide disclosure regarding its use (Appx4594(¶107)); (2) adding starter culture after "boiling" the plant material to "kill germs" and allowing the plant material to cool—two separate modifications proposed by FFP—would result in an

entirely new and different process neither contemplated nor suggested by Voorde (Appx4598(¶115)); (3) Voorde *promotes* the conversion reaction by heating to a low temperature (~52ºC), well below boiling/sterilization (100ºC+), for stimulating conversion but warns not to heat to a temperature which would "excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate into nitrite" (Appx4593(¶105); Appx4599(¶118); Appx4604(¶128); Appx725-726(Voorde_pp.6-7)); and (4) FFP ignored Voorde's explicit direction not to use a temperature that would excessively reduce the natural enzymes and microbes Voorde requires for its conversion (Appx4579-4580(¶76); Appx4597-4598(¶114); *see* Appx175-180(§_VI.A.2)).

Regarding FFP's heat-treating modification, Kerry explained (1) Hara taught heating for two distinct reasons at different times: (a) initially for extracting ingredients to make plant juice; and (b) end product sterilizing for storage (Appx4572-4575(¶¶63-69); Appx4600-4601(¶¶120-121)); (2) the Petition only relied on Hara's first heating (Appx4600(¶120); Appx89-90); and (3) Hara cannot suggest heat treating plant material prior to adding an organism because Hara neither discloses adding organisms (Appx4573(n.5)) nor discloses pre-converting plant nitrate to nitrite (Appx4575-4576(¶71); Appx4600-4601(¶¶120-121)).

The only way FFP could have arrived at Ground I was through improper hindsight, backtracking from the claims to try to find something related in the prior

art, which is exactly what FFP did in searching for the missing heat treating. *See* Appx166; Appx182-183.

## C.    The PTAB's Institution Decision

In its Institution Decision ("ID"), the PTAB noted that neither party raised an issue of claim construction for the heat-treating step in the '304 claims. Appx275-278.  The PTAB then addressed Ground I ("*D. Obviousness Over Voorde and Hara*") (Appx278), characterizing FFP's contention as "claims 1-5 … would have been obvious over the combined disclosures of Voorde and Hara.  Pet. 30-43." *Id.*

At Appx279-280, the PTAB summarized the parties' contentions as to the proposed ground, then found that "FFP has set forth a sufficient rationale why a person of ordinary skill in the art would have modified Voorde's process to use Hara's sterilization step."  Appx280.  In finding Voorde and Hara "compatible," the PTAB first misapprehended the Petition's Ground I:

> We do not, on this record, believe the two disclosures to be incompatible or that application of Hara would render Voorde's process inoperable. While recognize (*sic*) that Voorde warns against heating to 90°C as disclosed in Hara's sterilization process, we note that the heating of Hara is at a different point in the curing process than Voorde's heating. Specifically, Hara discloses heating prior to storage of the plant-derived solution, to sterilize it, whereas Voorde's heating step is during treatment, to encourage the nitrate conversion process. We do not understand combining these two heating steps into one process to be incompatible.

Appx280-281. Thus, as asserted in Kerry's Patent Owner Response ("POR"), instead of dealing with Kerry's position that Hara's initial boiling/steaming step would kill off Voorde's natural enzymes and microbes required for conversion, the PTAB side-stepped the issue by combining Voorde with Hara's *post-processing sterilization step*. Appx354-356. In view of the Petition ground where FFP conceded Voorde lacked the initial heat-treating step of claim 1, this new combination was legal error.

As a second reason, the PTAB further bungled the record in misreading Voorde's disclosure as suggesting that the natural microbes could be *replaced* by the starter culture ("We do not understand Voorde's disclosure to exclude processes in which the nitrite-generating microbes are added via starter culture, rather than naturally occurring in the plant material. Voorde does not express any preference for naturally-occurring microbes…." (Appx281). Voorde contains no such disclosure, only stating in one sentence that starter culture could be added *in addition to* the natural microbes. Appx725(Voorde_p.6) ("additional micro-organisms"). Even Dr. Baldwin conceded this point. Appx7469-7470(88:18-90:8).

In the ID, the PTAB gave no indication that it read the '304 patent as requiring anything other than heat treating according to Hara's end product sterilization, or that the proposed ground was anything other than *the combination* of Voorde and Hara.

### D. Kerry's Patent Owner Response

In the POR, Kerry maintained that FFP's rationale to "kill germs" does not support its proposed modification to initially boil/steam (100ºC+) Voorde's plant material, and goes against Voorde's express teaching away. Appx725-726(Vorde_pp.6-7); Appx7415-7423(¶¶35-49); *see* Appx347-374(§_III). Further, Kerry emphasized that FFP's grounds of unpatentability are critically rooted in the opinions of Dr. Baldwin in an area of science where Dr. Baldwin lacks the requisite competency. Appx7423-7431(¶¶50-72); *see* Appx331-346(§_II).

Kerry demonstrated that FFP proposes substantially rewriting Voorde, including a fundamentally different heating and cooling procedure, requiring (1) heating Voorde's fresh plant material to 100°C+ by boiling/steaming to kill germs (killing the plant material's enzymes/microbes); (2) cooling the sterilized material to 50°C-60°C; and (3) then adding starter culture *to replace the denatured enzymes and dead microbes*, resulting in a new process and product:

*What's Left From Voorde?*

Finely chop fresh spinach → <u>heat the spinach to 100°C+ by boiling/steaming to kill germs thereby killing the natural enzymes/microbes → allow the *sterilized* spinach to *cool* to 50°C-60°C →</u> ~~optionally~~ add starter culture to the ~~natural enzymes/microbes of the fresh~~ <u>sterilized/cooled</u> spinach → ~~heat the spinach to 52°C over a time period of 3 hours and~~ hold <u>the cultured spinach at 50°C-60°C</u> for 2 hours → remove from heat and keep at room temperature for 19 hours → ~~use or optionally~~ sterilize an end product.

Appx349; *compare* Appx676(¶124) *with* Appx725-728(Voorde_pp.7-10); *see* Appx7432-7433(¶¶73-74).

Kerry showed how FFP relied on Dr. Baldwin's opinions as a rationale for the modifications (rather than disclosures in Voorde and Hara), which are not based on his expertise or first-hand knowledge, but on a simplistic and unscientific statement: "washing and heating, boiling, or steaming the vegetable would be as common as washing one's hands before cooking a meal—a matter of routine sanitization." Appx674(¶119); Appx665(¶¶97-98); *but see* Appx7416-7431(¶¶36-72).

During cross-examination, Dr. Baldwin could not point to a basis in Voorde, Hara, or any other document for heat treating Voorde's plant material. Appx7475-7477(111:7-118:22). Instead, Dr. Baldwin asserted that sterilizing a medium prior to inoculating with a microorganism is simply what was "normally done"—a clearly erroneous understanding as Dr. Milkowski testified. *See* pp. 8-10, *supra*. Dr. Baldwin's ignorance was not surprising, given his lack expertise in this technology. For example, Dr. Baldwin was not aware of *in situ* curing prior to being retained by FFP's counsel for this proceeding (Appx7473(102:7-21)); never performed culturing (Appx7476(114-8:11)); and admitted he lacks the requisite knowledge and expertise in the areas of food and meat science (Appx7454-7457(28:18-21; 30:19-31:11, 32:7-33:9 ("my focus is synthetic chemistry" which

he expressly admits is *not the field of the '304 patent*); 37:12-39:6 ("I'm not a food scientist. There's no question about that.")); Appx7480-7481(132:8-133:1, 135:10-17)). *See also* Appx332-338(§_II.A).

Kerry's evidence showing the nonobviousness of Ground I's modifications included:

### 1. Selecting Hara's Heating for Making Juice

Hara teaches initial mechanical processing (chopping, shredding, centrifuging) with optional additional heating (boiling/steaming) for the purpose of *making plant juice*; not for killing germs. Appx3509-3510(Hara_2:5, 3:11, 3:14, 5:14, 5:48-49); Appx7417-7419(¶¶39-43); *see* Appx357-359. However, Hara and Voorde both teach an option of *end product sterilization*. Appx3509(Hara_1:59-2:4); Appx726(Vorde_p.7); Appx7417-7418(¶¶39-41); *see* Appx353-356. FFP ignored these undisputed facts in selecting from Hara the initial boiling/steaming *for killing germs* based on the testimony of Dr. Baldwin. Appx88-91; *see* Appx4574-4575(¶¶68-69).

### 2. Initially Sterilizing Voorde's Plant Material

The Petition, Dr. Milkowski *and* Dr. Baldwin all agreed that Voorde does not disclose initially heat treating its fresh plant material in the manner of the '304 patent (Appx90; Appx7470(91:21-92:6); Appx7472(98:1-11); Appx7419-742(¶¶44-48)), yet Ground I requires boiling/steaming (100ºC+) to kill germs for

"routine sanitization" (Appx88-91). This modification lacks merit because FFP

and the PTAB failed to address the teachings of the prior art as a whole, including

undisputed facts that confirm Voorde's teaching away:

a) Voorde had a full understanding of Hara's disclosure, *citing to Hara*

*seven times* at pages 1-4 (Appx720-723), explaining its drawbacks and

its failure to preserve the red color of meat because Hara did not

convert plant nitrates to nitrite (Appx7418-7419(¶¶42-43); *see*

Appx358-359(§_III.C.2));

b) Voorde discloses preparing the plant material using the same types of

initial mechanical comminution steps as Hara (*compare*

Appx724(Voorde_p.5) *with* Appx3509(Hara_2:5-11)); but Voorde—

well aware of Hara—has no mention of an initial heating (Appx7418-

7419(¶43); *see* Appx359(§_III.C.3));

c) Voorde teaches that its low temperature is *for promoting and*

*stimulating* the conversion reaction (Appx725-726(Voorde_pp.6-7);

Appx7419-7421(¶¶44-46); *see* Appx359-361(§_III.C.4));

d) Voorde expressed "more than a mere preference" for the natural

enzymes/microbes, by *explicitly directing* that the heating must not

excessively reduce the natural enzymes and microbes required for

conversion  (Appx726(Voorde_p.7); Appx7421(¶¶47-48); *see* Appx359-361(§_III.C.4); Appx366-369(§_III.C.8));

e) Voorde teaches the optional starter culture is additional (*i.e.*, extra or supplementary) to the natural enzymes and microbes, and not a replacement (Appx725(Voorde_p.6 ("Optionally, additional microorganisms or, in other words, starter culture can be added")); Appx7422(¶49); *see* Appx362-363(§_III.C.5));

f) All of Voorde's Examples started with "fresh" (unheated) plant material (Appx727-729(Voorde_pp.8-10); AppxAppx7418-7420(¶¶43, 46); *see* Appx364(§_III.C.6)); and

g) ***Accordingly, Voorde, when read as a whole, purposely excluded Hara's initial heating step, which confirms the teachings away*** (Appx7420-7421(¶¶46-48); *see* Appx364-366(§_III.C.7)); *see* Argument § II-D, *infra*.

### 3.     *A New Cooling Procedure Not Found in Voorde*

Voorde discloses heating fresh vegetables *up to* an optimal temperature (*e.g.*, ~52ºC) to promote the conversion of nitrate to nitrite.  Appx725-726(Voorde_pp.6-7) ("the conversion of nitrate into nitrite is *promoted* by carrying it out at least partially at a temperature higher than 20°C [and] preferably *further stimulated* by heating to … a temperature higher than 50°C); Appx727-728(Voorde_pp.8-9

23

("The whole was heated to 52ºC")); *see* Appx359-361(§_III.C.4). However, FFP's modification requires excessively heating well past this temperature (100ºC+), and then *cooling* the sterilized vegetables down to Voorde's 52ºC for adding the starter culture. Appx90. However, no intermediate cooling procedure is disclosed in Voorde; this new step comes only from Dr. Baldwin. Appx7419-7420(¶44); Appx7423(¶50).

### 4.    *Selecting the Optional Starter Culture*

Voorde undisputedly *requires* the endogenous plant enzymes/microbes for conversion (Appx4577-4579(¶¶74-75, p.31.n9); Appx7420-7421(¶46); Appx7431(¶72)), and undisputedly discloses the optional starter culture is for use *in addition to* the endogenous enzymes/microbes; not a replacement (Appx725(Voorde_p.6) ("Optionally, additional microorganisms … can be added"); Appx7420-7422(¶¶46, 49); *see* Appx362-363(§_II.C.5)), yet the Petition's modification sterilizes Voorde's plant material and uses the starter culture alone (Appx90 ("after boiling the plant material as in Hara, a POSITA would have found it obvious to let the plant material cool before adding starter culture")).

### 5.    *Selecting an Optional Sterilization of the End Product*

Ground I requires—in addition to adding an initial sterilization—selecting an optional sterilization of the end product to inactivate the added microbes.

Appx91-92. Both Voorde and Hara teach optionally sterilizing the *end product* (Appx3509(Hara_1:59-2:4); Appx726(Vorde_p.7)), and it is undisputed that end-product sterilization would satisfy a need for routine sanitization—another point ignored in the Petition, and the FWD, demonstrating clear hindsight. Appx7417-7418(¶¶40-41); *see* Appx353-356(§_III.B).

Much of Dr. Milkowski's testimony in the IPR is essentially unrebutted because FFP filed no counter-evidence with its Reply.

### E.    FFP's Reply and Kerry's Sur-Reply

FFP confirmed in its Reply that "starting with a sterile medium" "was part of the Hara reference that the Petition combines with Voorde." Appx410-411; *see also* Appx411 ("heating to sterilization as taught by Hara to reduce the pre-existing microbial load before adding the starter culture would have been obvious."). As in the Petition, the Reply never urged that Voorde alone rendered the claims unpatentable, and specifically cited Hara for "heating to sterilization." *Id*.

FFP further asserted that Voorde does not teach away from the '304 claims merely because Voorde discloses a "preference for temperatures lower than boiling." Appx416-418(§_II.B.3). FFP did not address Voorde's explicit direction that the temperature must not "excessively" reduce the natural enzymes and microbes, which is not a preference but a clear directive.

In its Sur-Reply, Kerry again demonstrated: (1) Voorde teaches not to excessively heat and to use the starter culture as a supplement (not a substitute) (Appx440-441); (2) Hara's first heating is not for killing germs (Appx441-443); (3) Dr. Baldwin is not qualified (Appx446-449), and his rationale to kill germs for "routine sanitization" is not found in Hara (or Voorde) and is objectively incompatible with Voorde's disclosure (Appx443-446); (4) optionally sterilizing the end product is taught by Voorde and Hara's second heating and is sufficient to meet a need for routine sanitization (Appx451), so why would a POSA do that at the beginning and end of the process?; and (5) Dr. Milkowski testified a POSA following Voorde and adding its optional starter culture "would start with the raw vegetables, add the starter culture, and then start warming it up [to 52ºC]." Appx453-454 (citing Appx4471(128:14-129:5)).

At no time before the Final Written Decision did FFP or the PTAB assert (1) unpatentability based on Voorde alone; (2) Ground I can be read as not requiring Hara's boiling/steaming for the heat-treating step; or (3) Voorde alone satisfies that step.

## F.     The PTAB's Final Written Decision

The Final Written Decision addressed FFP's contention the '304 claims "would have been obvious over the combined disclosures of Voorde and Hara." Appx15-23(§_II.E).  Voorde and Hara are then discussed.  Appx15-16.

Regarding Voorde, the PTAB stated:

> Multiple methods of conversion are disclosed, including "allowing the natural enzymatic and/or microbiological conversion processes to run their course" **_or_**, optionally, "additional micro-organisms or . . . so-called starter cultures can be added for this purpose."

Appx15 (emphasis added). However, to the extent other conversion methods are disclosed, the Petition only relied on Voorde's natural enzymatic and/or microbiological conversion process. Appx88-91; *see* pp. 12-14, *supra*. Moreover, Voorde only discloses adding a starter culture *in addition to* the natural enzymes and microbes, not in place of them. Appx725(Voorde_p.6); *see* pp. 22-23, *supra*.

The FWD described Voorde's heating to stimulate conversion of nitrate to nitrite to a temperature higher than 50ºC, but noted:

> Voorde warns against heating higher than 80ºC, however, to avoid excessively reducing the enzymatic and microbiological conversion processes. *Id*. at 7.

Appx15-16. While giving lip service to this warning and adverse consequences, in its obviousness analysis several pages later the PTAB never mentioned Kerry's "teaching away" arguments and unrebutted evidence.

In discussing Hara, the FWD referenced Hara's sterilization of the *end product* (Appx16, citing Appx3509(Hara_1:59-64)), as opposed to Hara's *initial high-temperature heating* on which the Petition relied to make up for Voorde's conceded lack of disclosure of that step (*see* pp. 13-15, *supra*). This ex-Petition

reference to Hara's final sterilization step was similar to the characterization in the ID, pp. 17-18, *supra*.

The PTAB then summarized the parties' contentions on 'Reason to Combine.' Appx16-18. However, the PTAB's statement that a sterile medium is not part of Ground I's combination is at odds with FFP's actual position. *Compare* Appx17-18 *with* Appx410-411. The PTAB's understanding of the Petition/Reply and their reliance on Hara was simply not in line with FFP's assertions.

In its merits analysis, rather than address FFP's Ground I (Voorde combined with Hara, with Hara supplying the heat-treating step conceded to be missing from Voorde) and Kerry's extensive argument and evidence developed throughout the proceeding, the PTAB first relied on *Voorde alone*. Appx18-19(("Upon review…")_p.18, l.13-p.19, l.14). While the PTAB argued that it wasn't clear if Ground I relied on Hara (Appx19(ll.13-24)), the Petition plainly undermines that concept. Indeed, the Petition *conceded* that the heat-treating step of the '304 claims is not disclosed in Voorde, and *combined* Hara's high-temperature initial heating to fill that void. Appx88-91; pp. 13-14, *supra*. Despite the Petition's concession, the FWD found that Voorde teaches the heat-treating step of claim 1. Appx18(ll.13-15); Appx19(ll.14-24). The PTAB clearly read the claims as reading on heating to *any temperature* resulting in at least some reduced microbial load, including Voorde's low temperature conversion reaction at preferred 50ºC-52°C.

Appx18(ll.14-17).[7]  But this is not the proposed ground in the Petition, nor the one litigated by the parties prior to the FWD.

Making clear it considered the Petition's theory an *alternative* to its new theory based on Voorde alone ("Even if we were to interpret FFP's combination of Voorde with Hara to require heating to 100°C …" (Appx19(ll.25-26)), the PTAB concluded that a POSA would have combined Voorde and Hara as FFP suggested. Kerry contends below that this conclusory analysis (Appx19-20) was rife with legal error and fact-findings not supported by substantial evidence.  Unlike the ID where the PTAB side-stepped Voorde's teaching against heating to high temperatures so as not to excessively reduce the natural enzymes and microbes, by looking to Hara's final sterilization step and not its initial boiling/steaming step relied on in the Petition (pp. 17-18, *supra*), in the FWD the PTAB simply ignored not only Voorde's explicit warning but also Kerry's extensive argument and evidence.  Appx19-20.  And, in its "even if" analysis, the PTAB again misread Voorde: "Voorde explicitly discusses the use of a starter culture, which would have replaced any microbes destroyed by Hara's sterilization."  Appx20(ll.2-3).

---

[7]  The PTAB at Appx18(n.13) unfairly asserts that Kerry made a claim construction argument for the first time at oral hearing.  That is a distortion of the transcript.  Kerry's counsel merely responded to questions from the panel.  Appx527-528; Appx554-555(*see* 61:1-7).  The Petition made clear Voorde's low-temperature conversion heating did not meet the claims, and Kerry addressed this proposed ground of unpatentability.

However, Voorde only discloses optional addition of starter culture to *supplement* the endogenous flora, not as a replacement.  Appx725(Voorde_p.6)

The PTAB's summary of Voorde and Hara in combination (Appx21) relies on *both* Voorde and Hara to satisfy the heat-treating step of claim 1 (Appx21(ll.16-17)).

The PTAB declined to consider Grounds 2, 3, and 4 of the Petition. Appx23.

## SUMMARY OF ARGUMENT

I.      The PTAB asserted a new theory of unpatentability, relying on Voorde alone, citing to ex-Petition aspects of Voorde to allegedly teach the critical heat-treating step in the claims, despite the Petition's unequivocal concession that Voorde lacked that step.  These aspects infected the analysis of the actual ground set forth in the Petition, tainted the result, and violated the APA.

II.      The PTAB improperly considered the actual ground in the Petition—Voorde+Hara—as an alternative.  In doing, over two pages it failed to make findings on motivation to combine the references, failed to address substantive arguments and evidence demonstrating clear teaching away by Voorde, used hindsight starting from the '304 claims to recreate the prior art, and made numerous findings unsupported by substantial evidence.  The PTAB's determination of obviousness was clearly and erroneously influenced by its ex-

Petition finding that Voorde taught the critical heat-treating step, when the Petition asserted the opposite.

III.     The PTAB fell short of the standards imposed by the Administrative Procedure Act.  It incorrectly analyzed the ground of unpatentability in the Petition, and asserted  new theories.  It repeatedly ignored relevant evidence, failed to make findings and consider evidence, ignored a central argument of teaching away, and made numerous findings unsupported by substantial evidence.  In short, the PTAB's rationale fell well short of reasoned decision-making, and was arbitrary and capricious.

## ARGUMENT

### I.     THE PTAB'S NEW THEORY OF UNPATENTABILITY WAS CLEAR LEGAL ERROR, AND INFECTED ITS ANALYSIS OF ACTUAL GROUND I

The PTAB impermissibly went outside the confines of the Petition's Ground I—the combination of Voorde and Hara, with Hara supplying the heat-treating step of the '304 claims, the Ground litigated below.

#### A.     Standard of Review

This Court reviews the PTAB's legal determinations de novo, and the PTAB's factual findings underlying those determinations for substantial evidence. *Pers. Web Techs., LLC v Apple, Inc.*, 848 F.3d 987, 991 (Fed Cir. 2017). Obviousness is a question of law based on underlying factual findings, which are

reviewed for substantial evidence. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (*citing KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B*., 305 U.S. 197, 229 (1938). "[T]he substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *OSI Pharmaceuticals, LLC v. Apotex Inc*., 939 F.3d 1375, 1381-82 (Fed. Cir. 2019) (quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)). "What the prior art teaches, whether a person of ordinary skill in the art would have been motivated to combine references, and whether a reference teaches away from the claimed invention are questions of fact." *Apple Inc. v. Samsung Elecs. Co*., 839 F.3d 1034, 1047-48 (Fed. Cir. 2016) (en banc). The same standards apply to the following § II as well.

### B.   The PTAB Introduced And Relied On A New Theory Of Unpatentability—Voorde Alone

The Petition took the unqualified position that Voorde did not teach heat treating the plant material as recited in the '304 claims: "***although the step of first heating, boiling, or steaming vegetables to kill germs was not explicitly stated in the Voorde*** …". Appx90 (emphasis added); pp. 13-14. *supra*. The Petition cited

Hara's boiling/steaming (100°C+) to make the combination. Appx89-90.

However, as the PTAB recognized (Appx19), that the Petition relied on a *combination* of Voorde and Hara cannot seriously be disputed. Appx88-91; pp. 12-15, *supra*. The ID had followed suit (Appx280(ll.22-24); pp. 17-18, *supra*), as did FFP's Reply brief (Appx410-411; pp. 25-26, *supra*). Accordingly, the combination of Voorde and Hara in the manner of the Petition—with Hara supplying the initial heat treating concededly absent from Voorde—is the precise proposed ground addressed by Kerry in its POR (Appx347-349(§_III.A); pp. 19-24, *supra*) and its Sur-Reply (Appx433-436(§_II.A); pp. 25-26, *supra*).

It is well settled that "the petitioner's contentions … define the scope of the litigation …." *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018). New theories of unpatentability in the Reply and/or by the PTAB are not permitted. Despite the present record, after summarizing its view of the parties' positions (Appx16-18), the FWD asserted a new theory based on *Voorde alone*, purporting to rely on Voorde's 50-52°C heating as a disclosure of the heat-treating step to reduce the microbial load (Appx18-19). This new theory was in direct contradiction of the Petition's concession that Voorde did not disclose the step of first heating, boiling, or steaming vegetables. Appx90. Under IPR practice, reliance on portions of a reference not cited in the Petition to fulfill a challenged claim feature is not permissible. *Ariosa Diagnostics v. Verinata*

*Health, Inc.*, 805 F.3d 1359, 1367-68 (Fed. Cir. 2015); *Emera-Chem Holdings,*

*LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1351-52 (Fed. Cir. 2017);

*LG Electronics, Inc. v. Immervision Inc.*, 2021 Pat. App. LEXIS 5001, *38-40

(PTAB May 11, 2021).

> This Court has prohibited new theories and evidence, not in the Petition:
>
> Because of the expedited nature of IPR proceedings, "[i]t is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'" Accordingly, an IPR petitioner may not raise in reply "an entirely new rationale" for why a claim would have been obvious.

*Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330-31 (Fed. Cir. 2019)

(internal citations omitted).  Late shifting of positions violates a Patent Owner's

due process rights under the APA because the Patent Owner has no opportunity to

respond with counter-evidence to an improper Reply rationale and/or evidence.

*Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015); *In re*

*NuVasive, Inc.*, 842 F.3d 966, 971 (Fed. Cir. 2016) ; 37 C.F.R. §42.23(b).

Although the above paragraph deals with improper Reply positions, even

greater harm is suffered where the PTAB's FWD deviates from the Petition's

theories, because the case is over.  Reliance on Voorde as teaching the critical

heat-treating step in the FWD was both legal error and an APA violation.

Indeed, the "Board must base its decision on arguments that were advanced

by a party, and to which the opposing party was given a chance to respond." *In re*

*Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (reversing obviousness determination); *Emera-Chem*, 859 F.3d at 1348 (noting that the APA imposes particular procedural requirements on the USPTO regarding timely notice and the opportunity to respond to matters of fact and law). In *EmeraChem*, 859 F.3d at 1350-52. the PTAB's reliance on a prior art reference that was unasserted for meeting a particular limitation was error, even though the passage from the reference that the PTAB relied on for disclosing the limitation had been block quoted in the petition and institution decision, in a different context. That is precisely the case here, because while the Petition mentioned Voorde's low-temperature heating in a different context—as promoting the conversion reaction—*it did not assert that passage as meeting the heat-treating step in the '304 claims*. *See* pp. 14-15, *supra*.

In *M&K Holdings, Inc. v. Samsung Elecs. Co., Ltd.*, this Court held that the PTAB erred in finding a claim was anticipated when the petitioner asserted only an obviousness theory, because the PTAB's decision was a "marked deviation" from the invalidity theory set forth in the petition. As here, Samsung's petition had conceded that the reference did not disclose the limitation at issue; the proposed ground of unpatentability was an obviousness *combination*. The ex-petition anticipation finding deprived the patent owner of notice and an opportunity to

respond to the anticipation theory, and the PTAB's holding that the claim was unpatentable was vacated. 985 F.3d 1376, 1383-86 (Fed. Cir. 2021).

Here, the PTAB's "Voorde alone" unpatentability theory (Appx18-19) was not raised in the ID or at any time before the FWD (pp. 17-18, 28-30, *supra*). *See Emera-Chem*, 859 F.3d at 1348, 1350-52. Therefore, the FWD's obviousness determination was reversible error because Kerry had no notice or opportunity to respond. *See Magnum Oil Tools*, 829 F.3d at 1380-81. The PTAB's unilateral modification of Ground I using Voorde, not Hara, to purportedly meet the heat-treating limitation, was not the ground addressed by Kerry, but was a new ground of unpatentability "never presented by petitioner and not supported by record evidence." *Id.* at 1381; *see also Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1334-36 (Fed. Cir. 2020) (The PTAB erred by instituting the IPR on a new ground not in the petition and carrying the new ground through to the final written decision; the statutory language gives the PTAB the power to initiate an IPR only on the basis of an underlying petition. Citing *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018), the court noted that "it's the petitioner, not the Director, who gets to define the contours of the proceeding."). Likewise, the PTAB cannot inject a new theory for the first time in the FWD. *Emera-Chem*, 859 F.3d at 1348, 1350-52.

As shown below, the PTAB's improper reliance on Voorde as purporting to teach the heat-treating step, in contrast to the Petition's reading of the '304 claims and its concession that Voorde does not disclose that step (thus relying on Hara), carried over to and tainted its analysis of the actual proposed Ground I.

## C. The PTAB's New Theory Is Not Supported By Substantial Evidence

While Kerry was never afforded an opportunity to present argument and evidence against the PTAB's new theory, relying on Voorde alone as teaching the heat treating is contrary to the undisputed evidentiary record.

As best understood, under the PTAB's theory, a POSA would heat the vegetable material up to Voorde's temperature of 50ºC-60ºC, and then add starter culture.[8] There is no evidence supporting this interpretation. To the contrary, the record evidence, including Dr. Milkowski's unrebutted testimony, demonstrates that a POSA desiring to use Voorde's optional starter culture would mix the starter culture with the vegetable and heat the whole up to 50ºC-60ºC. Appx7420-7423(¶¶46, 49); Appx4471(128:14-129:5).

Additionally, Dr. Milkowski testified without opposition that 52ºC is warm, but is not heat treating according to the '304 patent. Appx4459(80:3-20); *supra*

---

[8] In contrast to FFP's Ground I, which heats according to Hara (boiling/steaming) and then cools to Voorde's promoting temperature of ~52ºC. *See* pp.13-14, 19-20 *supra*.

pp. 9-10. Thus, the PTAB's finding that Voorde teaches the heat-treating requirement of the '304 claims (Appx18.ll.14-17) is not supported by substantial evidence.

Accordingly, in addition to being contradictory to the Petition, the PTAB's key finding is unsupported by substantial evidence.

## II. THE PTAB'S 'EVEN IF' ANALYSIS WAS FLAWED FOR MULTIPLE REASONS

Following its new theory, the PTAB considered the actual Voorde+Hara Ground, but this analysis was riddled with legal errors and findings unsupported by substantial evidence.

### A. Standard of Review

*See* Argument § I.A., pp. 32-33, *supra*.

### B. The PTAB's Ex-Petition Reliance On Voorde Infected The Analysis Of The Actual Ground In The Petition

The PTAB then considered, *in the alternative*, the actual ground set forth in the Petition—*the combination* of Voorde in view of Hara, where Hara supplied the missing heat-treating step at 100°C+—but intermingled its own APA-violating view of Voorde as teaching the heat-treating step. This finding about Voorde—in the face of the Petition's explicit concession of Voorde's lack of disclosure of the step—gave the PTAB easy license to find obviousness, when the evidence demanded otherwise.

The PTAB's analysis of 'reason to combine' Voorde and Hara largely consists of two paragraphs beginning at the bottom of FWD page 19, leading off with "Even if …." Appx19(l.25).  This clearly signifies an *alternative* ground from the just-prior Voorde-alone analysis.  In the "even if" analysis, the PTAB, among other errors discussed below, carried forward its failure to adhere to the Petition's critical concession that Voorde fails to disclose that "***the step of first heating, boiling, or steaming vegetables ….***"  Appx90.

The infection is first evident from the finding that, "[a]t the very least, the skilled artisan would have looked to Hara as evidence that pre-treatment using heat could be beneficial to reduce microbial load, *a disclosure confirmed by Voorde*." Appx20(ll.17-19) (emphasis added).

The infection is further evident where the PTAB summarized its findings regarding "Voorde and Hara in Combination" in a similar manner, finding "that *both Voorde and Hara disclose heating a plant material which would result in the material having a reduced microbial load ….*" Appx21(ll.16-17) (emphasis added).

Both of these findings clearly contravene the Petition's concession that Voorde lacks the claimed step, and creates a ground of unpatentability not litigated below.[2]

Putting aside the below-discussed lack of substantial evidence supporting these findings, p. 60 Finding-16 and pp. 61-62 Finding-20, *infra*, the PTAB failed to carry out the basic obviousness analysis requiring it to compare the disclosure of Voorde to the claimed invention and identify the differences. Here, the Petition's contentions mandated a finding that Voorde does not disclose the heat-treating step, and then ***look only to Hara*** to determine whether the modification(s) to Voorde would have been obvious in view of the record evidence. This was not done. Instead, the PTAB invoked its ex-Petition reliance on Voorde twice in the "even if" analysis. The overall obviousness analysis was tainted for this basic reason, because the PTAB's improper finding that Voorde taught the critical heat-treating step was a foregone conclusion and pre-ordained the result.

---

[2] *See* pp. 32-37, *supra*. Hara never discussed pre-heat-treatment "to reduce microbial load," but instead used its initial heating for extracting juice. And the Petition never cited Voorde as teaching the claimed heat-treating step. These findings also ignore the undisputed record that Hara and Voorde disclosed optional heating of the *end product* for sterilization, which cuts against initial sterilization— a foundation of the proposed ground of unpatentability.

## C. The PTAB Never Provided A Sound Rationale To Combine

The PTAB *never addressed the rationale or motivation to combine Voorde and Hara in the manner of the Petition*. Appx15-22. Instead, the "even if" analysis *simply assumes* they are combinable, without a rationale as to why, and in the face of an explicit teaching away in Voorde not addressed by the PTAB.

First, the PTAB stated: "Even if we were to interpret FFP's combination of Voorde with Hara to require heating to 100°C, we disagree that this modification would be inconsistent with Voorde or destroy its intended purpose, as Kerry argues. PO Resp. 34-46." Appx19-20(p.19,l.23-p.20,l.2). This wipes out 12 pages of detailed arguments and unrebutted evidence in the POR in one stroke of the pen. Why wouldn't it be inconsistent with Voorde, when Voorde instructs "*not to excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate into nitrite*"? Appx725(Voorde_p.6) (emphasis added). Why wouldn't it destroy Voorde's intended purpose of using the natural enzymes and microbes for the conversion of nitrate to nitrite? No findings were made.

It is undisputed that initially heating the plant material to 100°C+ would indeed *excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate into nitrite*, in direct contrast to Voorde. Appx20(ll.2-3); Appx4592-4598(¶¶103-114). The PTAB never mentioned this

critical passage from Voorde (Appx726(Voorde_p.7)) in its "even if" analysis, let alone provide a sound rationale for combining the references as in Ground I.

The PTAB then found:

> At the very least, the skilled artisan would have looked to Hara as evidence that pre-treatment using heat could be beneficial to reduce microbial load, [a disclosure confirmed by Voorde.]

Appx20(ll.17-19).

This is not a reason to combine Hara with Voorde. Hara says nothing about performing initial heating to "reduce microbial load," and the PTAB never explained *how* Hara's boiling/steaming squares with and fits into Voorde's process. In fact, in the FWD, the PTAB stated:

> In addition, Hara could have been relied upon for its disclosure of full sterilization by boiling, followed by cooling prior to the addition of a starter culture as disclosed in Voorde.

Appx20(ll.19-22).

This conclusory finding simply rewrites the reference disclosures, without evidentiary citation, and without explaining *why* a POSA would have been motivated to combine them as in the Petition. In order to "allow effective judicial review, … the agency is obligated to 'provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions.'" *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1322 (Fed. Cir. 2016) (quoting *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir.

2002)). The PTAB did not do that here. Therefore, the PTAB's determination of obviousness was legal error, is not supported by substantial evidence, and violated the APA for this basic reason.

The PTAB went on to conclude, "[n]either of these modifications [quoted above] would have been beyond the ordinary level of skill in the art, nor do we agree that they would have made Voorde's process unsuitable for its intended purpose." Appx20(ll.22-24) (matter in brackets added). The issue is not whether any modification "would have been beyond the ordinary level of skill in the art"; rather, as stated in the FWD:

> a petitioner must articulate a reason why a person of ordinary skill in the art would have combined or modified the prior art references. *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016); *see also Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017) ("In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason why a person of skill in the art would have made the combination."); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not only could have made but would have been motivated to make the combinations or modifications of prior art to arrive at the claimed invention.") (citing *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)).

Appx7-8.

In essence, the PTAB set out the correct standard for analyzing combining references, but failed to apply it by never explaining *why* a POSA would have been motivated to make the modifications, much less discuss Kerry's evidence to the

contrary. *See* pp. 19-24, *supra*, citing, e.g., Appx4577-4579(¶¶74-75, p.31.n9); Appx7415-7423(¶¶35-49). As this Court explained in *In re Nuvasive, Inc*., the PTAB first must "make the necessary findings and have an adequate 'evidentiary basis for its findings.'" 842 F.3d at 1382 (quoting *In re Lee*, 277 F.3d at 1344). Second, the PTAB "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). *Nuvasive* warns that "it is not adequate to summarize and reject arguments without explaining why the [PTAB] accepts the prevailing argument." 842 F.3d at 1383; *see also Cutsforth, Inc. v. MotivePower, Inc*., 636 Fed. App'x 575, 578 (Fed. Cir. 2016) ("[t]he majority of the Board's Final Written Decision is spent summarizing the parties' arguments and offers only conclusory analysis of its own."). Yet, the PTAB did just that. *Compare* Appx16-18 (summarizing parties' positions) with Appx19-20 (conclusory analysis on motivation to combine with minimal evidence cited).

The issue is not whether a POSA *could have* made the modification as the PTAB contended (Appx20(ll.22-23 ("Neither of these modifications would have been beyond the ordinary level of skill in the art …")), it is *why a POSA would have been motivated* to make the modification. *See Polaris Indus., Inc. v. Arctic Cat, Inc*., 882 F.3d 1056, 1068-69 (Fed. Cir. 2018). In this regard, the finding that

such modifications would not have made Voorde's process unsuitable for its intended purpose (Appx20(ll.23-24)) is conclusory and without basis. It cannot seriously be disputed—and was not—that Hara's boiling would kill off the beneficial microbes and enzymes on which Voorde relies to convert nitrate to nitrite. Appx4592-4598(¶¶103-114); Appx20(ll.2-3); pp. 9-10, *supra.* The PTAB's flawed rationale is essentially 'a POSA could have' made the modifications without explanation. *See Polaris*, 882 F.3d at 1068-69; *Pers. Web Techs., LLC*, 848 F.3d at 993-94 ("But that reasoning seems to say no more than that a skilled artisan, once presented with the two references, would have understood that they could be combined. And that is not enough: it does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention.").

Moreover, the PTAB properly decided not to credit the motivation argued by FFP—routine sanitization / killing germs upon applying Hara's 100°C+ heating at the outset. Appx19-20. FFP's argument invited error, since Hara performed the heating to extract juice and, like Voorde, performed sterilization only at the end for storage.

The PTAB incorrectly asserted that *In re Lintner*, 458 F.2d 1013 (CCPA 1972) creates a blanket rule such that differences in the purpose of the heating steps in the claims and the prior art do not matter. Appx19. *Lintner* dealt with a

composition claim which recited a sugar, as did the prior art, and the claimed sugar imparted no functional difference to the composition. *Id.* at 1016. In contrast, where, as here, heating for different purposes would in fact lead to the invention's different and advantageous results (summarized at pp. 1, 4-10, *supra*), distinct purposes can and should be given weight in an obviousness analysis. *See In re Fine*, 837 F.2d 1071, 1075-76 (Fed. Cir. 1988) ("Because the purposes of the two temperature ranges are entirely unrelated, Eads does not teach use of the claimed range. *See In re Geiger*, 815 F.2d at 688, 2 USPQ2d at 1278. The Board erred by concluding otherwise.").

### D. The PTAB Failed To Address Kerry's "Teaching Away" Arguments And Evidence

Voorde's teaching away should have been dispositive, or at least a central factor in not adopting Ground I. *See* Appx347-366; Appx436-440; pp. 19-24, *supra*. Voorde is unambiguous that the heating cannot "***excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate into nitrite***"—the very modification FFP asserts. *Id.*; Appx725(Voorde_p.6). Therefore, while Voorde allows for temperatures higher than 50-60°C (preferably not higher than 80°C; more preferably not higher than 70°C), Voorde is explicit as to the reason for limiting the temperature. It is undisputed that heating to 100°C+ (boiling/steaming) would kill the

enzymes/microbes (Appx4594-4598(¶¶109-114)), an excessive reduction in violation of Voorde, and thus not obvious.

As explained in *Spectralytics Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011), "'teaching away' does not require that the prior art foresaw the specific invention that was later made, and warned against taking that path." The Court stated: "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path that was taken by the applicant." *Id*. At a minimum Voorde "discourages" a POSA from using Hara's boiling/steaming temperatures.

**The PTAB never addressed the argument and evidence that Voorde teaches away from applying Hara's boiling/steaming at the beginning of the process**. Appx4591-4607(¶¶100-131); Appx7415-7423(¶¶35-49); Appx347-366; Appx436-440. The FWD merely referenced Voorde's warning in its summary of Voorde and then its summary of the parties' positions under "Reason to Combine" (Appx15-18), but in its *analysis* made no findings on this issue (Appx19-20). This classic teaching away by Voorde should have defeated the combination.

Here, there is an explicit, unambiguous teaching away in Voorde:

| Express Teaching Away in Voorde | Subject Matter Added from Hara to Make The Combination |
|---|---|
| "Preferably, the heating is not higher than 80 °C, and more preferably not higher than 70 °C, **in order not to excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate into nitrite**." Appx726(Voorde_p.7) (emphasis added). | "***after boiling the plant material as in Hara***, a POSITA would have found it obvious to let the plant material cool before adding starter culture, as instructed in Voorde." Appx90 (emphasis added). |

It is hard to imagine a clearer case of an express and controlling teaching away by the primary reference. The text plainly instructs not to heat excessively so as not to kill off the necessary enzymes and microbes. It's there in black-and-white. Stunningly, the PTAB never addressed this critical passage or Kerry's arguments and unrebutted evidence (pp. 19-25, *supra*) in its "even if" obviousness analysis at Appx19-20.

The PTAB's failure to even mention Voorde's warning against excessive heating in its analysis underscores that its obviousness determination is not supported by substantial evidence. *See Chemours Co. FC, LLC  v. Daikin Indus.*, 4 F.4th 1370, 1376 (Fed. Cir. 2021) (reversing because, *inter alia*, "Here, the Board appears to have ignored the express disclosure in Kaulbach that teaches away from the claimed invention …."); *cf. Polaris*, 882 F.3d at 1068 ("The Board failed to analyze whether Denney 'teaches away' from claims 17-19 by determining whether 'a person of ordinary skill, upon reading [Denney], would be discouraged

from following the path set out in [Denney], or would be led in a direction divergent from the path that was taken by the applicant.' *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). This was error.").

The present case is further aligned with *Chemours*, in that the proposed modification of Voorde would alter its fundamental process of relying on the endogenous microbes and enzymes for converting nitrate to nitrite. "This does not explain why a POSA would be motivated to increase Kaulbach's melt flow rate to the claimed range, when doing so would necessarily involve altering the inventive concept of a narrow molecular weight distribution polymer. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) (finding no motivation to modify the prior art where doing so "would destroy the basic objective" of the prior art.")." *Chemours*, 4 F.4th at 1376. *Chemour's* finding that the reference's teaching away gives negative results ("teaching against using high fluorination temperatures, because doing so 'can result in a broadening of the molecular weight distribution and negatively effect [sic] performance,'" *Chemours*, 4 F.4th at 1377) is akin to Voorde's warning against excessive heating so as to avoid the negative effect of killing needed natural enzymes and microbes. Appx726(Voorde_p.7). Just as the PTAB's erroneous handling of the teaching away record in *Chemours* significantly contributed to the reversal due to "an inadequate evidentiary basis and fail[ure] to articulate a satisfactory explanation that is based on substantial evidence,"

*Chemours*, 4 F.4th at 1377, here too this Court should reverse based on the inadequate motivation to combine analysis and failure to address teaching away.

In other contexts, this Court has instructed that, as in *Chemours*, "[a] reference does not teach away 'if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." *Polaris*, 882 F.3d at 1069 (quoting *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009)). Here, Voorde satisfies the *Polaris / DePuy* standard by not only stating the preference for heating to well below 80°C, but is *coupled with* discouragement of higher temperatures (such as Hara's) due to negative, undesired results: **excessive reduction of the enzymatic and microbiological conversion processes necessary for the conversion of nitrate into nitrite**. Appx726(Voorde_p.7). Voorde clearly qualifies as a teaching away under this Court's framework. Indeed, as in *Polaris*, destroying the natural enzymes and microbes in the plant material by Hara's high temperature heating would run contrary to one of Voorde's fundamental purposes—"The nitrate can be converted into nitrite by allowing the natural enzymatic and/or microbiological conversion processes to run their course for a certain period of time." Appx725(Voorde_p.6). *Compare to Polaris*, 882 F.3d at 1069: "it is undisputed that adding a fuel tank

under one of the seats … render[ed] the vehicle less stable, which would run contrary to one of Denney's stated purposes."

The PTAB also failed to address Kerry's arguments and evidence that Voorde **confirms** *the teaching away* by its seven citations to Hara. Appx720-723(Voorde_pp.1-4). Voorde clearly understood Hara, but chose not to use Hara's initial boiling/heating despite its disclosure of the same initial mechanical vegetable comminution steps as Hara. In other words, a POSA would have understood that Voorde purposely excluded Hara's boiling/steaming (100ºC+) (Appx7420-7421(¶¶46-48)), and instead provided an explicit direction ***not to excessively heat***—the very modification required by FFP's Ground I and litigated in the IPR. This line of argument and evidence (Appx358-359; Appx364-366) was never addressed by the PTAB, the same treatment given to Kerry's basic teaching away arguments and evidence discussed above.

The PTAB's failure to address Voorde's teaching away should lead to reversal, as in *Chemours*.

### E. The Combination Analysis Is Fraught With Hindsight

The PTAB's obviousness determination improperly used hindsight to reconstruct the '304 claims. This is self-evident from the following finding: "For these reasons, *we conclude that a person of ordinary skill in the art, seeking to reduce microbial load in a plant material prior to converting nitrate to nitrite,*

would have combined Voorde and Hara's disclosures in the manner FFP suggests." Appx20(ll.14-17) (emphasis added). Neither reference discloses seeking to reduce microbial load in a plant material *prior to converting* nitrate to nitrite; instead, this objective comes straight out of the '304 claims. Indeed, Hara cannot disclose this objective because the record is clear that Hara performed no conversion of nitrate to nitrite, as confirmed by Voorde itself. Appx721(Voorde_p.2); Appx4600-4601(¶¶119-121); pp. 12, 22(2.a), *supra*.

It is impermissible to use the challenged claims as a template to select only certain prior art and only certain aspects of that art. This is a classic case of the PTAB impermissibly using the challenged claims as a roadmap, working backwards to recreate the claimed invention. The "[d]etermination of obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention." *ATD Corp. v. Lydall, Inc*., 159 F.3d 534, 546 (Fed. Cir. 1998). In analyzing obviousness, the PTAB may only consider the knowledge of a POSA, the prior art references, and the accepted wisdom in the field at the time. "It is impermissible, however, simply to engage in a hindsight reconstruction of the claimed invention, using the applicant's structure as a template and selecting elements from the references to fill the gaps." *In re Gorman*, 983 F.2d 982, 987 (Fed. Cir. 1991); *In re Enhanced Security Research, LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014) (it is improper to

"stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole.").

The PTAB started with the *invention of the '304 patent*—reducing the microbial load in a plant material prior to converting nitrate to nitrite—before finding that Voorde and Hara could allegedly be combined to achieve this goal. This use of hindsight was legal error, and further contributed to the PTAB's inadequate motivation to combine analysis, and lack of substantial evidence supporting the same.

### F.      Numerous Findings Lack Substantial Evidence

The PTAB's perfunctory analysis contains a number of discrete findings unsupported by substantial evidence, some already indicated above.  Moreover, half of the PTAB's specific findings in its analysis relate to its improper new theory of unpatentability based on Voorde alone.

### 1.      *Findings Relating To The New Theory Should Be Vacated*

Page 18, line 13 to page 19, line 24 (Appx18-19) of the FWD contains the PTAB's findings and analysis in support of the new theory of unpatentability discussed in Argument § I, *supra*.  Because Kerry never had an opportunity to address the question of whether Voorde teaches the heat-treating step because it was not raised in the Petition, in fairness any such findings should be vacated.

Moreover, many of the findings lack substantial evidence support in any event, and/or are contradicted by undisputed record evidence, or are simply not relevant to Ground I.

Finding-1:    "Upon review, we find that a person of ordinary skill in the art would have had reason to modify Voorde in the manner FFP suggests." Appx18(ll.13-14).  This finding is not supported by substantial evidence, because no reasons for the modification are given, nor is evidence cited.

Finding-2:    "Voorde explicitly discloses the advantages of heating the medium, and there is no disagreement that heating to 50–52°C would have resulted in at least some reduced microbial load, which is all that the claims require.[13]" Appx18(ll.14-17).  This aspect of Voorde is not relied on in the Petition for the heat-treating step, and FFP concedes the *claimed* heat-treating is not disclosed. FFP did not read the '304 claims as encompassing such low-temperature heating, and Kerry never had an opportunity to address that theory.  *See* pp. 1, 12-15, 32-33, 36-37, *supra*.

Finding-3:    Footnote 13, Kerry allegedly belatedly raised a claim construction argument at the oral hearing.  Appx18.  This lacks any supporting evidence, as it is a clear mischaracterization of the transcript; Kerry's counsel merely answered the panel's questions.  Appx527-528; Appx554-555(*see* 61:1-7). Moreover, the answer provided by counsel is not only consistent with the

prosecution history (and the citation thereto to Dr. Milkowski on page 48 (Appx4595(n.17)) referenced by counsel) and the '304 patent description, but also evidences the need for FFP's reliance on temperatures outside of Voorde—Hara's boiling/heating (100°C+)—to address the heat-treating step of the '304 claims.

Finding-4:   "Indeed, Voorde describes that as a result of heating to 50-52°C, its medium is '(partially) sterilized.' Ex. 1003, 7."  Appx18(ll.17-19).  The Petition does not rely on this low-temperature nitrate conversion heating for the heat-treating step.  Appx88-91.  Moreover, undisputed evidence showed that 50-52°C is warm but would not be considered heat treating as in the '304 patent (Appx4459(80:3-20)).

Finding-5:   "Kerry's argument that Voorde does not disclose starting with a 'sterile medium' (PO Resp. 25) is unavailing; as discussed above, we do not interpret anything in claim 1 or the '304 patent to require a sterile medium, and Kerry does not direct us to anything in the record that would persuade us otherwise."  Appx18-19.  The Petition argued for 'routine sanitization' and 'killing germs' based on Hara.  Appx89-91(34-36); pp. 13-14, *supra.*  FFP's Reply at 12-13 confirmed that "starting with a sterile medium" "was part of the Hara reference that the Petition combines with Voorde."  Appx410-411.  Those are the precise positions Kerry addressed, and the PTAB's finding is flatly contradicted by the record.  Moreover, the heat-treating limitation was added to distinguish moderate

heating.  *Supra*, pp. 9, 11.  Therefore, this finding lacks substantial evidence support.

Finding-6:  "Nor does it matter that, as Kerry argues, the purpose of Voorde's heating is to promote conversion of nitrite to nitrate, whereas the claims recite heating to reduce microbial load."  Appx19(ll.2-5).  This is part of a legal conclusion, addressed above at pp. 45-46, which shows that the purpose of prior art steps do indeed matter when considering *motivation to combine reference disclosures* as set forth in Ground I.

Finding-7:  "Based on the foregoing, we find that Voorde would have taught the person of ordinary skill to heat treat a medium to around 50°C."  Appx19(ll.13-14).  This finding is not relevant to FFP's Ground I, which did not rely on Voorde for the claimed heat-treating step, and only pertains to the PTAB's new theory.

Finding-8:  "FFP does not rely solely on Voorde's heating, however, but rather combines Voorde's disclosure with Hara, which teaches heating to a much higher temperature. Pet. 33–36; Ex. 1023, 3:3–6, 5:10–16."  Appx19(ll.14-17).  This finding is not supported by substantial evidence because the Petition conceded that Voorde did not teach that limitation, and pulled in Hara's high-temperature heating.  *See* pp. 13-14, *supra*.

Finding-9:  The PTAB stated:

> At oral argument, FFP's counsel stated that this combination was to provide 'objective evidence' that heat treating to kill microbes was known, and that Hara was not relied on 'for a physical combination of Voorde and Hara.' Tr. 12:1-13:1. Referring to the Petition, this is not so clear; there, FFP states that 'Hara … evidences the routine heating of vegetables before use,' but then also contends that the person of ordinary skill would have found it obvious to 'boil[] the plant material as in Hara.' Pet. 34-35.

Appx19(ll.17-24).

This finding is not supported by substantial evidence. The Petition can only be read as a 'physical combination of Voorde and Hara.' The PTAB's professed confusion appears to be an attempt to explain its new theory of unpatentability. The Petition makes clear the precise proposed ground. Appx89-91; pp. 12-15, 33, *supra*. Moreover, the PTAB's only reference to FFP's alleged position that Hara "was not relied on 'for a physical combination of Voorde and Hara'" was FFP's statement to that effect at oral argument, underscoring that such position was never taken in Ground I set forth in FFP's petition.

### 2. *Many Findings Under The Voorde / Hara Combination Lack Substantial Evidence Support*

Finding-10: "Even if we were to interpret FFP's combination of Voorde with Hara to require heating to 100°C, we disagree that this modification would be inconsistent with Voorde or destroy its intended purpose, as Kerry argues." Appx19-20. There is no ambiguity or interpretation requiring an *alternative* analysis; the proposed ground is clear. No reason is given or evidence cited as to

why the modification would not be inconsistent with Voorde or destroy its intended purpose, particularly considering Voorde's explicit warning discussed above (see pp. 47-51, *supra*). Therefore, this finding is not supported by substantial evidence. Moreover, undisputed evidence ignored by the PTAB contradicts the finding. *See, e.g.*, Appx4592-4598(¶¶103-114).

Finding-11: "Voorde explicitly discusses the use of a starter culture, which would have replaced any microbes destroyed by Hara's sterilization." Appx20(ll.2-3). This finding lacks substantial evidence because it is not a correct reading of Voorde. No "replacement" of the natural microbes is disclosed by Voorde; only optional addition of a starter culture. Appx725(Voorde_p.6) ("additional micro-organisms").

Finding-12: "[W]e disagree with Kerry's argument that a person of ordinary skill would not have modified the process to add the starter culture subsequent to Hara's sterilization step, if there were concerns about destroying the beneficial microbes." Appx20(ll.5-8). The PTAB's finding on modification lacks substantial evidence, because no reason or rationale for doing so is provided. Moreover, this finding lacks substantial evidence because there is no "Hara's sterilization"; the only heating cited by FFP is for extracting juice at the outset, not sterilization of the end product for storage. *See* pp. 13-14, *supra.*

Finding-13:  In support of Finding-12, the PTAB cited testimony, "Dr.

Milkowski—who Kerry extensively argues is a person having ordinary skill in the

art (PO Resp. 8, 10-12; Sur-Reply 12) .…" Appx20(ll.8-9).  This finding lacks

substantial evidence support, because undisputed evidence showed that Kerry's

expert is one of the world's pre-eminent food scientists.  He is not simply a POSA

as the PTAB asserted.  Page 5, n.3, *supra*.

Finding-14:  "[Dr. Milkowski] conceded on cross-examination that, if he

were adding a starter culture, he would do so after heating. Ex. 1037, 88:19–89:6

("Q: [Y]ou would want to add the microorganisms after the heating; right? A.

Well, if I were doing it, I would do that.")."  Appx20(ll.10-13).  This testimony

does not support Finding-12.  This is not some major admission as FFP touted,

because there is no disagreement in the record on this point.  Aside from the fact

that Dr. Milkowski was testifying about his present day knowledge as an expert

and not a POSA in 2007, *no one would add the starter culture and then sterilize*,

because doing so would kill the required microbes.  Also, neither the question nor

the answer addresses whether a POSA in 2007 would have found it obvious to heat

Voorde's plant material to 100ºC+.

Finding-15:  "For these reasons, we conclude that a person of ordinary skill

in the art, seeking to reduce microbial load in a plant material prior to converting

nitrate to nitrite, would have combined Voorde and Hara's disclosures in the

manner FFP suggests." Appx20(ll.14-17). Despite the statement "[f]or these reasons," the PTAB provided no reason or rationale as to *why* a POSA would have modified Voorde to add Hara's initial high-temperature heating. The lack of discussion is striking given (1) Voorde's warning not to heat above 80° "in order not to excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate into nitrite" (Appx726(Voorde_p.7), and (2) Kerry's extensive arguments and unrebutted evidence demonstrating teaching away by Voorde. *See* pp. 47-51, *supra*. Therefore, this finding lacks substantial evidence support.

Finding-16: "At the very least, the skilled artisan would have looked to Hara as evidence that pre-treatment using heat could be beneficial to reduce microbial load, a disclosure confirmed by Voorde." Appx20(ll.17-19). This finding lacks substantial evidence support because it mischaracterizes Hara, which does not disclose that the initial boiling/steaming was "to reduce microbial load;" (pp. 12-14, *supra*); and it also mischaracterizes Voorde, which is not relied on in the Petition for the heat-treating step (pp. 13-15, *supra*). In this finding, the PTAB improperly rewrote Ground I.

Finding-17: "In addition, Hara could have been relied upon for its disclosure of full sterilization by boiling, followed by cooling prior to the addition of a starter culture as disclosed in Voorde." Appx20(ll.19-22). This is *actually what was*

*relied on*, not 'could have been relied upon' in the Petition, confirming that certain of the PTAB's other analysis and findings were ex-Petition. In any event, this finding lacks substantial evidence because no reason or rationale is provided as to *why* the art would have been combined by a POSA, nor is evidence cited in support, and the PTAB ignored contrary evidence (pp. 19-24, *supra*).

Finding-18: "Neither of these modifications would have been beyond the ordinary level of skill in the art." Appx20(ll.22-23). This finding does not address motivation to combine. This issue is not whether a POSA could have made the modifications, but whether a POSA *would have made them*—an issue not addressed. *See* pp. 44-45, *supra.*

Finding-19: "nor do we agree that they would have made Voorde's process unsuitable for its intended purpose." Appx20(ll.23-24). This finding lacks substantial evidence because no reason or rationale is provided, nor is the record evidence cited or addressed.

Finding-20: "And we find that both Voorde and Hara disclose heating a plant material which would result in the material having a reduced microbial load, and Voorde discloses addition of an organism through its starter culture." Appx21(ll.16-19). This finding lacks substantial evidence because no reason or rationale is provided, nor is the record evidence addressed. Moreover, reliance on

Voorde as teaching the heat-treating step is a new theory, as explained at pp. 32-37 above.

In sum, the PTAB's findings alleged to support the reason to combine Voorde and Hara lack substantial evidence support, are not relevant, and/or relate to the PTAB's ex-Petition new theory.

## III. THE PTAB'S ANALYSIS FAILS THE APA'S NOTICE AND REASONED DECISION-MAKING REQUIREMENT

The PTAB's decision requires reversal for another, independent reason. Its analysis repeatedly fails the APA's reasoned decision-making requirement.

### A. Standard of Review

Under the APA, agency decisions are reviewed to "ensure that they are not 'arbitrary, capricious,'" "'otherwise not in accordance with law,'" or "'unsupported by substantial evidence.' 5 U.S.C. § 706(2)(A), (E)," *Pers. Web Techs.,* 848 F.3d at 992, citing *Pride Mobility Prods. Corp. v. Permobil, Inc*., 818 F.3d 1307, 1313 (Fed. Cir. 2016). The PTAB's obviousness determination did not satisfy these standards.

Additionally, the PTAB's decision fails to "take account of all the evidence of record, including that which detracts from the conclusion the agency ultimately reaches," *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017). It also fails to "'present a full and reasoned explanation of its decision,'" "supported by

the agency record, and explain its application of the law to the found facts." *In re Lee*, 277 F.3d at 1342.

## B.    Ex-Petition Theory and Findings

IPR proceedings are confined to the grounds advanced by the challenger in its Petition, and it is legal error for the PTAB to redefine the scope of the proceeding by rendering a decision on a new ground neither raised in the petition nor argued throughout the entire proceeding.  Here, the PTAB's analysis based on Voorde alone, then including *both* Voorde and Hara teaching the heat treating step, was a "marked deviation" from the Petition's theory and evidence (Argument § I), and thus an APA violation as Kerry was deprived of notice and the case was over.  *M&K Holdings,* 985 F.3d at 1383-86; *Emera-Chem*, 859 F.3d at 1348-51.

## C.    Motivation to Combine Findings Were Not Made

The PTAB did not sufficiently explain and support the conclusion *why* a POSA would have been motivated to combine Voorde and Hara to arrive at the '304 claims, rendering its decision arbitrary and capricious (Argument § II.B). *See Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 124 (Fed. Cir. 2022).  "Just as [the PTAB] may not short-cut its legal analysis," it "may not short-cut its consideration of the factual record before it."  *Princeton Vanguard, LLC v. Frito-Lay North Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015).  The PTAB's conclusory analysis did that here.

The PTAB failed to apply the very standards it set forth in the FWD (Appx6-8) on motivation to combine. Rather, the PTAB's 2-3 page perfunctory analysis on 'reason to combine' (Appx18-20) cited scant evidence—and none of Kerry's—other than the references themselves. *See Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) (holding that agency decisions must be grounded in evidence.).

Notwithstanding that both parties introduced evidence on the critical issue of whether a POSA would have found it obvious to modify Voorde as set forth in the Petition, the PTAB's FWD does not cite, discuss or distinguish evidence in support of its analysis and ultimate conclusion, particularly Dr. Milkowski.[10] Appx18-21.

### D.    Teaching Away  Was Not Addressed

The PTAB's analysis is particularly egregious in light of its failure to address Kerry's argument and evidence that Voorde teaches away from initially heat-treating the vegetable material. *See* pp.__, *supra.* Given the extensive briefing and unrebutted evidence on this issue, the PTAB's refusal to even engage with Kerry's undisputed evidence that Voorde teaches away (pp. 19-24, 47-51,

---

[10] The PTAB's decision not to credit Dr. Baldwin's testimony is understandable given his lack of qualifications with respect to the claimed technology. Appx7423-7431(¶¶50-72); *see* Appx331-346(§_II).  But that is not the case for Dr. Milkowski, whose expertise on the technology at issue is unassailable and whose testimony directly conflicts with and undermines the PTAB's analysis and conclusion. *See* p. 5 (n.3), *supra.*

*supra*) is inexcusable and yet another violation of the APA and Kerry's deprivation

of due process. *Provisur Techs., Inc. v. Weber, Inc*., 50 F.4th 117, 123-124 (Fed.

Cir. 2022). To reject Kerry's arguments and evidence about teaching away, the

PTAB needed (at the very least) to address the issue and underlying facts and

explain why Kerry's position was incorrect. *Id*. It did not. The PTAB's refusal to

consider any of that renders its obviousness decision arbitrary and capricious.

*Princeton*, 786 F.3d at 970.

## E. Lack of Substantial Evidence Pervaded the PTAB's Findings

As set forth above, the PTAB's findings purporting to support the

obviousness determination are woefully deficient given the record. *See*

Argument § II.E. *Aqua Prods.,* 872 F.3d at 1325; *Synopsys*, 814 F.3d at 1322.

The PTAB's numerous APA failures require reversal of the decision.

## CONCLUSION

This Court should reverse the PTAB's obviousness determinations with respect to Claims 1-5. *See Magnum Tools*, 829 F.3d at 1380-81 (new theory and lack of findings on motivation to combine—reversed); *Chemours*, 4 F.4th at 1376, 1379 (failure to properly consider teaching away—reversed).


October 6, 2023                    Respectfully submitted,

                                   /s/ Mark Boland
                                   Mark Boland
                                   Raja N. Saliba
                                   SUGHRUE MION, PLLC
                                   2000 Pennsylvania Ave., NW
                                   Washington, D.C. 20006
                                   Tel: (202) 293-7060
                                   Fax: (202) 293-7860
                                   mboland@sughrue.com
                                   rsaliba@sughreu.com

                                   *Counsel for Appellant Kerry Group Services International Ltd.*

# **ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

Final Written Decision (04/26/2023) …………………………………. Appx1-25

Exhibit 1001 — U.S. Patent No. 11,071,304 B2 ……………………. Appx615-623

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

FLORIDA FOOD PRODUCTS, LLC,
Petitioner,

v.

KERRY GROUP SERVICES INT'L LTD.,
Patent Owner.
————————

IPR2022-00006
Patent 11,071,304 B2
————————

Before CHRISTOPHER L. CRUMBLEY, CHRISTOPHER M. KAISER, and JULIA HEANEY, Administrative Patent Judges.

CRUMBLEY, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

Florida Food Products, LLC ("FFP") filed a Corrected Petition (Paper 12, "Pet.") requesting the Board institute an *inter partes* review of claims 1–5 of U.S. Patent No. 11,071,304 B2 (Ex. 1001, "the '304 patent"). Kerry Group Services International Ltd. ("Kerry"), which identified itself as the owner of the '304 patent, filed a Preliminary Response to the Petition. Paper 17. We subsequently granted authorization for FFP to file a limited Reply to the Preliminary Response (Paper 20), followed by a Sur-Reply from Kerry (Paper 23).

Upon consideration of the Petition and the evidence, we determined that FFP had demonstrated a reasonable likelihood that it would prevail with respect to at least one claim of the '304 patent. Paper 26 ("Decision on Institution" or "DI"). Pursuant to the Supreme Court's decision in *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018), and USPTO Guidance,[1] we instituted review of all challenged claims on all asserted grounds. *Id*.

Following institution of trial, Kerry filed a Patent Owner Response (Paper 31, "PO Resp."), FFP filed a Reply (Paper 33, "Reply"), and Kerry filed a Sur-reply (Paper 34, "Sur-reply").

In support of their respective positions, FFP relies on the testimony of Steven W. Baldwin, Ph.D. (Ex. 1002, "Baldwin Declaration") and Kerry relies on the testimony of Andrew L. Milkowski, Ph.D. (Ex. 2001, "Milkowski Declaration"; Ex. 2014, "Second Milkowski Declaration").

---

[1] "If the PTAB institutes a trial, the PTAB will institute on all challenges raised in the petition." *See* USPTO, Guidance on the Impact of SAS on AIA Trial Proceedings (April 26, 2018) (available at https://www.uspto.gov/patents-application-process/patent-trial-and-appeal-board/trials/guidance-impact-sas-aia-trial) ("USPTO Guidance").

Appx2

Kerry took cross-examination testimony of Dr. Baldwin via deposition and submitted the transcript (Ex. 2015); FFP did the same with Dr. Milkowski (Ex. 1037).

An oral hearing was held on January 24, 2023, and a transcript of the hearing is included in the record (Paper 42, "Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, we determine that FFP has shown by a preponderance of the evidence that claims 1–5 of the '304 patent are unpatentable.

### A. Related Proceedings

The parties have not indicated any related administrative or judicial proceedings involving the '304 patent, but do discuss the Board's previous decision in an appeal (Appeal 2020-006388) involving the application that issued as the '304 patent. Pet. 66–67; Paper 17.

### B. The '304 Patent

The '304 patent, entitled "Method and Composition for Preparing Cured Meat Products," issued July 27, 2021, with claims 1–5. Ex. 1001, codes (54), (45), 12:30–61. The '304 patent describes a curing agent comprising a plant-based nitrite, prepared using an organism capable of converting the naturally-occurring nitrates in a plant material into nitrites. *Id*. at code (57). The patent also describes curing or preserving meat using this curing agent. *Id*.

According to the '304 patent, methods of curing or preserving meat, including by treating the meat with nitrite, have been practiced for many years. *Id*. at 1:4–9. In one such method, nitrate-containing substances are

Appx3

applied to meat, and then bacteria or other organisms convert the nitrate to nitrite. *Id.* at 1:9–14. The '304 patent discloses that the presence of nitrite gives the meat a distinct color and flavor, but existing methods presented several problems including the processing time required for the organisms to convert the nitrate to nitrite after contacting the curing agent to the meat. *Id.* at 1:15–24. The '304 patent proposes a solution in which the curing agent is prepared outside the meat curing process, so as to speed up the process and simplify the number of steps involved. *Id.* at 1:34–44.

The particular curing agent described in the '304 patent is substantially free of non-natural nitrate or nitrite, meaning there is no nitrate or nitrite artificially added to the plant material. *Id.* at 2:58–64. Preferably, the plant material is a plant derivative that contains at least about 50 ppm nitrate, such as celery. *Id.* at 2:14–19. The plant derivative can then be subjected to additional steps, including heat treatment or sterilization that reduces the naturally-occurring microbial load. *Id.* at 3:5–8. Organisms capable of converting nitrate to nitrite, such as preferably *S. carnosus*, are added to the plant material, after which fermentation is conducted at any suitable temperature. *Id.* at 3:15–52. Once a predetermined nitrite level is reached in the curing agent, the organisms can be inactivated using known methods such as pasteurization, after which the curing agent can be stored or used to cure meat. *Id.* at 4:38–49.

### C. Challenged Claims

FFP challenged the patentability of claims 1–5 of the '304 patent. Pet. 29. Claims 1 and 5 are independent; claim 1 is illustrative and reads as follows, with line breaks added for readability:

1. A process for preserving a meat or meat product comprising

contacting the meat or meat product to be preserved with a curing
agent comprising a plant-based nitrite and an added organism,

the plant-based nitrite being derived from a plant material
comprising at least about 50 ppm nitrate and the organism,

wherein the plant material is heat treated prior to addition of
the organism so as to have a reduced microbial load
relative to a naturally occurring microbial load of the plant
material,

the organism inactivated, wherein the organism was capable
of converting nitrate to nitrite before the inactivation, and

preserving the contacted meat or meat product.

Ex. 1001, 12:31–44. Claim 5 is similar to claim 1, but is directed to a cured
meat product having been treated with a curing agent according to the
process of claim 1. *Id*. at 12:52–61.

D. *Prior Art and Asserted Grounds of Unpatentability*

FFP contends that the challenged claims are unpatentable based on the
following grounds, each asserted under 35 U.S.C. § 103(a):[2]

| Claim(s) Challenged | References |
|---|---|
| 1–5 | Voorde,[3] Hara[4] |

---

[2] The Leahy-Smith America Invents Act ("AIA") includes revisions to
35 U.S.C. §§ 102, 103 that became effective on Mar. 16, 2013. Pub. L.
No. 112–29, §§ 3(b), 3(c), 3(n)(1), 125 Stat. 284, 287, 293 (2011). Because
the '304 patent claims priority to a provisional application filed June 11,
2007, we apply the pre-AIA version of § 103 to this Decision.

[3] Belgian Patent Application Publication No. 1014557A6 to Van de Voorde
et al., granted December 2, 2003. An English translation of Voorde was
submitted as Exhibit 1003.

[4] U.S. Patent No. 3,911,146 to Hara et al., issued October 7, 1975
(Ex. 1023).

| Claim(s) Challenged | References |
|---|---|
| 1, 4, 5 | Fast,[5] Voorde, Yamamoto[6] |
| 2 | Fast, Voorde, Yamamoto, Stumpf[7] |
| 3 | Fast, Voorde, Yamamoto, Kurihara[8] |

Pet. 29. FFP contends that Voorde, Fast, Yamamoto, and Kurihara are prior art to the '304 patent under 35 U.S.C. §§ 102(a) and (b), while Hara and Stumpf are prior art under §§ 102(a), (b), or (e). *Id.* at 30. Kerry did not argue that any of the asserted references are not prior art to the '304 patent. We determine, based on the entirety of the trial record, that all references listed above are prior art to the '304 patent.

## II. ANALYSIS

### A. *Legal Standards*

To prevail in its challenge, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d) (2019). A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the

---

[5] European Patent Application Publication EP 0805205 A1 to Fast et al., published November 5, 1997 (Ex. 1019).

[6] Japanese Unexamined Patent Application Publication No. 2001/352935 to Yamamoto, published December 25, 2001. An English translation of Yamamoto was submitted as Exhibit 1024.

[7] U.S. Patent No. 4,806,373 to Stumpf et al., issued February 21, 1989 (Ex. 1025).

[8] Japanese Unexamined Patent Application Publication No. 48-82054 to Kurihara et al., published November 2, 1973. An English translation of Kurihara was submitted as Exhibit 1018.

art. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence,[9] objective indicia of obviousness or non-obviousness, such as commercial success, long-felt but unsolved needs, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To show obviousness, it is not enough to merely show that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR*, 550 U.S. at 418–419.

On the other hand, an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id*. at 418; *accord In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007). However, a petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Instead, a petitioner must articulate a reason why a person of ordinary skill in the art would have combined or modified the prior

---

[9] Neither party has submitted any evidence of objective indicia of obviousness or non-obviousness.

art references. *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016);
*see also Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1366
(Fed. Cir. 2017) ("In determining whether there would have been a
motivation to combine prior art references to arrive at the claimed invention,
it is insufficient to simply conclude the combination would have been
obvious without identifying any reason why a person of skill in the art would
have made the combination."); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064,
1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not
only *could have made* but *would have been motivated to make* the
combinations or modifications of prior art to arrive at the claimed
invention.") (citing *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327, 1352 (Fed. Cir. 2014)).

   *B.  Level of Ordinary Skill in the Art*

   The level of skill in the art is a factual determination that provides a
primary guarantee of objectivity in an obviousness analysis. *See Al-Site
Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (citing
*Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). The level of skill in
the art also informs the claim-construction analysis. *See Teva Pharm. USA,
Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015) (explaining that claim
construction seeks the meaning "a skilled artisan would ascribe" to the claim
term "in the context of the specific patent claim" (emphasis omitted)).

   FFP contends that a person of ordinary skill in the art at the time of
the invention would have had:

> a master's or doctorate degree in food science, biology,
> chemistry, or a similar field; or a bachelor's degree in food
> science, biology, chemistry, or a similar field along with at least
> 2-3 years of experience in food preservatives generally or more
> specifically 2-3 years of experience in the chemistry associated

with food preservation and nitrates/nitrites [and] would have known that the USDA regulated nitrites for curing meat and would have been able to find these USDA regulations affecting meat products.

Pet. 23–34 (citing Ex. 1002 ¶ 48).

Kerry's recitation of the level of ordinary skill in the art is nearly identical. Prelim. Resp. 13–14 (citing Ex. 2001 ¶¶ 43–44). To the extent the parties' formulations of the level of skill differ, the differences do not appear to be material to any dispute between the parties or any issue of patentability that we must resolve. We determine that the level of ordinary skill the parties propose is consistent with the challenged patent and the asserted art, and adopt that level for purposes of this Decision.

C. *Claim Construction*

In an *inter partes* review filed on or after November 13, 2018, we construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b); *see Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Furthermore, we expressly construe the claims only to the extent necessary to resolve the parties' dispute. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

9

In the Petition, FFP addressed the construction of only one claim phrase, but also submitted that the construction of that phrase does not affect our decision in this case. Pet. 24. Specifically, FFP asked us to adopt a construction that "clarifies that the nitrite results from the added organism reducing the plant nitrate." *Id*. at 25. Kerry does not address this construction, and we agree with FFP that construction of that claim phrase has no effect on our decision herein. Thus, we need not adopt it. *See Nidec*, 868 F.3d at 1017; *Vivid Techs.*, 200 F.3d at 803.

At institution, we noted Kerry's argument that claim 1 is a method claim that contains a "nested" product-by-process element. DI 8–10. Specifically, Kerry argued that the method of claim 1 involves the use of a "'curing agent' that is defined by the process of making it: it contains a plant-based nitrite 'derived from a plant material comprising at least about 50 ppm nitrate and the organism, wherein the plant material is heat treated prior to addition of the organism.'" *Id*. We noted at the time that

> [t]he law of product-by-process claims "developed in response to the need to enable an applicant to claim an otherwise patentable product that resists definition by other than the process by which it is made." *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985). But "[t]he patentability of a product does not depend on its method of production." *Id*. (citing *In re Pilkington*, 411 F.2d 1345, 1348 (CCPA 1969)). Thus, while the scope of a product-by-process claim for infringement purposes is limited by the process, when determining patentability the claim is considered only in view of the resulting product. *See Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1370 n.14 (Fed. Cir. 2009) ("a patent is invalid if a product made by the process recited in a product-by-process claim is anticipated by or obvious from prior art products, even if those prior art products are made by different processes"). Only if the process of manufacture results in "structural and functional differences" in the product can the process distinguish the claim over the prior art. *Id*. at

10

> 1370; *see Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261,
> 1268 (Fed. Cir. 2012). Analysis of a product-by-process element
> "nested" within a method claim does not differ from the analysis
> of a product-by-process claim itself. *Biogen MA Inc. v. EMD
> Serono, Inc.*, 976 F.3d 1326, 1334 (Fed. Cir. 2020) ("The nesting
> of the product-by-process limitation within a method of
> treatment claim does not change the proper construction of the
> product-by-process limitation itself.").

*Id*. at 8–9.

In view of this precedent, at institution we preliminarily construed claim 1 as containing a nested product-by-process limitation, which defines the claimed curing agent as containing a plant-based nitrite derived using a particular process involving heat treatment prior to introduction of the nitrite-producing organism.[10] We were not persuaded on the then-existing record, however, that this process imparts any structural or functional differences to the recited curing agent product, as opposed to curing agents produced by other means. We noted Kerry's contention that "the variations inherent in the biological processes for producing plant-derived nitrite, in addition to selecting the plant material and organism, result in qualitative differences in the curing agent that, when applied to meat, affect taste, smell,

---

[10] We also considered, but rejected, Kerry's interpretation of *In re Thorpe*, 777 F.2d at 697, that a product-by-process claim requires a "product-to-product analysis." DI 14 n.11. Kerry attempts to preserve this argument for trial, incorporating by reference the arguments contained in its Preliminary Response in a footnote in its Response. PO Resp. 24 n.8. But "[a]rguments must not be incorporated by reference from one document into another document." 37 C.F.R. § 42.6(a)(3). We do not consider Kerry to have appropriately preserved this argument for trial. *See* Paper 27, 9 ("any arguments for patentability not raised in the response may be deemed waived"); *see also* Consolidated Trial Practice Guide, 94. Even if Kerry had preserved the arguments, we would not consider them persuasive for the same reasons given in our Decision on Institution.

texture, and color, while also impacting the safety of the product." *Id*. at 10 (quoting Paper 17, 23 (citing Ex. 2001 ¶¶ 127–131)). But we found that Dr. Milkowski had not provided any evidence of these "qualitative differences" beyond citations to FFP's marketing materials. *Id*. (citing Ex. 2001 ¶ 129 n.23). On the preliminary record, therefore, we construed the product-by-process element of claim 1 to not be limited by the process steps recited.[11]

During trial, Kerry continued to argue that the process of deriving the plant-based nitrite recited in claim 1 results in a final product having qualitative differences from those made from other processes. PO Resp. 47–48. According to Kerry, the process "provides a curing agent that gives meat products consistently unique and predictable flavor, smell, and/or color characteristics, all of which are expected by consumers and meat processors." *Id*. at 48 (citing Ex. 2001 ¶¶ 127–131, 181; Ex. 2014 ¶¶ 102–104). And Dr. Milkowski provided additional testimony as to these differences, contending that prior art processes such as Voorde resulted in "the accumulation of varying microbial generated byproducts, all of which a [person of ordinary skill in the art] would appreciate impact qualitative characteristics." Ex. 2014 ¶ 103. Kerry argues that the process of claim 1, on account of its heat treating step, eliminates microbes and avoids these byproducts.

FFP does not directly contest these assertions, nor does it argue that the process steps of claim 1 are product-by-process elements that should not carry patentable weight. FFP stresses that its Petition provides analysis

---

[11] We also applied this reasoning to the interpretation of claim 5, which the parties agreed is a product-by-process claim in its entirety. DI 10 n.10.

regarding the process limitations of claims 1 and 5, such that even if the process steps of the product-by-process limitations do carry patentable weight, the ultimate determination regarding obviousness would not change. Reply 5 (citing Pet. 30–55).

Because, as discussed below, we agree with FFP that the record proves that the prior art teaches or suggests the process steps of claims 1 and 5, we agree that a determination as to whether the product-by-process elements carry patentable weight is moot. We, therefore, decline to make any finding regarding whether Kerry has proven that the process results in a product having qualitative differences, and need not further construe the product-by-process limitations of the claims.

### D. Competency of Dr. Baldwin to Provide Expert Testimony

Before turning to the merits of FFP's grounds, we must first address Kerry's challenge to the competency of FFP's expert, Dr. Baldwin, to provide testimony as to the person of ordinary skill in the art. According to Kerry, FFP relies on Dr. Baldwin to establish its reason to modify the references as part of its obviousness analysis. PO Resp. 8. Kerry argues that this testimony should be given little to no weight, because of Dr. Baldwin's "demonstrated lack of competency in the area of meat science and curing." *Id*. According to Kerry, while Dr. Baldwin has expertise as a synthetic organic chemist, he has no familiarity with meat curing and does not belong to any of the professional organizations that a person of ordinary skill in the art, such as Dr. Milkowski, would belong to. *Id*. at 10–12, 14. Kerry highlights Dr. Baldwin's testimony that he familiarized himself with the technology of meat curing in an "afternoon," because "it's not an area I follow," and that he only became familiar because of his involvement in this

13

proceeding, which required a "crash course" to prepare him.  *Id*. at 12–13 (citing Ex. 2015, 28:18–21, 38:10–16, 135:10–17).[12]

FFP defends the competency of Dr. Baldwin to testify, noting that as of the time of the invention he "had spent nearly forty years teaching organic chemistry at premier universities," and his credentials as an organic chemist were and are "impeccable."  Reply 3.  FFP argues that the relevant art "includes" organic chemistry, and that the curing agent of the '304 patent is prepared independent of the actual curing of meat.  *Id*. (citing Ex. 1037 37:7–13).  According to FFP, Kerry's emphasis on the science of "meat curing" is new, was not reflected in prior arguments to the Office during prosecution, and is "perfunctory" in the patent.  *Id*. at 4.  FFP emphasizes that the dispute between the parties, and the only modification to the prior art that must be made, is whether it would have been obvious to sterilize a medium before adding a starter culture, and this is a subject that is within Dr. Baldwin's expertise, not specific to "meat science."  *Id*.

Upon review, we do not believe it is proper to adopt a blanket approach that would assign weight to the entirety of Dr. Baldwin's

---

[12] In its Sur-Reply, Kerry raises for the first time that, under its definition of the level of skill in the art, Dr. Baldwin is not himself a person of ordinary skill and therefore is not allowed to offer expert testimony from the perspective of a skilled artisan, citing *Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1376–78 (Fed. Cir. 2022).  *See* Sur-Reply 15 n.1.  To the extent that Kerry is seeking to disqualify Dr. Baldwin's testimony in its entirety under *Kyocera*, we consider this to be a new argument that differs from Kerry's initial argument that Dr. Baldwin's testimony should be afforded little or no weight due to his lack of familiarity with the field of the '304 patent. Because new arguments made for the first time in sur-reply are not permitted, we will only focus on Kerry's initial challenge to the testimony of Dr. Baldwin.

testimony, regardless of the subject of his particular opinions. It is clear that Dr. Baldwin has expertise in some areas of chemistry, while Dr. Milkowski's experience is focused on other areas and emphasizes food chemistry. These differences in expertise may impact how we weigh the testimony of both witnesses, but that determination should be made in the context of a specific subject and based on the applicability of each witness's background to the opinions. Therefore, we decline to adopt Kerry's proposed approach of giving Dr. Baldwin's testimony "little to no weight," and instead will weigh the expertise of both witnesses in evaluating their testimony on specific areas of dispute, if necessary.

### E. Obviousness Over Voorde and Hara

FFP contends that claims 1–5 are unpatentable under 35 U.S.C. § 103(a), as their subject matter would have been obvious over the combined disclosures of Voorde and Hara. Pet. 30–43. FFP relies on the testimony of Dr. Baldwin to support its contentions. *Id.*

Voorde discloses a method of heat treating meat products to reduce discoloration, comprising treating the meat with a solution containing nitrite. Ex. 1003, 1. Voorde uses a vegetable material containing nitrate as a starting material, and then converts the nitrate into nitrite. *Id.* at 3. Multiple methods of conversion are disclosed, including "allowing the natural enzymatic and/or microbiological conversion processes to run their course" or, optionally, "additional micro-organisms or . . . so-called starter cultures can be added for this purpose." *Id.* at 5–6. Conversion to nitrite is further stimulated by heating, preferably to a temperature higher than 50 ºC, because "at these temperatures undesired micro-organisms are killed and the materials is thus (partially) sterilized." *Id.* at 6. Voorde warns against

15

heating higher than 80 ºC, however, to avoid excessively reducing the enzymatic and microbiological conversion processes. *Id*. at 7.

Voorde, in its background section, also discusses Hara as disclosing "a method for preserving the color of animal tissue during heat treatment in which no chemical nitrite and/or nitrate is used." *Id*. at 1–2. Voorde notes that Hara calls for sterilizing the liquid phase containing the water-soluble plant ingredients immediately after its preparation. *Id*. at 2. Hara states that "[e]xposure to a temperature of about 90 ºC . . . for about 30 minutes, is effective." Ex. 1023, 1:59–64.

FFP contends that a person of ordinary skill in the art would have had reason to combine these disclosures of Voorde and Hara, especially in view of Voorde's express citation to Hara. Pet. 43. FFP also notes that both references relate to plant-based curing solutions for preserving meat. *Id*. As such, a person of ordinary skill "would have looked to Hara for background steps not improved upon in Voorde, such as heating the vegetables, concentrating curing solutions, and processing the curing solutions to make it last for months." *Id*. (citing Ex. 1002 ¶¶ 162–163).

With few exceptions, Kerry does not contest FFP's assertions as to the disclosure of Voorde or how it teaches the elements of the challenged claims. We find that, on these uncontested elements, FFP has proven by a preponderance of the evidence that Voorde discloses a process meeting these elements. We now turn to resolving the parties' dispute as developed during trial.

    *1.  Reason to Combine*

Kerry contends that a person of ordinary skill would not have combined Voorde and Hara, because the modification is a "substantial

rewriting" of Voorde that a person of ordinary skill would have had no reason to make. PO Resp. 24–29. Specifically, Kerry argues that Voorde does not disclose starting with a sterile medium because it only heats to 50–60°C to promote the conversion of nitrite to nitrate. *Id*. at 25. Furthermore, Kerry notes Voorde's express warning to not heat higher than 70°C to avoid reducing the enzymatic and microbiological activity of the process. *Id*.

According to Kerry, FFP proposes a "fundamentally different heating and cooling procedure" than Voorde, which would require heating Voorde's plant material to 100°C, killing natural enzymes and microbes, then cooling the material to 50–60°C before adding a starter culture. *Id*. at 26. Kerry argues that FFP's modification is based not on Dr. Baldwin's expertise, but rather on his "unscientific" testimony that washing and heating a vegetable before treatment is a common matter of "routine sterilization." *Id*. at 27 (citing Ex. 1002 ¶¶ 97–98, 119). And rather than the moderate heating of Voorde, Kerry emphasizes that Dr. Baldwin's proposal is to "sterilize" the plant material at a temperature well beyond that disclosed by Voorde. *Id*. at 29. This is allegedly supported by FFP's and Dr. Baldwin's reliance on Hara as part of the combination, which discloses boiling and steaming plant material at 100°C. *Id*. at 30–31. Kerry argues that a person of ordinary skill, if combining the references in the manner FFP proposes to "kill germs" as contended by Dr. Baldwin, would have resulted in a modified process that heats to a temperature that destroys Voorde's stated purpose of encouraging microbial conversion processes. *Id*.

FFP responds that its ground is entirely consistent with Voorde's teachings of heating the medium, noting that the claims do not require a "sterile medium." Reply 12–13. FFP notes the claims only require heating

to "reduce microbial load," which Dr. Milkowski admits would result from Voorde's heating to 50–60°C. *Id.* Furthermore, FFP argues that even if a person of ordinary skill in the art would have decided to apply Hara's heating step to its full extent of 100°C, it would have been obvious for the person of ordinary skill in the art to let the mixture cool before adding a starter culture, as Voorde explicitly teaches to avoid high temperatures. *Id.* at 13–14. FFP notes that both experts agree that sterilizing a medium before adding a starter culture was well-known in chemistry and food science at the time of the invention. *Id.* at 14 (citing Ex. 1002 ¶¶ 97–98; Ex. 1037, 122:24–123:4; Ex. 2014 ¶ 68). As such, FFP contends that Voorde does not teach away from sterilizing its medium before adding a starter culture. *Id.* at 18–19.

Upon review, we find that a person of ordinary skill in the art would have had reason to modify Voorde in the manner FFP suggests. Voorde explicitly discloses the advantages of heating the medium, and there is no disagreement that heating to 50–52°C would have resulted in at least some reduced microbial load, which is all that the claims require.[13] Indeed, Voorde describes that as a result of heating to 50–52°C, its medium is "(partially) sterilized." Ex. 1003, 7. Kerry's argument that Voorde does not disclose starting with a "sterile medium" (PO Resp. 25) is unavailing; as discussed above, we do not interpret anything in claim 1 or the '304 patent

---

[13] At oral argument, Kerry raised for the first time a claim construction argument that "heat treating," as recited in the claims, requires heating to a level in excess of what is required in Voorde, and a person of ordinary skill would have understood the term to refer to sterilization. Tr. 33:4–34:19, 55:3–9. We decline to address this late-arising argument fully, but note that we find that the '304 patent does not support such a limited interpretation of the term "heat treating."

to require a sterile medium, and Kerry does not direct us to anything in the record that would persuade us otherwise.

Nor does it matter that, as Kerry argues, the purpose of Voorde's heating is to promote conversion of nitrite to nitrate, whereas the claims recite heating to reduce microbial load. *Id.* at 25, 27. That the prior art's purposes differ from those of the inventors does not diminish the prior art's teachings, and if a step taught by the prior art would accomplish both purposes that is sufficient. *See In re Lintner*, 458 F.2d 1013, 1016 (CCPA 1972) ("The fact that appellant uses sugar for a different purpose does not alter the conclusion that its use in a prior art composition would be prima facie obvious from the purpose disclosed in the references."); *see also In re Dillon*, 919 F.2d 688, 693 (Fed. Cir. 1990) (en banc).

Based on the foregoing, we find that Voorde would have taught the person of ordinary skill to heat treat a medium to around 50°C. FFP does not rely solely on Voorde's heating, however, but rather combines Voorde's disclosure with Hara, which teaches heating to a much higher temperature. Pet. 33–36; Ex. 1023, 3:3–6, 5:10–16. At oral argument, FFP's counsel stated that this combination was to provide "objective evidence" that heat treating to kill microbes was known, and that Hara was not relied on "for a physical combination of Voorde and Hara." Tr. 12:1–13:1. Referring to the Petition, this is not so clear; there, FFP states that "Hara . . . evidences the routine heating of vegetables before use," but then also contends that the person of ordinary skill would have found it obvious to "boil[] the plant material as in Hara." Pet. 34–35.

Even if we were to interpret FFP's combination of Voorde with Hara to require heating to 100°C, we disagree that this modification would be

inconsistent with Voorde or destroy its intended purpose, as Kerry argues. PO Resp. 34–46. Voorde explicitly discusses the use of a starter culture, which would have replaced any microbes destroyed by Hara's sterilization. Although Voorde discloses adding this starter culture prior to heating to the medium, we disagree with Kerry's argument that a person of ordinary skill would not have modified the process to add the starter culture subsequent to Hara's sterilization step, if there were concerns about destroying the beneficial microbes. Dr. Milkowski—who Kerry extensively argues is a person having ordinary skill in the art (PO Resp. 8, 10–12; Sur-Reply 12)— conceded on cross-examination that, if he were adding a starter culture, he would do so after heating. Ex. 1037, 88:19–89:6 ("Q: [Y]ou would want to add the microorganisms after the heating; right? A. Well, if I were doing it, I would do that.").

For these reasons, we conclude that a person of ordinary skill in the art, seeking to reduce microbial load in a plant material prior to converting nitrate to nitrite, would have combined Voorde and Hara's disclosures in the manner FFP suggests. At the very least, the skilled artisan would have looked to Hara as evidence that pre-treatment using heat could be beneficial to reduce microbial load, a disclosure confirmed by Voorde. In addition, Hara could have been relied upon for its disclosure of full sterilization by boiling, followed by cooling prior to the addition of a starter culture as disclosed in Voorde. Neither of these modifications would have been beyond the ordinary level of skill in the art, nor do we agree that they would have made Voorde's process unsuitable for its intended purpose.

   2.  *Disclosure of Voorde and Hara in Combination*

FFP contends that Voorde, as modified by Hara to heat the medium prior to adding a starter culture, teaches or suggests each element of claims 1–5.  Pet. 30–43.  As noted above, other than disputing whether such a modification would have been made, Kerry does not dispute the disclosures of the prior art.  Dr. Milkowski also apparently agrees, testifying that Voorde discloses the elements of claim 1 except for expressly stating that heat treating would occur prior to adding a starter culture.  Ex. 1037, 81:5–87:12.

   We find that the combined disclosures of Voorde and Hara would have led a person of ordinary skill in the art to a process that has all the steps claimed in claim 1.  For example, we find that Voorde discloses contacting a meat product with a curing agent comprising a plant-based nitrite and an added organism.  Ex. 1003, 3, 6–7.  Furthermore, Voorde discloses deriving its nitrite from a plant material comprising at least 50 ppm nitrate, as Voorde's Example 1 uses spinach containing 2826 ppm nitrate. Ex. 1003, 8–9.  And we find that both Voorde and Hara disclose heating a plant material which would result in the material having a reduced microbial load, and Voorde discloses addition of an organism through its starter culture. Ex. 1003, 6; Ex. 1023, 3:3–6, 3:13–16.  Finally, Voorde discloses sterilizing its nitrite-containing product for storage, which a person of ordinary skill in the art would have understood would have inactivated the added organism. Ex. 1003, 7; Ex. 1002 ¶ 127.  In addition, we find that the combination of Voorde with Hara would also result in a process having the limitations of the dependent claims, for the reasons set forth by FFP in its Petition.  Pet. 38–41.  We note that Kerry does not separately address the dependent claims or argue their patentability separately from claim 1.

Regarding claim 5, which as noted above is directed to a meat product created by the process of claim 1, we find that its subject matter would have been obvious for the same reasons the process of claim 1 would have been obvious. Kerry argues that, by solely relying on its showings for claim 1, FFP has failed to make a prima facie case of obviousness against claim 5. PO Resp. 49–51. According to Kerry, because FFP did not compare a cured meat product produced by Voorde's process to the meat product of claim 5, there is no analysis of whether the product would be "compositionally and qualitatively distinctive." *Id*.

On the record before us, we disagree with Kerry's analysis. As noted above, we reject Kerry's interpretation of product-by-process precedent to require a "product-to-product" comparison of a single prior art reference to the claimed invention. Rather, we look to whether the "product-by-process claim is the same as or obvious from a product of the prior art" (*In re Thorpe*, 777 F.2d at 697), namely the product of the process that a person of ordinary skill in the art would have derived from the combined disclosures of Voorde and Hara, as outlined above in our analysis of claim 1. Because, as we found above, a person of ordinary skill would have arrived at the process of claim 1 based on Voorde and Hara's teachings, and Voorde discloses that its process can be used in the curing of meat products (Ex. 1003, 4), we conclude that a meat product produced using the process of claim 1 would have been obvious. Thus, claim 5 is also obvious over the disclosures of the prior art.

### 3. Conclusion as to Obviousness

For these reasons, we find that FFP has met its burden of showing that claims 1–5 would have been obvious over the combined disclosures of Voorde and Hara.

### F. Remaining Obviousness Grounds

FFP also contends that the subject matter of claims 1–5 would have been obvious over various combinations of Fast, Voorde, Yamamoto, Stumpf, and Kurihara. Pet. 43–61. Because we have determined above that the same claims would have been obvious over the combined disclosures of Voorde and Hara, these additional challenges to the claims are moot and we decline to address them as unnecessary to our ultimate determination of unpatentability. *Cf. In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009).

## III. CONCLUSION

For the foregoing reasons, we conclude that FFP has satisfied its burden of demonstrating, by a preponderance of the evidence, that claims 1–5 of the '304 patent are unpatentable,[14] and resolve the asserted grounds of unpatentability as follows:

---

[14] Should Kerry wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Kerry's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Kerry chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Kerry of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claim(s) | 35 U.S.C. § | References | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5 | 103(a) | Voorde, Hara | 1–5 | |
| 1, 4, 5 | 103(a) | Fast, Voorde, Yamamoto[15] | | |
| 2 | 103(a) | Fast, Voorde, Yamamoto, Stumpf | | |
| 3 | 103(a) | Fast, Voorde, Yamamoto, Kurihara | | |
| **Overall Outcome** | | | 1–5 | |

IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has established by a preponderance of the evidence that claims 1–5 of the '304 patent are unpatentable;

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[15] As discussed above, we do not reach this or subsequent grounds because all claims are addressed by the first ground of unpatentability.

Appx24

FOR PETITIONER:

Louis L. Campbell
Brian E. Ferguson
Juan C. Yaquian
Brett Johnson
Michael Bittner
Winston & Strawn LLP
llcampbell@winston.com
beferguson@winston.com
jyaquian@winston.com
mbjohnson@winston.com
mbittner@winston.com


FOR PATENT OWNER:

Mark Boland
Raja N. Saliba
Michael G. Raucci
L. Roman Rachuba
Sughrue Mion, PLLC
mboland@sughrue.com
rsaliba@sughrue.com
mraucci@sughrue.com
lrachuba@sughrue.com

UNITED STATES PATENT AND TRADEMARK OFFICE


BEFORE THE PATENT TRIAL AND APPEAL BOARD


Florida Food Products,

Petitioner

v.

Kerry Group and Kerry Luxembourg S.á.r.1,

Patent Owner

Case IPR2022-00006

U.S. Patent No. 11,071,304


**PETITIONER'S EXHIBIT 1001**



US011071304B2

(12) **United States Patent** 
Husgen et al.

(10) **Patent No.:** US 11,071,304 B2 
(45) **Date of Patent:** Jul. 27, 2021

(54) **METHOD AND COMPOSITION FOR PREPARING CURED MEAT PRODUCTS**

(71) Applicant: **Kerry Luxembourg S.a.r.l.,** Luxembourg (LU)

(72) Inventors: **Ann Husgen**, Rochester, MN (US); **Ken Bauman**, Rochester, MN (US); **Lacey McKlem**, Elgin, IL (US); **Petri Papinaho**, Spicer, MN (US); **Beth Jones**, Rochester, MN (US)

(73) Assignee: **Kerry Luxembourg S.a.r.l.,** Luxembourg (LU)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/269,455**

(22) Filed: **May 5, 2014**

(65) **Prior Publication Data** 
US 2014/0242217 A1 Aug. 28, 2014

**Related U.S. Application Data**

(62) Division of application No. 12/119,990, filed on May 13, 2008.

(60) Provisional application No. 60/943,163, filed on Jun. 11, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *A23B 4/22* | (2006.01) |
| *A23B 4/20* | (2006.01) |
| *A23B 4/24* | (2006.01) |
| *A23L 13/70* | (2016.01) |
| *A23L 13/40* | (2016.01) |
| *A23L 13/00* | (2016.01) |
| *A23L 13/60* | (2016.01) |

(52) **U.S. Cl.** 
CPC ................. *A23B 4/22* (2013.01); *A23B 4/20* (2013.01); *A23B 4/24* (2013.01); *A23L 13/03* (2016.08); *A23L 13/428* (2016.08); *A23L 13/60* (2016.08); *A23L 13/72* (2016.08); *A23L 13/74* (2016.08)

(58) **Field of Classification Search** 
None 
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,685,629 A | 9/1928 | Drake | |
| 4,013,797 A | 3/1977 | Gryczka | |
| 4,113,885 A | 9/1978 | Zyss | |
| 4,315,946 A | 2/1982 | Greiner et al. | |
| 4,490,396 A | 12/1984 | Hsu et al. | |
| 4,806,373 A | 2/1989 | Stumpf et al. | |
| 5,192,565 A * | 3/1993 | Buhler | A23B 7/0053 |
| | | | 426/49 |
| 5,731,018 A | 3/1998 | Janda et al. | |
| 5,980,890 A | 11/1999 | Dong et al. | |

| | | | |
|---|---|---|---|
| 5,981,260 A | 11/1999 | Metz | |
| 6,217,925 B1 | 4/2001 | Kim | |
| 6,689,403 B1 | 2/2004 | Gehring et al. | |
| 2003/0091694 A1 * | 5/2003 | Remo | A23L 11/09 |
| | | | 426/52 |
| 2007/0141228 A1 | 6/2007 | Korleski | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| BE | 1014557 A6 | 12/2003 |
| CA | 2 367 598 A1 | 10/2000 |
| CN | 101759572 B | 1/2014 |
| DE | 102006050386 A1 | 4/2008 |
| EP | 0 515 721 A1 | 12/1992 |
| EP | 0 805 205 A1 | 11/1997 |
| GB | 1 353 008 | 5/1974 |
| JP | S48 082054 A | 11/1973 |
| JP | 2001 352935 | 12/2001 |
| WO | WO 00/57728 A1 | 10/2000 |
| WO | WO 2005/013703 A1 | 2/2005 |
| WO | 2008154536 A1 | 12/2008 |

OTHER PUBLICATIONS

Ko et al. "Effect of Incubation Conditions on the Reduction of Nitrate to Nitrite by Micrococcus roseus and *Escherichia coli* O157:H7" Journal of Food and Drug Analysis 2003 vol. 11 No. 2 pp. 164-170.*

Smith et al. Journal of Applied Bacteriology "Reduction of Nitrate in a meat System by Lactobacillus plantarum" 1978 vol. 45 pp. 153-155.*

Pöhnl et al. (WO 2005013703 WIPO Patentscope utilizing Google Translation) 13 pages.*

Kurihara et al. "Production Method of Vegetable Extract or Powder thereof, which have a Coloring Effect" JP-A-S48-082054 (English Translation) pp. 1-14.*

Stewart et al. "Periplasmic Nitrate Reductase (Nap ABC Enzyme) Supports Anaerobic Respiration by *Escherichia coli* K-12" Mar. 2002 Journal of Bacteriology vol. 184 No. 5 pp. 1314-1323.*

Pohnl (WO 2005/013703) Machine Translation 8 pages (Year: 2005).*

Cammack et al. "Nitrite and nitrosyl compounds in food preservation" Biochimica et Biophysica Acta 1411 pp. 475-488 (Year: 1999).*

Walker, Ronald, "Naturally Occurring Nitrate/Nitrite in Foods", 1975, Journal of the Science of Food Agriculture, vol. 26, pp. 1735-1742.

Bickers, GA; Bäwald, G., Fermentative Ein Flüsse auf die Nitratgehalte in Gemüse-Trünken, Die Industrielle Obst-und Gemüseverwertung, Nov. 1994, pp. 395-399 (English translation attached).

Sebranek et al., "Natural and Organic Cured Meat Products: Regulatory, Manufacturing, Marketing, Quality, and Safety Issues", Mar. 2007 (American Meat Science Association White Paper Series No. 1; pp. 1-15.

Rosypal et al., "The Classification of Micrococci and Staphylococci Based on their DNA Base Composition and Adanonian Analysis" (J. Gen. Microbiology 1966 vol. 44; pp. 281-292.

(Continued)

*Primary Examiner* — Felicia C Turner 
(74) *Attorney, Agent, or Firm* — Sughrue Mion, PLLC

(57) **ABSTRACT**

The invention provides a curing agent comprising a plant-based nitrite derived from plant material comprising nitrate and a process for preparing the curing agent comprising contacting a plant material with an organism capable of converting nitrate to nitrite. The curing agent can be used to preserve or cure meat or meat products.

**5 Claims, No Drawings**

**Florida Food Products, LLC**   **IPR2022-00006**   **Ex. 1001, p. 1**

Appx616

(56)         **References Cited**

OTHER PUBLICATIONS

Casaburi et al., "Technological activities of *Staphylococcus carnosus* and *Staphylococcus simulans* strains isolated from Fermented Sausages," 2005 Meat Science 71; pp. 643-650.

Matsubara, "Notice of Reasons for Refusal" (Office Action), dated Aug. 21, 2012, pp. 3-4E and English translation pp. 1-4.

European Patent Office, Brief Communication dated Dec. 27, 2010, 14 pages.

Communication dated Apr. 19, 2017 from the State Intellectual Property Office of the P.R.C. in counterpart Application No. 2013107221496.

Lowell Klepper, "A Mode of Action of Herbicides: Inhibition of the Normal Process of Nitrite Reduction", Historical Research Bulletins of the Nebraska Agricultural Experiment Station (1913-1993). 201., Feb. 1974, 45 pages total.

Muhammad Aslam, et al., "Role of Nitrate and Nitrite in the Induction of Nitrite Reductase in Leaves of Barley Seedings", Plant Physiol., 1989, vol. 91, pp. 1152-1156.

Emelia E. Timpo, et al., "Expression of Nitrate and Nitrite Reductase Activities under Various Forms of Nitrogen in *Phaseolus vulgaris* L.", Plant Physiol., 1983, vol. 72, pp. 71-75.

Lin et al., "Changes in the Nitrate and Nitrite Contents of Fresh Vegetables During Cultivation and Post-Harvest Storage," Food and Cosmetics Toxicology; vol. 18, Issue 6, 1980. (pp. 597-603).

Loomis Jr., "What do Plant Enzymes do?" Food Enzyme Institute, Copyright 1988-2017. (1 page total).

Ramarao et al., "Inactivation of Nitrate Reductase from Wheat and Rice Leaves," Phytochemistry, vol. 20, No. 7, 1981. (pp. 1487-1491).

R. Angelotti et al., "Time-Temperature Effects on Salmonellae and Staphylococci in Foods, III. Thermal Death Time Studies", Appl. Microbiol., Oct. 11, 1950, vol. 9, pp. 308-315 (10 pages total).

Gupta, "Food and Industrial Microbiology", Food Preservation, Sep. 17, 2007 (27 pages).

"Survey of Nitrates and Nitrites in Food and Beverages in Australia", Food Standards Australia New Zealand, Nov. 2011 (78 pages).

Whittington, "Fermentation Broth Clarification Techniques", Applied Biochemistry and Biotechnology, The Humana Press Inc., vol. 23, 1990 (31 pages).

De Boer, "The Use of Nitrates and Nitrites in Meat Curing and Preservation: An Abstract of a Thesis submitted in partial fulfillment of the requirements for the degree of doctor of philosophy in bacteriology in the graduate school of The University of Illinois", 1941 (6 pages).

Notice of Grounds for the Decision of the Opposition Division dated Dec. 19, 2018, issued by the European Patent Office in application No. EP 08770585.1.

Bahadoran, et al., "Nitrate and nitrite content of vegetables, fruits, grains, legumes, dairy products, meats and processed meats", Journal of Food Composition and Analysis 51, 2016 (pp. 93-105).

Renix, "Evaluation of the Thermal Inactivation Kinetics of Surrogate Vegetative Bacteria", Masters Theses, University of Tennessee, Trace: Tennessee Research and Creative Exchange, 2015 (54 pages).

"What is Bacillus subtilis natto?", Japanese Natto Kinase Association, 2017 (2 pages) http://i-nattokinase.org/en/inkna_nattou_02.html.

Alexander, Jan, et al., Nitrate in vegetables, Scientific Opinion of the Panel on Contaminants in the Food chain, The EFSA Journal (2008) 689, 1-79.

Machine Translation of Notice of Reasons for Refusal dated Jan. 15, 2019 from the Japanese Patent Office in application No. 214185/2017.


* cited by examiner

# METHOD AND COMPOSITION FOR PREPARING CURED MEAT PRODUCTS

## BACKGROUND OF THE INVENTION

The preservation of meat and meat products has been practiced for many years in a variety of ways, such as by smoking, treatment with salt or nitrite, or combinations thereof. In one method for preparing cured meat and meat products, the meat or meat product desired to be cured is exposed to a nitrate-containing substance. Bacteria or other organisms that are capable of converting the nitrate to nitrite are then added to the mixture of the meat or meat product to be cured and the nitrate-containing substance to ferment the nitrate to nitrite. The presence of nitrite gives the meat a distinct color and flavor, in addition to preventing the growth of harmful microorganisms. The curing processes described in the prior art present several problems. The number and sensitivity of the steps involved in such curing processes leads to variable curing of the meat, resulting in an inconsistent product. In addition, the process of converting nitrate to nitrite using bacteria or another organism requires additional processing time, thus slowing the prior art processes. There is need in the art for a commercially viable process for preserving or curing meat and meat products which does not include the introduction into the meat curing process of a nitrate-containing substance and bacteria or other organisms for the conversion of nitrate to nitrite by fermentation, and thus which eliminates the problems outlined above.

## BRIEF SUMMARY OF THE INVENTION

The invention provides a curing agent comprising a plant-based nitrite derived from plant material comprising nitrate. The curing agent is capable of curing a meat or meat product and can be prepared outside the meat curing process so as to eliminate the need to introduce bacteria or other organisms along with a nitrate-containing substance into the environment sought to be maintained during curing. This simplifies the number of steps involved in the curing process, increases the speed at which the process occurs, and generally results in a more consistent product.

The invention also provides a process for preparing a curing agent comprising (i) selecting a plant material comprising nitrate, (ii) contacting the plant material with an organism capable of converting said nitrate to nitrite, and (iii) converting a predetermined amount of nitrate to nitrite.

The invention further provides a process for preserving meat or meat product comprising contacting meat or meat product with a curing agent comprising plant-based nitrite, wherein the plant-based nitrite is derived from plant material comprising nitrate, by contacting the plant-based nitrite with the meat or meat product, wherein the meat or meat product is preserved.

The invention also provides a cured meat or meat product, cured by exposing or treating uncured meat or meat product to a curing agent comprising plant-based nitrite. The curing agent of the present invention comprises a sufficient amount of nitrite to cure meat or meat product upon exposure to the curing agent. Similarly, the curing agent comprises plant-based nitrite derived from plant material comprising a sufficient amount of nitrate such that when the plant material is exposed to bacteria or other organism capable of converting nitrate to nitrite, the curing agent has a sufficient amount of nitrate to be effective to cure meat or meat product.

## DETAILED DESCRIPTION OF THE INVENTION

In accordance with the invention a curing agent comprising plant-based nitrite derived from plant material comprising nitrate is provided. The curing agent comprises an amount of nitrite such that the curing agent is capable of curing meat or meat product.

The terms meat and meat product, as they relate to the invention described herein, mean any edible tissue or flesh derived from the taxon of organisms that fall within the Kingdom Animalia, including all red meats, pork, poultry, fish, wild game, and combinations thereof.

The curing agent comprises plant-based nitrite and can be derived from any nitrate-containing plant material including, for example, plant extracts, plant juices, plant powders, or any plant derivative which contains nitrate, preferably at least about 50 ppm nitrate. Suitable plant materials include, but are not limited to, celery, beet, spinach, lettuce, cabbage, cucumber, eggplant, mushroom, green pepper, butternut squash, zucchini, mixed salad greens, carrot, artichoke, green bean, lima bean, broccoli, cauliflower, collard green, corn, mustard, okra, onion, Chinese pea pod, black eyed pea, green pea, potato, turnip, sauerkraut, radish and the like. Other edible plant material containing nitrate, preferably at least about 50 ppm nitrate, also can be used. Any mixture or combination of plant materials can be used to make the curing agent. Suitable plant material is available from commercial suppliers such as Florida Food Products, Inc. and Vegetable Juices, Inc. The plant material can be processed in any of a number of ways which are known to those of ordinary skill in the art, such as by low temperature concentration, blending, filtration, pasteurization, and vacuum drying. Aqueous liquid plant material, concentrates or dry powder can be used to make the curing agent.

The nitrate concentration of the plant material used to make the curing agent is preferably at least 50 ppm; plant material with higher nitrate concentrations are also useful. Thus, for example, the nitrate concentration of the plant material is at least about 100 ppm (e.g., at least about 200 ppm, at least about 300 ppm, at least about 400 ppm, at least about 500 ppm, at least about 600 ppm, or at least about 700 ppm). The nitrate concentration of the plant material is preferably about 24,000 ppm or less (e.g., about 20,000 ppm or less, about 15,000 ppm or less, about 10,000 ppm or less, about 8000 ppm or less, about 5000 ppm or less, about 3000 ppm or less, about 2500 ppm or less, or about 2000 ppm or less). Preferably, the nitrate concentration of the plant material is, for example, about 100 ppm to about 10,000 ppm, about 100 ppm to about 5000 ppm, about 200 ppm to about 5000 ppm, about 300 ppm to about 3000 ppm, about 400 ppm to about 1000 ppm, about 50 ppm to about 3000 ppm, or about 100 ppm to about 2500 ppm.

In keeping with the invention, at least a portion of the nitrate naturally occurring in the plant material is converted to nitrite to form the curing agent. It is not necessary nor, in the preferred embodiment of this invention, is it desirable, to add either nitrate or nitrite to the plant material. Thus, the curing agent is, particularly in the preferred embodiments, substantially free of non-natural nitrate and nitrite. The term non-natural nitrate or nitrite, as it relates to the invention described herein, means any nitrate or nitrite which is artificially added to the plant material and thus is not naturally contained within the plant material.

The curing agent can further comprise additional components, including but not limited to, yeast extract, protein hydrolyzates, amino acids, vitamins, minerals, and carbo-

3

hydrates. Prior to the conversion of nitrate to nitrite, the pH and salt content of the plant material can be adjusted with the addition of a suitable acid, base, salt, or combination thereof. The plant material can be subjected to additional processing steps prior to conversion of nitrate to nitrite. Such processing steps can include, but are not limited to, heat treatment, filter sterilization, or a process which reduces the initial microbial load.

The invention also provides a process for preparing a curing agent comprising (i) selecting a plant material comprising nitrate, preferably at least about 50 ppm nitrate, (ii) contacting the plant material with an organism capable of converting nitrate to nitrite, and (iii) converting a predetermined amount of nitrate to nitrite.

Any organism capable of converting nitrate to nitrite can be used in the process of the present invention. Any organism possessing nitrate reductases or other enzymes capable of converting nitrate to nitrite can be used. Such organisms can include both food grade and non-food grade organisms. Suitable organisms include but are not limited to yeast, fungi, and bacteria. The organism can be, for example, *E. coli, Rhodobacter sphaeroides, Paracoccus pantotrophus, Wautersia eutropha, Bradyrhizobium japonicum,* any *Pseudomonas* species, *Campylobacter jejunii, Wollinella succinogenes, Haemophylus influenzae, Shewanella oneidensis, Desulfitobacterium hafniense, Rhodobacter capsulatus, Klebsiella pneumoniae, Bacillus subtilis,* the genus *Cyanobacteria,* any *Synechococcus* species, the genus *Haloferax,* the genus *Haloarcula,* and *Thermus thermophilus.* Preferably, the organism is a single strain or combination of bacterial strains within the Micrococcaceae family, including *Micrococcus* and *Staphylococcus,* Gram-positive cocci, including *Enterococcus, Lactococcus, Leuconostoc, Pediococcus, Streptococcus,* and *Staphylococcus,* and all lactic acid bacteria. Examples of the organism or organisms useful in the process of the invention include *M. varians, S. carnosus,* or a combination thereof. It is believed that the organism interacts with the nitrate in the plant material to reduce the plant-based nitrate to nitrite (e.g., by fermentation, metabolic, and/or enzymatic activity).

The nitrate to nitrite conversion process can occur under any suitable parameters. The pH is any pH at which sufficient conversion of nitrate to nitrite occurs. The pH is preferably at least about 5 (e.g., at least about 5.5, at least about 6, at least about 6.5, at least about 7, or at least about 7.5). The pH is preferably about 9 or less (e.g., about 8 or less, about 7 or less, about 6.5 or less, about 6 or less, or about 5.5 or less). The pH is, for example, about 5 to about 9, about 6 to about 8, about 6.5 to about 8, about 6.5 to about 7.5, or about 6.5 to about 7.

The temperature at which the conversion occurs can be any suitable temperature. The temperature at which the conversion occurs is preferably at least about 0° C. (e.g., at least about 15° C., at least about 20° C., at least about 25° C., at least about 30° C., or at least about 35° C.). The temperature at which the conversion occurs is preferably about 50° C. or less (e.g., about 45° C. or less, about 40° C. or less, about 35° C. or less, or about 30° C. or less). The temperature at which the conversion occurs can be, for example, about 0° C. to about 50° C., about 20° C. to about 45° C., about 21° C. to about 43° C., or about 35° C. to about 40° C.

The salt concentration is the salt concentration at which the conversion of nitrate to nitrite occurs. The salt concentration is preferably at least about 0.5 wt. % (e.g., at least about 1 wt. %, at least about 2 wt. %, at least about 3 wt. %, at least about 4 wt. %, or at least about 5 wt. %). The salt

4

concentration is preferably about 8 wt. % or less (e.g., about 6 wt. % or less, about 5 wt. % or less, about 4 wt. % or less, about 3 wt. % or less, about 2 wt. % or less, or about 1 wt. % or less). The salt concentration can be, for example, about 0.1 wt. % to about 8 wt. %, about 0.1 wt. % to about 7 wt. %, about 0.5 wt. % to about 6 wt. %, about 1 wt. % to about 7 wt. %, or about 1 wt. % to about 6 wt. %.

The nitrate to nitrite conversion process can occur under either aerobic or anaerobic aeration conditions, with or without pH control, temperature control, or agitation, until a predetermined level of nitrite is reached. In one embodiment, the conversion process occurs under anaerobic conditions achieved with a nitrogen sparge and low agitation throughout. In another embodiment, the conversion process occurs under anaerobic conditions achieved via low agitation, without a sparge. In another embodiment, the conversion occurs under aerobic conditions achieved with a low air sparge and agitation throughout the conversion process. In another embodiment, the conversion occurs under aerobic conditions achieved with an air sparge and an oxygen sparge, with agitation, wherein levels of 20% dissolved oxygen are maintained throughout the conversion process. In an additional embodiment, the conversion occurs under aerobic conditions achieved initially with a low air sparge with agitation until mid-conversion, at which point an oxygen sparge is added. In a further embodiment, the conversion occurs under aerobic conditions achieved with an air sparge and an oxygen sparge, with agitation, wherein levels of 20% dissolved oxygen are maintained until mid-conversion, at which point the oxygen sparge is removed and the level of agitation is lowered. The nitrite levels can be monitored using techniques such as nitrate depletion, nitrite accumulation, optical density, carbohydrate depletion, or other suitable methods for monitoring fermentation progress, techniques well known to those of ordinary skill in the art.

When the predetermined level of nitrite is reached, the curing agent can be inactivated using methods known to those of ordinary skill in the art. Useful inactivation methods include, but are not limited to, filter sterilization, heat treatment such as pasteurization, sterilization, or centrifugation. When the predetermined level of nitrite is reached, the organism can be inactivated and remain in the curing agent, or inactivated and removed from the curing agent.

The nitrite concentration of the curing agent is a concentration sufficient to cure meat or meat product upon exposure or treatment of uncured meat or meat product to the nitrite-containing curing agent. The curing agent can be concentrated and/or dried after processing of the curing agent is complete by using methods which are known to those of ordinary skill in the art. Similarly, the concentrated curing agent can be diluted before it contacts the meat or meat product by using methods which are known to those of ordinary skill in the art. The nitrite concentration of the concentrated curing agent can be any suitable concentration. The nitrite concentration of the curing agent is preferably at least about 50 ppm (e.g., at least about 100 ppm, at least about 200 ppm, at least about 300 ppm, at least about 400 ppm, at least about 500 ppm, or at least about 600 ppm). The nitrite concentration of the curing agent is preferably about 24,000 ppm or less (e.g., about 20,000 ppm or less, about 15,000 ppm or less, about 10,000 ppm or less, about 8000 ppm or less, about 5000 ppm or less, about 3000 ppm or less, or about 2000 ppm or less). The nitrite concentration of the curing agent can be, for example, about 50 ppm to about 24,000 ppm, about 100 ppm to about 10,000 ppm, about 200

Appx619

ppm to about 8000 ppm, about 300 ppm to about 6000 ppm, about 400 ppm to about 5000 ppm, or about 500 ppm to about 1000 ppm.

The invention provides a process for preserving meat or meat product comprising contacting the meat or meat product with a curing agent comprising plant-based nitrite. The plant-based nitrite is derived from plant material comprising nitrate in an amount sufficient to cure the uncured meat or meat product upon exposure to or treatment with the curing agent. Preferably the curing agent comprises at least about 50 ppm nitrite.

The invention also provides a cured meat or meat product, wherein the meat or meat product has been treated with a curing agent comprising plant-based nitrite and the plant-based nitrite is derived from plant material comprising nitrate, preferably at least about 50 ppm nitrite.

The terms preserving, preserve(d), curing, and cure(d), as they relate to the invention described within, mean any improvement in the amount of time that meat or meat product treated with the curing agent can be safely stored (e.g., shelf-life), or remains sensory, organoleptic, or color-acceptable, when compared with meat or meat products that have not been cooked, cured, preserved, or treated with any shelf-life extending agent, such as salt or smoke.

The curing agent of the present invention can be used to cure any of a wide variety of uncured meat or meat product that it is desired to cure. Uncured meat or meat product that can be cured with the curing agent of the present invention include, but are not limited to, whole muscle meats, emul-sified meats, and the like. Cured meat or meat products include, for example, ham, turkey, chicken, hot dogs, lunch meat, bacon and the like.

The nitrite concentration of the curing agent which con-tacts the meat or meat product can be any suitable concen-tration. The nitrite concentration of the curing agent which contacts the meat or meat product can be at least about 10 ppm (e.g., at least about 30 ppm, at least about 50 ppm, at least about 75 ppm, at least about 100 ppm, or at least about 125 ppm). The nitrite concentration of the curing agent which contacts the meat or meat product can be about 300 ppm or less (e.g., about 250 ppm or less, about 200 ppm or less, about 175 ppm or less, about 156 ppm or less, or about 125 ppm or less). The nitrite concentration of the curing agent which contacts the meat or meat product can be, for example, about 10 ppm to about 300 ppm, about 20 ppm to about 275 ppm, about 30 ppm to about 250 ppm, about 40 ppm to about 220 ppm, or about 50 ppm to about 200 ppm.

The following examples further illustrate the invention but, of course, should not be construed as in any way limiting its scope.

EXAMPLE 1

This example illustrates the effect of fermentation on the nitrate to nitrite conversion levels of various sources of plant material.

The source of plant material used in each of the compo-sitions is indicated below in Table 1. Each composition contained the juice concentrate specified in Table 1 that was diluted 1:10 in de-ionized water to which 0.3 wt. % yeast extract was added. The pH of each composition was adjusted to 7 with 50% sodium hydroxide. The compositions were sterilized at 121° C. for 15 minutes. Each composition was then inoculated with *M. varians* and placed in a shaker at 200 rpm and incubated at 31° C. for 8-20 hours.

The nitrite concentration (ppm) was determined before and after fermentation for each composition, and the results are shown in Table 1.

TABLE 1

| Vegetable Source | Nitrite Conc. Before Fermentation (ppm) | Nitrite Conc. After Fermentation (ppm) |
|---|---|---|
| Cabbage | 0 | 280 |
| Bell Pepper | 0 | 13 |
| Beet | 0 | 724 |
| Celery | 0 | 1086 |

The data presented in Table 1 show that the fermentation process increased the nitrite levels in each type of plant material examined.

EXAMPLE 2

This example illustrates the effect of sodium chloride used during the fermentation process on the nitrate to nitrite conversion levels of a plant material.

The strain of bacteria and amount of sodium chloride used in each of the compositions are indicated below in Table 2. Each composition contained celery juice concentrate that was diluted 1:10 in de-ionized water to which 0.3 wt. % yeast extract was added. The pH of each composition was adjusted to 7 with 50% sodium hydroxide. The compositions were sterilized at 121° C. for 15 minutes. Each composition was then inoculated with either *M. varians* or *S. carnosus* and placed in a shaker at 200 rpm and incubated at 31° C. for 8-20 hours.

The nitrite concentration (ppm) was determined after fermentation for each composition, and the results are shown in Table 2.

TABLE 2

| NaCl Conc. (wt. %) | *M. varians* Nitrite Conc. (ppm) | *S. carnosus* Nitrite Conc. (ppm) |
|---|---|---|
| 0 | 1086 | 724 |
| 5 | 767 | 382 |
| 7.50 | 28 | 17 |
| 10 | 0 | 0 |
| 12.50 | 0 | 0 |
| 15 | 0 | 0 |

The data presented in Table 2 show that a sodium chloride concentration of 10% or above inhibits the formation of any nitrite in compositions containing either strain of bacteria.

EXAMPLE 3

This example illustrates the effect of temperature used during the fermentation process on the nitrate to nitrite conversion levels of a plant material.

The temperature level and strain of bacteria used in each of the compositions is indicated below in Table 3. Each composition contained celery juice concentrate that was diluted 1:10 in de-ionized water to which 0.3 wt. % yeast extract was added. The pH of each composition was adjusted to 7 with 50% sodium hydroxide. The compositions were sterilized at 121° C. for 15 minutes. Each composition was then inoculated with either *M. varians* or *S. carnosus* and placed in a shaker at 200 rpm and incubated at the tempera-ture indicated in Table 3 for 8-20 hours.

The nitrite concentration (ppm) was determined after fermentation for each composition, and the results are shown in Table 3.

TABLE 3

| Temperature | *M. varians* Nitrite Conc. (ppm) | *S. carnosua* Nitrite Conc. (ppm) |
|---|---|---|
| 4.4° C. | 8 | 0 |
| 22.2° C. | 1020 | 102 |
| 37.8° C. | 1086 | 724 |
| 40.6° C. | 767 | 576 |
| 43.3° C. | 855 | 428 |
| 46.1° C. | 9 | 82 |
| 48.9° C. | 0 | 0 |

The data presented in Table 3 show that a temperature of 22.2° C.-43.3° C. increased the amount of nitrite production from plant material that was fermented with either strain of bacteria.

EXAMPLE 4

This example illustrates the effect of pH used during the fermentation process on the nitrate to nitrite conversion levels of a plant material.

The pH and cell count at 0 hours and 20 hours are indicated below in Table 4. Each composition contained celery juice concentrate that was diluted 1:10 in de-ionized water to which 0.3 wt. % yeast extract was added. The compositions were sterilized at 121° C. for 15 minutes. Each composition was then inoculated with *M. varians* and placed in a shaker at 200 rpm and incubated at 31° C. for 20 hours.

The nitrite concentration (g/L) was determined before and after 20 hours of fermentation for each composition, and the results are shown in Table 4.

TABLE 4

| PH | Cell Count, 0 hrs. Incubation (cfu/ml) | Cell Count, 20 hrs. Incubation (cfu/ml) | Nitrite Conc., 0 hrs. Incubation (mg/L) | Nitrite Conc., 20 hrs. Incubation (mg/L) |
|---|---|---|---|---|
| 5 | 6.7E+07 | 1.2E+08 | 0 | 500 |
| 5.5 | 6.7E+07 | 4.1E+08 | 0 | 1000 |
| 6 | 6.7E+07 | 8.3E+08 | 0 | 1000 |
| 6.5 | 6.7E+07 | 1.9E+09 | 0 | 1500 |
| 7 | 6.7E+07 | 3.2E+09 | 0 | 1500 |
| 7.5 | 6.7E+07 | 2.8E+09 | 0 | 1500 |
| 8 | 6.7E+07 | 1.7E+09 | 0 | 1500 |

The data presented in Table 4 show that a pH of 6.5-8 increased the amount of nitrite production in plant material that was examined.

EXAMPLE 5

This example illustrates the effect of the aeration conditions used during the fermentation process on the nitrate to nitrite conversion levels of a plant material.

The aeration conditions and incubation time of each composition are indicated below in Table 5. It should be noted that when the aeration conditions depend on the level of dissolved oxygen, the levels of agitation and aeration vary in order to maintain the desired amount of dissolved oxygen. Each composition contained celery juice concentrate that was diluted 1:10 in de-ionized water to which 0.3 wt. % yeast extract was added. The pH of each composition was adjusted from 6.8 to 6.5 with 50% sodium hydroxide. The

compositions were sterilized at 121° C. for 20 minutes. Each composition was then inoculated with *M. varians* and placed in an incubator at 31° C.

The nitrite concentration (mg/L) was determined after fermentation for each composition, and the results are shown in Table 5.

TABLE 5

| Aeration Conditions | Fermentation Time (hours) | Nitrite Conc. (mg/L) |
|---|---|---|
| Anaerobic w/nitrogen sparge | 13 | 1546 |
| Fermentation w/low agitation only (5%) | 12 | 1250 |
| Aerobic w/low air sparge (5 L/min aeration) and low agitation (5%) | 13 | 1382 |
| Aerobic w/air sparge, oxygen sparge, and low agitation (5%), wherein levels of 20% dissolved oxygen were maintained | 11 | 724 |
| Aerobic w/low air sparge (5 L/min aeration) and low agitation (5%) until mid-fermentation, wherein an oxygen sparge was added and conditions were changed to maintaining levels of 20% dissolved oxygen | 12.5 | 1020 |
| Aerobic w/air sparge, oxygen sparge, and low agitation (5%), wherein levels of 20% dissolved oxygen were maintained until mid-fermentation, wherein conditions were changed to a low air sparge (5 L/min) with low agitation | 12.5 | 1382 |

The data presented in Table 5 show that anaerobic conditions, aerobic conditions, or various combinations of such all enabled conversion of nitrate to nitrite in the plant material that was examined.

EXAMPLE 6

This example illustrates the use of the curing agent in the preparation of a cured ham product.

Each composition contained celery juice concentrate was diluted to 4.3% solids. 0.3 wt. % yeast extract was added to the composition, which was then inoculated with *M. varians*. The pH of the composition was adjusted from 6.8 to 6.5 with sodium hydroxide. A temperature of 31° C. and an agitation level of 10% were maintained throughout the fermentation process. After 6 hours of fermentation, a 5 SCFM air sparge was added. The fermentation continued until base addition flatlined. After fermentation was completed, the pH of the composition was adjusted to 7.5 with sodium hydroxide. The fermentate temperature was brought to 95° C. for 20 minutes, then the fermentate was concentrated to 46% solids. The fermentate was than autoclaved at 121° C. for 15 minutes. The resulting curing agent contained approximately 5000 ppm nitrite, which corresponds to approximately 7500 ppm sodium nitrite.

The curing agent was formulated in 40% extended hams from Swift & Company (NAMP 402F, pork leg (fresh ham), inside) at concentrations of 75 ppm, 150 ppm, and 200 ppm sodium nitrite, which corresponds to 50 ppm, 100 ppm, and 133 ppm nitrite per meat green weight, respectively. Meat green weight is the weight of the raw meat before the addition of other components or cooking, thus a 40% extended ham contains 40 wt. % non-meat ingredients. In addition, an uncured ham and a ham to which 200 ppm sodium nitrite was directly added served as controls. It should be noted that all nitrite concentrations listed in Tables 6-8 are calculated as ppm sodium nitrite.

The five different formulations examined are indicated below in Table 6.

Appx621

TABLE 6

| Ingredient | Uncured Control | Nitrite Control (200 ppm) | Curing Agent (75 ppm Nitrite) | Curing Agent (150 ppm Nitrite) | Curing Agent (200 ppm Nitrite) |
|---|---|---|---|---|---|
| Pork, inside rounds (%) | 100 | 100 | 100 | 100 | 100 |
| Water/Ice (%) | 35.82 | 35.50 | 34.82 | 33.82 | 33.15 |
| Salt (%) | 2.10 | 2.10 | 2.10 | 2.10 | 2.10 |
| Sodium tripolyphosphate (%) | 0.63 | 0.63 | 0.63 | 0.63 | 0.63 |
| Dextrose (%) | 1.40 | 1.40 | 1.40 | 1.40 | 1.40 |
| Curing salt containing 6.25 wt. % sodium nitrite (%) | — | 0.32 | — | — | — |
| Sodium erythorbate (%) | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| Curing agent (%) | | | 1.00 | 2.00 | 2.67 |
| Total (%) | 140 | 140 | 140 | 140 | 140 |

A brine was prepared by mixing water and ice, sodium tripolyphosphate, salt, the curing agent or sodium nitrite, dextrose, and sodium erythorbate at the concentrations listed in Table 6. The pork was then injected with 40% of the brine and vacuum tumbled for 2 hours at 8 rpm. The product was held overnight under refrigeration at 2.7° C. The product was then tumbled for 15-30 minutes, packaged in heat shrink vacuum bags, and cooked at 100% humidity in a smoke-house for 1 hour at 48.9° C., 1 hour at 60° C., 1 hour at 71° C., and at 82° C. until it reached an internal temperature of 71° C. The product was then showered until the temperature dropped below 37.8° C. and was stored under refrigeration at 2.7° C. Yield and color measurements were then taken.

The percent yield of each of the five different formulations examined is indicated below in Table 7. As is apparent from the data presented, the addition of the curing agent neither significantly (p>0.05) increased nor decreased the final yield of the product.

TABLE 7

| Nitrite Additive | % Yield |
|---|---|
| Uncured Control | 94.7 |
| Nitrite Control (200 ppm) | 92.7 |
| Curing Agent (75 ppm Nitrite) | 93.4 |
| Curing Agent (150 ppm Nitrite) | 93.2 |
| Curing Agent (200 ppm Nitrite) | 92.6 |

The color of slices of the treated ham product was also measured using a Minolta Chroma-meter (CR-300), wherein L* (100=white, 0=black), a* (+60=red, −60=green), and b* (+60=yellow, −60=blue) were measured and are listed below in Table 8. The a* values indicated that both the nitrite control ham product and the curing agent treated ham product appeared more red or pink in color when compared with the uncured sample. This was expected, as meat products that have been treated with nitrite typically have a red/pink appearance when compared with untreated meat products. The differences in color between the hams treated with the three different concentrations of curing agent were minimal.

TABLE 8

| Nitrite Additive | L* | a* | b* |
|---|---|---|---|
| Uncured Control | 71.68 | 5.85 | 10.12 |
| Nitrite Control (200 ppm) | 70.24 | 10.32 | 5.93 |
| Curing Agent (75 ppm Nitrite) | 66.29 | 11.28 | 7.45 |
| Curing Agent (150 ppm Nitrite) | 63.39 | 10.82 | 7.64 |
| Curing Agent (200 ppm Nitrite) | 64.28 | 9.25 | 7.42 |

EXAMPLE 7

This example illustrates the use of the curing agent in the preparation of a cured hot dog product.

Each composition contained celery juice concentrate was diluted to 4.3% solids. 0.3 wt. % yeast extract was added to the composition, which was then inoculated with *M. varians*. The pH of the composition was adjusted from 6.8 to 6.5 with sodium hydroxide. A temperature of 31° C. and an agitation level of 10% were maintained throughout the fermentation process. After 6 hours of fermentation, a 5 SCFM air sparge was added. The fermentation continued until base addition flatlined. After fermentation was completed, the pH of the composition was adjusted to 7.5 with sodium hydroxide. The fermentate temperature was brought to 95° C. for 20 minutes, then the fermentate was concentrated to 46% solids. The fermentate was then autoclaved at 121° C. for 15 minutes. The resulting curing agent contained approximately 5000 ppm nitrite, which corresponds to approximately 7500 ppm sodium nitrite.

The curing agent was formulated in a meat block from Amity Packing Company ((NAMP 402F, pork leg (fresh ham) and NAMP 418, pork trimmings) comprising 56% lean pork, 31% 80/20 pork trimmings, and 13% 50/50 pork trimmings at concentrations of 75 ppm and 156 ppm sodium nitrite, which corresponds to 50 ppm and 104 ppm nitrite per meat green weight, respectively. The meat green weight is the weight of the raw meat before the addition of other components or cooking. In addition, an untreated hot dog and a hot dog to which 156 ppm sodium nitrite was directly added served as controls. It should be noted that all nitrite concentrations listed in Tables 9-11 are calculated as ppm sodium nitrite.

The four different formulations examined are indicated below in Table 9.

**11**

TABLE 9

| Ingredient | Uncured Control | Nitrite Control (156 ppm) | Curing Agent (75 ppm Nitrite) | Curing Agent (156 ppm Nitrite) |
|---|---|---|---|---|
| Meat block (%) | 100 | 100 | 100 | 100 |
| Water/Ice (%) | 20.83 | 20.58 | 19.83 | 18.75 |
| Salt (%) | 2.50 | 2.50 | 2.50 | 2.50 |
| Sodium tripolyphosphate (%) | 0.37 | 0.37 | 0.37 | 0.37 |
| Dextrose (%) | 1.25 | 1.25 | 1.25 | 1.25 |
| Curing salt containing 6.25 wt. % sodium nitrite | — | 0.25 | — | — |
| Sodium erythorbate (%) | 0.05 | 0.05 | 0.05 | 0.05 |
| Curing agent (%) | — | — | 1.00 | 2.08 |
| Total | 125 | 125 | 125 | 125 |

The meat was pre-ground or chopped and placed in a bowl chopper with the sodium tripolyphosphate, salt, sodium nitrite or curing agent, and half of the water and ice, at the concentrations listed in Table 9. The product was chopped under a vacuum for approximately 3 minutes until an even batter is formed. The remaining water and ice, pork, and additional ingredients (see Table 9) were added to the mixture. The product was mixed until a fine batter was formed. The product was then vacuum stuffed into 28 mm diameter cellulose casings. The product was cooked for 15 min at 48.9° C./−17.8° C. (dry bulb/wet bulb), 45 min at 62.8° C./43.3° C., 10 min at 65.5° C./44.4° C., 10 min at 73.9° C./54.4° C., 10 min at 79.4° C./62.8° C., and 4 min at 82.2° C./76.7° C., resulting in a 71° C. internal temperature of the product, which was then followed by a 10 minute shower. The product was cooled and the percent yields and color measurements were taken.

The percent yield of each of the four different formulations examined is indicated below in Table 10. As is apparent from the data presented, the addition of the curing agent neither significantly increased nor decreased the final yield of the product.

TABLE 10

| Nitrite Additive | % Yield |
|---|---|
| Uncured Control | 90.7 |
| Nitrite Control (156 ppm) | 88.8 |
| Curing Agent (75 ppm Nitrite) | 89.5 |
| Curing Agent (156 ppm Nitrite) | 91.1 |

The color of slices of the treated hot dog product was also measured using a Minolta Chroma-meter (CR-300), wherein L* (100=white, 0=black), a* (+60=red, −60=green), and b* (+60=yellow, −60=blue) were measured and are listed below in Table 11. The a* values indicated that both the nitrite control hot dog product and the curing agent treated hot dog product appeared more red or pink in color when compared with the uncured sample. This was expected, as meat products that have been treated with nitrite typically have a red/pink appearance when compared with untreated meat

**12**

products. The differences in color between the hot dog products treated with the two different concentrations of curing agent were minimal.

TABLE 11

| Nitrite Additive | L* | a* | b* |
|---|---|---|---|
| Uncured Control | 69.40 | 4.00 | 10.71 |
| Nitrite Control (156 ppm) | 71.55 | 10.83 | 8.70 |
| Curing Agent (75 ppm Nitrite) | 68.80 | 9.73 | 9.12 |
| Curing Agent (156 ppm Nitrite) | 68.27 | 10.64 | 10.13 |

All references, including publications, patent applications, and patents, cited herein are hereby incorporated by reference to the same extent as if each reference were individually and specifically indicated to be incorporated by reference and were set forth in its entirety herein.

Preferred embodiments of this invention are described herein, including the best mode known to the inventors for carrying out the invention. Variations of those preferred embodiments may become apparent to those of ordinary skill in the art upon reading the foregoing description. Accordingly, this invention includes all modifications and equivalents of the subject matter recited in the claims appended hereto as permitted by applicable law. Moreover, any combination of the above-described elements in all possible variations thereof is encompassed by the invention unless otherwise indicated herein or otherwise clearly contradicted by context.

What is claimed is:

1. A process for preserving a meat or meat product comprising

contacting the meat or meat product to be preserved with a curing agent comprising a plant-based nitrite and an added organism, the plant-based nitrite being derived from a plant material comprising at least about 50 ppm nitrate and the organism, wherein the plant material is heat treated prior to addition of the organism so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material, the organism inactivated, wherein the organism was capable of converting nitrate to nitrite before the inactivation, and

preserving the contacted meat or meat product.

2. The process of claim 1, wherein the curing agent is concentrated before it contacts the meat or meat products.

3. The process of claim 1, wherein the plant-based nitrite is present in the curing agent in an amount of about 50 ppm to about 200 ppm.

4. The process of claim 1, wherein the curing agent is substantially free of non-natural nitrate and nitrite.

5. A cured meat or meat product, the meat or meat product having been treated with a curing agent comprising plant-based nitrite and an added organism, the plant-based nitrite being derived from a plant material comprising at least about 50 ppm nitrate and the organism, wherein the plant material is heat treated prior to addition of the organism so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material, the organism inactivated, wherein the organism was capable of converting nitrate to nitrite before the inactivation.

* * * * *

Appx623

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I electronically filed the foregoing Appellant Kerry Group Services International Ltd.'s Opening Brief with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.


/s/ Soo Jin Hur
Soo Jin Hur

# CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), this brief contains 13,850 words.

This brief complies with the typeface and type style requirements because it was prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14pt Times New Roman.

October 6, 2023                    /s/ Mark Boland_____
                                   Mark Boland
                                   *Counsel for Appellant Kerry Group Services*
                                   *International Ltd.*