**2023-2092**

# United States Court of Appeals for the Federal Circuit

**KERRY GROUP SERVICES INTERNATIONAL LTD.,**

*Appellant*,

v.

**FLORIDA FOOD PRODUCTS, LLC,**

*Appellee*.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2022-00006 for U.S. Patent No. 11,071,304

## BRIEF FOR APPELLEE FLORIDA FOOD PRODUCTS, LLC

Michael B. Johnson
Michael Bittner
Winston & Strawn LLP
2121 N. Pearl Street
Suite 900
Dallas, TX 75201
Tel: (214) 453-6500

Louis L. Campbell
Winston & Strawn LLP
225 Shoreline Drive
Suite 520
Redwood City, CA 94065
Tel: (650) 858-6500

Brian E. Ferguson
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 282-5276

*Counsel for Appellee Florida Food Products, LLC*

December 15, 2023

# CERTIFICATE OF INTEREST

Counsel for appellee certifies the following:

1. Provide the full names of all entities represented by undersigned counsel:

   FLORIDA FOOD PRODUCTS, LLC

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   None/Not Applicable.

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   ARDIAN; MIDOCEAN PARTNERS

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   Juan C. Yaquian, Winston & Strawn LLP

5. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   No.

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   None/Not Applicable.

December 15, 2023

*/s/ Brian E. Ferguson*
Brian E. Ferguson
*Counsel for Appellee Florida Food Products, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF AUTHORITIES ........................................................................ iv

TABLE OF ABBREVIATIONS ........................................................................ vii

STATEMENT OF RELATED CASES ........................................................................ viii

I. INTRODUCTION ........................................................................ 1

II. COUNTER-STATEMENT OF THE ISSUES ........................................................................ 2

III. COUNTER-STATEMENT OF THE CASE AND FACTS ........................................................................ 3

A. Natural Curing Agents for Meat Products ........................................................................ 3

B. The ’304 Patent ........................................................................ 13

C. The Prior Art: Voorde and Hara ........................................................................ 17

1. Voorde ........................................................................ 17

2. Hara ........................................................................ 19

3. The Combined Teachings of Voorde and Hara Disclose the Claims ....... 20

D. The IPR Proceedings Before the Board ........................................................................ 26

IV. SUMMARY OF THE ARGUMENT ........................................................................ 30

V. ARGUMENT ........................................................................ 32

A. Legal Standards ........................................................................ 32

B. The Board Did Not Rely on a New Theory of Unpatentability ........................ 33

1. The Petition Identified the Passages From Voorde Relied on by the Board in the FWD ........................................................................ 33

2. The Board’s Unpatentability Decision is Based on the Same Ground Asserted in the Petition and Was Proper ........................................................................ 39

3. Kerry's Cited Cases Do Not Support its Argument ....................................43

C. Substantial Evidence Supports the Board's Unpatentability Determination ....................................................................................46

1. The Board's First Rationale for Combining Voorde and Hara Was Supported by Substantial Evidence ..........................................................47

2. The Board's Second Rationale for Combining Voorde and Hara Was Supported by Substantial Evidence ..........................................................52

a. The Modification of Heating to 100°C, Cooling, and Adding the Starter Culture Was Supported by Substantial Evidence ..............................52

b. The Board's Individual Findings Were Supported by Substantial Evidence.............................................................................................59

D. The Board's Decision Complies with the APA .............................................64

E. Reversal is Not the Appropriate Relief...........................................................66

VI. CONCLUSION...........................................................................................67

# TABLE OF AUTHORITIES

## Cases

*Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1360 (Fed. Cir. 2020) ........60

*Anacor Pharmaceuticals, Inc. v. Iancu*, 889 F.3d 1372 (Fed. Cir. 2018) ........45

*Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697 (Fed. Cir. 2020) ........38

*Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319 (Fed. Cir. 2019) ........48

*Bamberg v. Dalvey*, 815 F.3d 793 (Fed. Cir. 2016) ........32

*Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015) ........43

*Chamberlain Grp. Inc. v. One World Techs. Inc.*, 944 F.3d 919 (Fed. Cir. 2019) ...38

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........33

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ........33

*Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990 (Fed. Cir. 2023) ........ 42, 43

*Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293 (Fed. Cir. 2016) ........67

*Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364 (Fed. Cir. 2018) ........51

*Emera-Chem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341 (Fed. Cir. 2017) ........ 43, 44

*ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378 (Fed. Cir. 2020)......63

*Genzyme Therapeutics Products Ltd. v. Biomarin Pharm. Inc.*, 825 F.3d 1360 (Fed. Cir. 2016) ........ 41, 46

*In re Gartside*, 203 F.3d 1305 (Fed. Cir. 2000) ........33

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) ........63

*In re Magnum Oil Tools Int'l*, 829 F.3d 1364 (Fed. Cir. 2016) ........43

*In re Mouttet*, 686 F.3d 1322 (Fed. Cir. 2012) ........................................................58

*Incept LLC v. Palette Life Scis., Inc.*, 77 4th 1366 (Fed. Cir. 2023) ........................50

*Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358 (Fed. Cir. 2018) ............49

*Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020) ..............45

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ................................................56

*M&K Holdings, Inc. v. Samsung Electronics Co., Ltd.*, 985 F.3d 1376 (Fed. Cir. 2021) ..........................................................................................................44

*Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316 (Fed. Cir. 2017) ..................41

*Owens Corning v. Fast Felt Corp.*, 873 F.3d 896 (Fed. Cir. 2017) .........................32

*Pride Mobility Prods. Corp. v. Permobil, Inc.*, 818 F.3d 1307 (Fed. Cir. 2016) .....32

*Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360 (Fed. Cir. 2017)............39

*SAS Institute, Inc. v. Iancu*, 584 U.S. __, 138 S. Ct. 1348 (2018) ...........................45

*Sirona Dental Systems GmbH v. Institut Straumann AG*, 892 F.3d 1349 (Fed. Cir. 2018) ........................................................................................... 30, 42, 46

*TQ Delta, LLC v. Dish Network LLC*, 929 F.3d 1350 (Fed. Cir. 2019) ...................65

*Yeda Research Dev. Co. v. Mylan Pharms Inc.*, 906 F.3d 1031 (Fed. Cir. 2018) ........................................................................................... 56, 65

**Statutes**

5 U.S.C. § 706 ........................................................................................... 32, 64

35 U.S.C. § 102(b) ..........................................................................................35

35 U.S.C. § 103(a) ..................................................................................... 26, 40

35 U.S.C. § 316(e) ..........................................................................................32

37 C.F.R. § 42.64(c) ........................................................................................58

**Other Authorities**

*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756 (Aug. 14, 2012)............51

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| FFP | Appellee Florida Food Products, LLC |
| Kerry | Appellant Kerry Group Services International Ltd. |
| ’304 patent | U.S. Patent No. 11,071,304 |
| POSITA | Person of Ordinary Skill in the Art |
| Board | Patent Trial and Appeal Board |
| FWD | Board’s April 26, 2023, Final Written Decision |
| APA | Administrative Procedure Act |
| Kerry Br. | Kerry October 6, 2023, Appeal Brief (Blue Brief) |
| Emphasis | All emphasis added herein unless noted otherwise |

## STATEMENT OF RELATED CASES

No other appeal in or from this proceeding was previously before this Court or any other appellate court. Appellee Florida Food Products, LLC and its undersigned counsel are unaware of any other actions now pending in this or any other court that may directly affect or be directedly affected by this Court's decision in the present appeal.

## I. INTRODUCTION

This appeal presents a straightforward and uncomplicated example of obviousness. The ’304 patent discloses and claims an age-old method for preserving meat by applying a “curing agent” that was undisputedly known in the art. Indeed, the primary reference before the Board—Voorde (Appx719-733)—expressly disclosed all limitations in the ’304 patent claims, save for one step. But that one step—heat treating plant material to reduce microbial load before adding desired microorganisms (e.g., a “starter culture”)—was also well-known, and at least disclosed in the secondary reference Hara (Appx3508-3513). The Board considered the evidence, and correctly determined that the combined teachings of Voorde and Hara rendered the claims obvious.

Facing a sure case of obviousness, Kerry sets up a strawman on appeal. According to Kerry, the Board went rogue and concocted a new invalidity ground—Voorde alone—that was not in the petition. Wrong. The petition’s ground one stated that all challenged claims (1-5) were “obvious over Voorde in view of Hara.” Appx84. The Board, in instituting trial, found that the petition “sufficiently sets forth reasons why a [POSITA] would have combined Voorde and Hara, and how such a combination would have disclosed the elements of claims 1–5.” Appx283. And in the FWD, the Board determined that “FFP has met its burden of showing that claims 1–5 would have been obvious over the combined disclosures

of Voorde and Hara." Appx23. In short, the Board followed the petition and complied with the APA.

Beyond its strawman argument, Kerry's remaining arguments are easily set aside. Substantial evidence supported the Board's findings concerning a motivation to combine Voorde and Hara. And as the Board correctly noted, other than the issue of heat treating the vegetable material before adding the starter culture, "Kerry does not dispute the disclosure of the prior art" regarding the claim limitations. Appx21.

The Board's determination that claims 1-5 would have been obvious was correct and should be affirmed.

## II. COUNTER-STATEMENT OF THE ISSUES

1. Whether the Board correctly found claims 1-5 of the '304 patent obvious based on the combined teachings of Voorde and Hara, when the petition provided facts and evidence supporting the combination, the combined teachings disclosed or rendered obvious every claim limitation, there was no evidence of secondary considerations, and the Board's findings were consistent with the petition and supported by substantial evidence.

2. Whether the Board complied with the APA when it followed the ground identified in the petition and its findings were supported by substantial evidence.

## III. COUNTER-STATEMENT OF THE CASE AND FACTS

This IPR involved meat curing/preserving techniques. The '304 patent was late to the game, as the evidence showed that the use of "natural" curing techniques was known well before the '304 patent filing date.[1] The Board thus correctly invalidated the challenged claims.

### A. Natural Curing Agents for Meat Products

The '304 patent discloses and claims a meat-curing agent comprising nitrite. Appx618 [2:4-8]. "The use of nitrites to preserve and cure meats evolved centuries ago." Appx2496.[2] Indeed, in the "late 1800s, it was discovered that nitrate was converted to nitrite by nitrate-reducing bacteria, and that nitrite was the true curing agent" for meats. Appx2743-2754 at Appx2745. By the first half of the 20th century, nitrite was "the primary curing agent for cured meats as the advantages of faster curing time for increased production capacity became more important, and as nitrite chemistry became better understood." *Id.*; *see* Appx3404-3405 (claiming in a 1918 patent a "pickling liquor … containing salt and nitrites in quantities

---

[1] Kerry's insinuations concerning the alleged commercial success of its and FFP's products (Kerry Br. at 6-8) have no bearing on the obviousness of the claims. Kerry put forward below no argument or evidence of secondary considerations. Appx7, fn. 9; *see* Appx712-716.

[2] Found in the 2006 Ph.D. dissertation *Investigating Uncured No Nitrate or Nitrite Added Processed Meat Products*. Appx2484-2485, Appx2492-2494.

sufficient to effect the cure of meats"); Appx3410-3411 (disclosing in a 1926 patent that "[m]eat can be cured by the use of nitrite in any form").

By the latter half of the 20th century, the process of using nitrite as a meat preserver was so ubiquitous that "[m]eat curing can be defined as the use of both salt and nitrite (the reduced form of nitrate) to chemically alter the physical, chemical and often microbiological properties of meat products." Appx2506. This results in "altering the color, texture, flavor, safety and shelf life characteristics" of the treated meat products. Appx2507; *see* Appx-2492-2493 ("A wealth of research has shown that nitrite is responsible for the development of cured color and flavor, serves as a strong antioxidant to protect flavor … and perhaps most important, acts as a strong antimicrobial agent to control *Clostridium botulinum* outgrowth."). Thus, it was common to add nitrite mixed with salt during meat processing (known as "chemical" nitrite). Appx720 ("Chemical nitrite is marketed mixed with kitchen and/or sea salt under the name nitrite brine salt…."); Appx2758 ("Conventionally-cured meat products are characterized by the addition of nitrate and/or nitrite.").

By the early 2000s, however, there were "negative perceptions of nitrite cured meat held by some consumers." Appx2761. As such, "[o]ne of the fastest growing categories in the food industry [was] the natural and organic market segment." Appx3345-3346 at Appx3345; Appx2743 ("[N]atural and organic foods

have been experiencing an explosive market growth.”).[3] The “natural” and “organic” labels for meat products are two distinct product categories governed by separate USDA labeling policies. Appx3345. Importantly, both products “cannot have added nitrates and nitrites by definition.” *Id*. However, so-called “natural curing” in which nitrite occurs naturally is acceptable and allows a meat product to qualify for the “natural” or “organic” label:

> Many uncured, natural and organic meat products to which the chemical additives, nitrate and nitrite, are not added, do undergo a natural curing process whereas naturally occurring nitrates that are very common in the environment are reduced to nitrite in the meat products by specific microorganisms. ***This ancient process has been around as long as man has been making processed meats*** with documentation on the salting and curing of meats from the early Egyptians and later the Romans.

Appx3345-3346; *see also* Appx660-668.

There was thus a strong marketing incentive for meat producers to use natural curing processes, and by the early 2000s natural curing was well-known and in use. Appx663-668. The process required a source of naturally occurring nitrate and a microorganism, or starter culture, to convert the nitrate to nitrite. *Id*. Vegetables were a known source of naturally occurring nitrate, and starter cultures were commercially available. “Natural curing requires both a natural nitrate source

---

[3] Consumer preferences for organic/natural foods was based on “concerns about antibiotics, pesticides, hormones, genetic modifications in plants and animals, and chemical additives…. Consumers are willing to pay significant premiums for organic and natural foods.” Appx2743.

(seasalt, vegetables, vegetable juices, beet powder, etc.) and specific microorganisms, which reduce enzymatically the nitrate to nitrite in the meat… [T]he resulting nitrite reacts immediately with the meat pigments in the form of nitric oxide." Appx3346. The "color and flavor of the naturally cured meat product is very similar or preferred to nitrite-added products." *Id*. This is confirmed by other references as well:

> Vegetables are well-known as a source of nitrate with concentrations as high as 1500-2800 ppm … in celery, lettuce and beets. Vegetable juices and vegetable powders are commercially available and may be used as ingredients in natural and organic foods….
>
> A critical ingredient for processed meats with natural nitrate sources is a nitrate-reducing bacterial culture…. The necessity of bacterial reduction of nitrate to nitrite for meat curing has long been recognized, and nitrate-reducing cultures have been commercially available for several years.

Appx2748-2749; Appx2750 (describing processes for naturally cured meats). Naturally cured meats provide numerous benefits to consumers. Appx2752 (stating that (1) the "fixation of desirable color is the first and most obvious effect of nitrite when added to meat;" (2) even "relatively low concentrations of nitrite result in significant cured flavor;" and (3) a "quality contribution of nitrite to cured meat is the often-overlooked, but highly effective role of nitrite as an antioxidant").

A 2006 public presentation at the 59th Reciprocal Meat Conference provided an overview of naturally cured meat processes and identified commercially-available meat products produced by such processes. Appx3348-3399. The slide

reproduced below from that presentation summarizes the well-known "natural curing" process using a natural source of nitrate (such as vegetables) and a starter culture to convert the nitrate to nitrite:




Appx3383. The following slide identifies some "key" natural curing ingredients, including vegetable juice powder such as "celery powder" and a commercially available "lactic acid starter culture" containing *staphylococcus carnosus*, which "reduces nitrate to nitrite":

**Key Natural Curing Ingredients**

CHR. HANSEN

- Vegetable Juice Powder Natural
  - "celery powder" or "flavoring", or "natural flavoring" (0.2 - 0.3%) in total injected product
  - contains approximately 2.5% natural occurring nitrate
- Bactoferm® Meat Starter Culture
  - "lactic acid starter culture"
  - *Staphylococcus carnosus* (25 grams per 300 lb)
    - reduces nitrate to nitrite
    - lowers redox potential

Appx3387.

The 2006 presentation showed examples of commercially available "natural" meat products:




Appx3374.

The below slide showed another such product, with the ingredients identified. They included, *inter alia*, “celery juice concentrate” and “lactic acid starter culture” (*see* enlargement):




Appx3372 (annotated).

As one way to carry out the naturally cured meat treatment process, the vegetable material and starter culture were applied to the meat, and the conversion of nitrate to nitrite took place over time. *See* Appx2750. But this "*in-situ*" process (*see* Appx668, Appx2421-2423) had known issues, including making sure that the nitrate source and starter culture were spread over the entire surface of the meat. Appx2750 (explaining that "good distribution of both the nitrate source and the

starter culture is essential to achieve uniform curing"). Another known issue was the time it took for the nitrate to convert to nitrite. *See* Appx2756-2771 at Appx2764 (explaining that the "conversion process requires some time, with the specific amount of time depending upon the temperature, the environment, and the concentration of the reactants").

Therefore, a known alternative was to prepare the curing agent in advance, such that the nitrate to nitrite conversion had already occurred. Appx663-668. Then, the curing agent (known as a "pickle" or "brine" solution)[4] could be uniformly applied to meat and the natural curing process would begin immediately. *Id*. One example of this for processing "natural bacon" involved using celery powder and a starter culture whereby a "pickle" was prepared "prior to use" by dissolving sea salt, sugar, celery powder, and the starter culture in water:

---

[4] *See* Appx2750 (referring to "curing brines"); Appx2765 (referring to a curing brine as a "pickle").

| Natural Bacon Formulation | |
|---|---|
| Water | 66.38% |
| Sea salt | 22.00 |
| Cane sugar | 10.40 |
| Celery powder | 1.20 |
| Starter culture | 0.02 |

**Natural Bacon Process**

1) Trim pork bellies.
2) Prepare pickle prior to use.
3) Dissolve the following in water: sea salt, cane sugar, celery powder, and starter culture.
4) Pump pork bellies to 115% of green weight.
5) Place the pumped pork bellies on bacon hooks and smoke-house process.
6) Chill and slice.

Appx2765 (annotated). Another example described a natural pork treatment process whereby a brine was first prepared by mixing water with vegetable juice powder, a starter culture, dextrose, and salt before injecting the meat with the brine:

**Meat Block:**

50 lb Lean pork boneless inside and outside ham muscles

**Injection:**

25% Injection

**Brine formulation for Low VJP ham :**

| Ingredient (25% Injection) | Percent | Weight (lb) | PPM |
|---|---|---|---|
| Water | 79.87 % | 99.84 lb. | |
| Salt | 11.00 % | 13.75 lb. | 27,500 ppm |
| Dextrose | 8.00 % | 10.00 lb. | 20,000 ppm |
| Vegetable Juice Powder (0.20%) | 1.00 % | 1.25 lb. | 2500 ppm (meat only) 2000 ppm total (meat + water) |
| Starter Culture (35g/300 lb) (7.29 g per 100 lb of brine) | 0.1285 % | 0.1606 lb. | 321 ppm |
| Total | 100.00 % | 125.0 lb. | |

**Processing procedures :**

1. Prepare meat ingredients: use skinless, boneless ham muscles. Trim ham muscles practically free of fat. Inject 2 – 25 lb batches (separate).
2. Prepare brine by adding ingredients to water while mixing. Add the ingredients in the following order: salt, sugar, vegetable juice powder and starter culture.
3. Inject hams to 25% over their initial weight.

Appx2726 (annotated).

By using this approach, starter cultures were "added directly to curing brines" rather than applied on the meat. Appx2764. This approach had known benefits by reducing the curing time required, because "a part of the nitrate from the vegetable material is converted into nitrite ***before*** the fluid is introduced into the meat product" so that "***immediately*** the required amount of nitrite in the meat product can be obtained to counter the undesired grey discoloration thereof." Appx722.

## B. The '304 Patent

As it must, the '304 patent in the *Background of the Invention* acknowledged that nitrite curing processes for meat were well-known:

> In one method for preparing cured meat and meat products, the meat or meat product desired to be cured is exposed to a nitrate-containing substance. Bacteria or other organisms that are capable of converting the nitrate to nitrite are then added to the mixture of the meat or meat product to be cured and the nitrate-containing substance to ferment the nitrate to nitrite. The presence of nitrite gives the meat a distinct color and flavor, in addition to preventing the growth of harmful microorganisms.

Appx618 [1:9-17]. The patent alleges that the prior art processes "present several problems." *Id*. [1:18-19]. The patent identifies two. First, the "number and sensitivity of the steps involved in such curing processes leads to variable curing of the meat, resulting in an inconsistent product." *Id*. [1:19-22]. Second, the "process of converting nitrate to nitrite using bacteria or another organism requires additional processing time, thus slowing the prior art processes." *Id*. [1:22-24]. Importantly, the '304 patent does ***not*** identify that the solution to both problems—preparing the curing agent in advance and then applying it to meat—was ***already known in the art*** as identified above.

Instead, the '304 patent describes and claims that ***already-known*** process:

> The invention provides a curing agent comprising a plant-based nitrite derived from plant material comprising nitrate. The curing agent is capable of curing a meat or meat product and can be prepared outside the meat curing process so as to eliminate the need to introduce bacteria or other organisms along with a nitrate-containing substance into the environment sought to be maintained during curing. This simplifies the number of steps involved in the curing process, increases the speed at which the process occurs, and generally results in a more consistent product.

*Id*. [1:34-44]; *see also* Appx623 (claims 1-5).

The ’304 patent endured a tortuous path through the PTO. *See* Appx647-651. The original application was filed on May 13, 2008, claiming priority to a provisional application filed on June 11, 2007. Appx616. Thirteen years later—after nine rejections, two notices of appeal, and one appeal decision—the five claims of the ’304 patent issued on July 27, 2021. *Id*. In this same time, claims in a divisional application were also filed, rejected, appealed, and abandoned. *See* Appx2417, fn. 1. The prior art relied on by the Examiner is not at issue in this appeal but was before the Board below. *See* Appx5-6, Appx23; Section V.E *infra*.[5]

In its decision on appeal during prosecution, the Board affirmed the Examiner’s rejection of all claims except for the five at issue in this appeal. Appx2417-2431 (affirming the Examiner’s rejection of claims 1-22 and 36-43, and reversing as to claims 23, 26-29).

The finally rejected claim 1 in the application and issued claim 1 of the ’304 patent are very similar. Indeed, the “curing agent” claimed in both is identical:

| **Finally Rejected Claim 1 (*see* Appx2418)** | **Allowed Claim 23 (issued as ’304 patent, claim 1)** |
|---|---|
| 1. An isolated and natural curing agent comprising a plant-based nitrite and an | 23. A process for preserving a meat or meat product comprising |

[5] The primary references relied on by the Examiner were Fast, Pohnl, Yamamoto, and Walker. Appx2418.

| | |
|---|---|
| added organism, the plant-based nitrite being derived from a plant material comprising at least about 50 ppm nitrate and the organism, wherein the plant material is heat treated prior to addition of the organism so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material, the organism inactivated, wherein the organism was capable of converting nitrate to nitrite before the inactivation, and<br>wherein the curing agent is capable of curing a meat or meat product. | contacting the meat or meat product to be preserved with a curing agent comprising a plant-based nitrite and an added organism, the plant-based nitrite being derived from a plant material comprising at least about 50 ppm nitrate and the organism, wherein the plant material is heat treated prior to addition of the organism so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material, the organism inactivated, wherein the organism was capable of converting nitrate to nitrite before the inactivation, and<br>preserving the contacted meat or meat product. |

*See* Appx2418 (left); Appx623 (right). As shown above, the "curing agent" language in both claims (in red) is identical. The only difference between the claims is that finally rejected claim 1 states that the curing agent is "capable" of

curing a meat or meat product, whereas allowed claim 23 requires "contacting the meat or meat product to be preserved" with the curing agent, and "preserving" the contacted meat or meat product. *Id*.

As to this difference, the Board found that while Fast taught using a "starter culture for efficiently reducing nitrate to nitrites for curing meat, Fast does not teach using the sampled product … in a meat curing process or forming a cured meat product with the composition." Appx2427. The Board also held that the secondary reference relied on by the Examiner, Pohnl, "does not cure that defect" because Pohnl taught an *in-situ* curing process. Appx2427-2428.

In reaching this conclusion, the Board did not have a full translation of Voorde available to it. Voorde unquestionably discloses preparing a curing agent in advance (*i.e.*, ***not*** *in-situ*), contacting a meat product with that curing agent, and preserving the meat. Appx15-16.

### C. The Prior Art: Voorde and Hara

As described below, the combined teachings of Voorde and Hara render claims 1-5 obvious. *See* Appx651-660.

#### 1. Voorde

Voorde, titled *Method of Preserving the Color of Animal Tissue*, is a patent issued in Belgium in 2003. Appx719-733; Appx651-654. Voorde is prior art under pre-AIA 35 U.S.C. § 102(b). Appx6.

Voorde explains that it was known that "chemical nitrite may be used to form and preserve the colour of meat products," and further that "chemical nitrite is also used to increase the shelf life and the microbiological safety of the meat." Appx720. When chemical nitrite was used in the curing brine, it was also known that the brine "can be homogeneously distributed among this animal tissue by spraying it on and mixing the whole." *Id*.

While such chemical nitrite curing processes had these known advantages, there was a problem: they were "not applicable in the production of so-called organic or bio-meat products. After all, no chemical nitrate or nitrite may be used in the production of such bio-meat products." *Id*. This is the same problem identified above that contributed to the growth of "natural" and "organic" meat products. *See* Section III.A *supra*.

Voorde therefore discusses natural nitrite treatment processes, including a prior art process found in Hara (U.S. Patent No. 3,911,146) "in which no chemical nitrite and/or nitrate is used." Appx720-721. But this process was the same type of *in-situ* curing process discussed in the '304 patent background section, and Voorde identifies the same problems with it. Specifically, Voorde notes that such processes were sub-optimal because they could take multiple days to complete and often resulted in non-homogeneous curing. Appx721 (discussing applying celery juice and a starter culture to a meat product, and that "notwithstanding the fact that the

meat was allowed to mature for three days before cooking it, no homogeneous coloration was obtained”).

Accordingly, Voorde sought to improve on the *in-situ* natural curing processes while also avoiding using chemical nitrite. And Voorde’s disclosed solution is the same as what the ’304 patent disclosed and claimed years later: prepare a natural curing brine in which nitrate from a vegetable source is converted into nitrite in advance, and then use that brine to homogenously cure and preserve a meat product:

> the method according to the invention is characterized in that, for the preparation of said liquid, ***vegetable material containing*** at least ***nitrate*** is used as a starting material and, ***before treating the meat product*** with the liquid, ***nitrate is converted into nitrite***…. Because a part of the nitrate from the vegetable material is converted into nitrite before the fluid is introduced into the meat product, immediately the ***required amount of nitrite in the meat product can be obtained to counter the undesired grey discoloration*** thereof. With the method according to the invention, the same effect on the red coloration of the meat product can thus be obtained as with chemical nitrite, without, however, having to use such a chemical nitrite, which may not be used in bio-meat products.

Appx722.

### 2. Hara

U.S. Patent No. 3,911,146 to Hara issued in 1975 and has the same title as Voorde: *Method of Preserving the Color of Animal Tissue*. Appx3508-3513. Hara is identified in Voorde’s introductory paragraphs as teaching using vegetable material to “preserv[e] the color of animal tissue … in which no chemical nitrite and/or

nitrate is used." Appx720-721; *see* Appx3508 [Abstract] ("The color of meat and other animal tissue … can be preserved by contacting the animal tissue with the water-soluble ingredients of edible vegetal matter…."); Appx3509 [1:14-17] ("It has been common practice to apply nitrates and/or nitrites to animal tissue to preserve the color, but the nitrates are effective mainly by their conversion to nitrite in the meat….").

Hara provides a variety of techniques for extracting juice from various vegetables. Appx3510 [Table 1]; Appx3510-3511 [Examples 1-8]. Hara's examples start with boiling, blanching, or otherwise heating the vegetables. Appx3510 [3:13-16], Appx3511 [5:10-16]; [5:43-50]; [6:13-36]; [6:50-55]. Hara also teaches that the resulting curing agent should be sterilized to prevent decomposition if not used immediately. Appx3509 [1:59-2:4]. The preservative is evaporated and steamed into a dry powder concentrate, and then kept for six months with "no significant loss" in its ability to preserve meat color in comparison to a fresh sample. Appx3511 [6:24-36].

**3. The Combined Teachings of Voorde and Hara Disclose the Claims**

The Board explained that "[w]ith few exceptions, Kerry does not contest FFP's assertions as to the disclosure of Voorde or how it teaches the elements of challenged claims." Appx16; Appx21 (stating that other than an issue involving modifying Voorde's teachings, "Kerry does not dispute the disclosures of the prior

art"). The Board therefore found that the "combined disclosures of Voorde and Hara would have led a [POSITA] to a process that has all the steps claimed in claim 1." Appx21; *see* Appx22 (holding that "claim 5 is also obvious over the disclosures" of Voorde and Hara). The following table shows how the combined teachings of Voorde and Hara disclose claim 1:[6]

| **'304 Patent, Claim 1 Limitations** | **Voorde and Hara** |
|---|---|
| Claim 1: A process for preserving a meat or meat product comprising… | **Voorde**:<br>• "Method of Preserving the Color of Animal Tissue" Appx720 (title).<br>• "The present invention relates to a method for treating a meat product…." Appx720.<br>• "[N]itrite inhibits the development of food-spoiling and/or pathogenic bacteria…." *Id*. |
| contacting the meat or meat product to be preserved with a curing agent comprising a plant-based nitrite and an added organism, | **Voorde**:<br>• "The method according to the invention is characterized in that, for the preparation of said liquid, vegetable material containing at least nitrate is used a starting material and, before |

6 The table identifies the claim 1 limitations separately for ease of reference.

| ’304 Patent, Claim 1 Limitations | Voorde and Hara |
|---|---|
| | treating the meat product with the liquid, nitrate is converted to nitrite….” Appx722.<br>• “[M]icro-organisms, or in other words, so-called starter cultures can be added for this purpose [converting nitrate to nitrite].” Appx725. |
| the plant-based nitrite being derived from [1] a plant material comprising at least about 50 ppm and [2] the organism, | **Voorde**:<br>• “[P]lants are preferably used which exhibit a higher nitrate content, such as, for example, endive, celery, lettuce, … spinach, radishes and parsley.” Appx724.<br>• “[M]icro-organisms, or in other words, so-called starter cultures can be added for this purpose.” Appx725.<br>• “Example 1[:] Fresh spinach leaves (with stems) were finely chopped. The minced vegetables thus obtained contained 2826 ppm of nitrate….” Appx727. |

| **’304 Patent, Claim 1 Limitations** | **Voorde and Hara** |
|---|---|
| wherein the plant material is heat treated prior to addition of the organism so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material, | **Voorde**:<br>• “Heating to a temperature higher than 50 °C, for example to 52 °C, is further preferred because at these temperatures undesired micro-organisms are killed and the material is thus (partially) sterilized….” Appx725.<br>**Hara**:<br>• “Fresh samples of spinach leaves, Chinese cabbage, turnip leaves, cabbage, lettuce, and onions in amounts … for obtaining 9 ml juice were extracted by boiling in an amount of water approximately equal to 100 to 200% of the weight of the fresh sample.” Appx3511 [5:11-16].<br>• “100 kg Cabbage were washed clean in water, drained, sliced, and extracted by pressure. The extract was boiled in a jacketed kettle for 30 minutes….” Appx3511 [6:13-15]; *see also id*. [6:51-55]; Appx3510 [3:3-17]. |

| ’304 Patent, Claim 1 Limitations | Voorde and Hara |
|---|---|
| the organism inactivated, | **Voorde**:<br>• “In the method according to the invention, … nitrate is converted into nitrite…. [T]his conversion can be carried out until the ratio between the nitrate and nitrite concentration … is smaller than 9/1 and in particular smaller than 5/1.” Appx724.<br>• “After the nitrate is converted into nitrite, … the nitrite concentration is preferably measured…. Subsequently, the necessary amount of water is added to obtain the desired nitrite concentration in the liquid…. [T]he nitrite-containing product that has been produced can first be stored for a certain period of time, in particular in a refrigerated or frozen state or optionally also, after sterilization, under sterile conditions.” Appx726. |

| ’304 Patent, Claim 1 Limitations | Voorde and Hara |
|---|---|
| wherein the organism was capable of converting nitrate to nitrite prior to inactivation” | **Voorde**:<br>• “[M]icro-organisms, or in other words, so-called starter cultures can be added for this purpose [converting nitrate to nitrite].” Appx725. |
| and preserving the contacted meat or meat product. | **Voorde**:<br>• “The nitrite-containing aqueous liquid prepared starting from the plant material can be introduced into the meat product in various ways. If this meat product is made of comminuted animal tissue, it can be homogeneously distributed among this animal tissue by spraying it on and mixing the whole.” Appx726.<br>• “[N]itrite may be used to form and preserve the colour of meat products….” Appx720.<br>• “Method of Preserving the Color of Animal Tissue” Appx720 (title). |

*See also* Appx669-688 (applying the prior art against the claims). The analysis for independent claim 5 is materially identical. Appx22 (holding that "claim 5 is also obvious over the disclosures" of Voorde and Hara).[7]

### D. The IPR Proceedings Before the Board

FFP filed its corrected IPR petition on January 25, 2022. Appx46-126. While the petition included four separate invalidity grounds, relevant to this appeal is ground one: "claims 1-5 are obvious over Voorde in view of Hara." Appx84. FFP supported its grounds with a declaration from Dr. Stephen Baldwin, a chemistry professor at Duke University since 1970. *See* Appx624-637, Appx717.

The Board instituted trial on April 26, 2022. Appx269-292. The Board noted that "FFP contends that claims 1–5 are unpatentable under 35 U.S.C. § 103(a), as their subject matter would have been obvious over the combined disclosures of Voorde and Hara." Appx278. The Board found that FFP had set forth sufficient rationale and evidence why a POSITA would have combined the Voorde and Hara references. Appx279-281. The Board further found that the "disclosures of the two references as combined … appear to disclose all elements of the challenged claims." Appx281; *see* Appx283 ("[W]e find that the Petition sufficiently sets forth

---

[7] Kerry did not separately argue for the patentability of dependent claims 2-4. Appx21 ("[W]e find that the combination of Voorde with Hara would also result in a process having the limitations of the dependent claims, for the reasons set forth by FFP in its Petition…. We note that Kerry does not separately address the dependent claims or argue their patentability separately from claim 1.").

reasons why a [POSITA] would have combined Voorde and Hara, and how such a combination would have disclosed the elements of claims 1–5."). Therefore, the Board concluded that "FFP has demonstrated a reasonable likelihood that at least one claim of the '304 patent is unpatentable on this ground of unpatentability [Voorde in view of Hara]." Appx283.

Following briefing and discovery, a hearing was held on January 24, 2023. *See* Appx495-497. The Board's FWD issued on April 26, 2023. The Board found that "FFP has met its burden of showing that claims 1–5 would have been obvious over the combined disclosures of Voorde and Hara." Appx23.

Turning first to the level of ordinary skill in the art as of June 2007, the Board cited with approval FFP's definition:

> a master's or doctorate degree in food science, biology, chemistry, or a similar field, or a bachelor's degree in food science, biology, chemistry, or a similar field along with at least 2-3 years of experience in food preservatives generally or more specifically 2-3 years of experience in the chemistry associated with food preservation and nitrates/nitrites [and] would have known that the USDA regulated nitrites for curing meat and would have been able to find these USDA regulations affecting meat products.

Appx8-9, citing Appx78-79; Appx645-646. The Board found that Kerry's proposed level of ordinary skill was "nearly identical." Appx9.

The Board summarized the relevant disclosures in Voorde and Hara (Appx15-16) and noted that Voorde discusses Hara in its background section. Appx16, citing Appx720-721. The Board turned to "resolving the parties' dispute

as developed during the trial," namely that Kerry contended that a POSITA "would not have combined Voorde and Hara." Appx16.

Kerry's argument centered on the claim limitation that the plant material is "heat treated prior to addition of the organism [the starter culture] so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material." Appx623 [12:37-40]. This simply means heating the vegetables to reduce the number of potentially harmful microbes that might naturally be present in the vegetables. *See* Appx619 [3:4-7] ("The plant material can be subjected to additional processing steps prior to conversion of nitrate to nitrite. Such processing steps can include, but are not limited to, heat treatment, filter sterilization, or a process which reduces the initial microbial load.").

FFP's expert, Dr. Baldwin, confirmed that a "POSITA would have found it obvious to wash, blanch, heat, boil, or steam the vegetable material to kill unwanted microbes before adding the desired nitrate-reducing organisms [the starter culture]." Appx674. Indeed, to a "POSITA, washing and heating, boiling, or steaming the vegetable would be as common as washing one's hands before cooking a meal—a matter of routine sterilization. A POSITA would understand these techniques to be effective methods of disinfection." *Id*. Dr. Baldwin provided objective evidence of this, citing Voorde, which explicitly taught that a "partial sterilization at 52 °C" resulted in a "strong decrease" in the total bacterial count.

Appx728. Likewise, Dr. Baldwin cited examples from Hara showing routine heating of the vegetable material as part of preparation. Appx674-675, citing Appx3510-3511. Dr. Baldwin confirmed that this evidence showed "how commonly this step occurred and how incredibly well-known and routine it was." Appx675; *see also* Appx664 ("The well-known process of converting vegetable nitrate to nitrite starts with washing and heat-treating vegetables in order to clean them."); Appx665 (citing numerous other prior art references as support).

Considering this straightforward evidence, the Board rejected Kerry's argument concerning the alleged lack of motivation to combine the Voorde and Hara references:

> we conclude that a [POSITA], seeking to reduce microbial load in a plant material prior to converting nitrate to nitrite, would have combined Voorde and Hara's disclosures in the manner FFP suggests. At the very least, the skilled artisan would have looked to Hara as evidence that pre-treatment using heat could be beneficial to reduce microbial load, a disclosure confirmed by Voorde.

Appx20. As Kerry did "not dispute the disclosures" in Voorde and Hara vis-à-vis the challenged claims, the Board held claims 1-5 obvious. This appeal followed.

## IV. SUMMARY OF THE ARGUMENT

1. Kerry's "new theory" / "ex-petition" argument is a strawman unsupported by the record. The Board did not create a new invalidity theory in violation of the APA. Ground one in the petition was obviousness based on the combination of Voorde and Hara, the Board instituted trial based on Voorde in view of Hara, and the Board found the claims obvious over Voorde and Hara. The Board did not bring in new evidence, every passage from Voorde the Board cited in the FWD was discussed in the petition and in FFP's reply brief, and the arguments the Board considered and resolved were developed during the trial. Kerry's argument to the contrary rests on its view that the APA requires the Board to follow the petition word-for-word. That argument is flatly contradicted by this Court's precedent. *Sirona Dental Systems GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018) ("The Board did not change theories simply because the petition did not use the exact words [the Final Written Decision did]").

2. The Board's findings regarding the motivation to combine Voorde and Hara were supported by substantial evidence. Kerry ignores the fact that the Board extensively cited to FFP's petition and reply brief in its analysis, which in turn cited as evidence the declaration of FFP's expert Dr. Baldwin and numerous prior art references. As the Board found and Kerry did not contest, Voorde expressly teaches every limitation in the challenged claims, but does not explicitly say that

the vegetable material should be heat-treated to reduce microbial load ***before*** adding the starter culture. The Board correctly found that this simple step was well within the capabilities of a POSITA, as confirmed by Hara and Voorde itself. The Board also held that a POSITA would have found it obvious to employ Hara's teachings of heat-treating the vegetable material and letting it cool before adding the starter culture. This finding too was supported by substantial evidence. Indeed, this minor modification to Voorde would require nothing more than ordinary creativity. Accordingly, the Board's finding that claims 1-5 of the '304 patent were invalid as obvious should be affirmed.

3. If this Court disagrees with any portion of the Board's analysis, it should at most only vacate and remand to the Board for further findings, not reverse. Reversal would be particularly inappropriate here because the Board did not consider FFP's second, third, and fourth invalidity grounds, finding them moot. Appx23.

# V. ARGUMENT

## A. Legal Standards

This Court reviews the Board's decisions under the standards set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706. *Pride Mobility Prods. Corp. v. Permobil, Inc*., 818 F.3d 1307, 1313 (Fed. Cir. 2016). The Board's actions are set aside only if the Court determines that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). An abuse of discretion occurs only if the decision (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) involves a record that contains no evidence on which the Board could rationally base its decision. *Bamberg v. Dalvey*, 815 F.3d 793, 799 (Fed. Cir. 2016).

IPR petitioners need only show the obviousness of the claims by a preponderance of the evidence. 35 U.S.C. § 316(e). Whether a claimed invention would have been obvious is a question of law, based on factual determinations regarding the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, the reasons to combine the prior art, and any objective indicia of non-obviousness. *Owens Corning v. Fast Felt Corp*., 873 F.3d 896, 902 (Fed. Cir. 2017). The Board's legal conclusions are reviewed *de novo* and its factual findings for substantial

evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). A finding is supported by substantial evidence if a reasonable mind might accept the evidence as adequate support for the finding. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

### B. The Board Did Not Rely on a New Theory of Unpatentability

Kerry's primary argument on appeal—that the Board improperly "asserted a new theory of patentability … neither set forth in the Petition nor addressed by the parties"—is meritless. Kerry Br. at 3. The Board's decision comports with the APA and this Court's precedent.

#### 1. The Petition Identified the Passages From Voorde Relied on by the Board in the FWD

Kerry is wrong when it states that the Board's analysis regarding Voorde was not "addressed by the parties below" or found in the petition. Kerry Br. at 3.

The claims include the limitation that the "plant material is heat treated prior to addition of the organism [starter culture] so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material…." Appx623 [12:37-40] (the "heat treating" or "heat treatment" limitation). The Board found that this limitation would have been obvious from the Voorde/Hara combination:

> we find that a [POSITA] would have had reason to modify Voorde in the manner FFP suggests. Voorde explicitly discloses the advantages of heating the medium, and there is no disagreement that heating to 50–52°C would have resulted in at least some reduced microbial load, which is all that the claims require. [footnote omitted] Indeed, Voorde describes that as a result of heating to 50–52°C, its medium is "(partially) sterilized." Ex. 1003, 7. Kerry's argument that Voorde does not disclose starting with a "sterile medium" (PO Resp. 25) is unavailing; as discussed above, we do not interpret anything in claim 1 or the '304 patent to require a sterile medium, and Kerry does not direct us to anything in the record that would persuade us otherwise.

Appx18-19; *see* Appx20 ("For these reasons, we conclude that a [POSITA], seeking to reduce microbial load in a plant material prior to converting nitrate to nitrite, would have combined Voorde and Hara's disclosures in the manner FFP suggests.").

According to Kerry, the Board's identification of the teachings in Voorde regarding heat treating the vegetables to reduce microbial load amounted to a "new theory of unpatentability based on Voorde alone, neither set forth in the Petition nor addressed by the parties below." Kerry Br. at 3. That is false. The centerpiece of Kerry's argument is that the petition allegedly "took the unqualified position that Voorde did not teach heat treating the plant material as recited in the '304 claims…. The Petition cited Hara's boiling/steaming (100°C+) to make the combination." Kerry Br. at 32-33. This argument mischaracterizes and ignores what is disclosed the petition.

FFP ***never*** conceded in the petition that Voorde did not disclose heat treating vegetables to reduce their microbial load. The petition instead explained that Voorde did not explicitly disclose the ***order*** of when the heat treatment occurred vis-à-vis the addition of the starter culture. FFP stated in the petition only that the "step of ***first*** heating, boiling, or steaming vegetables to kill germs was not ***explicitly stated*** in Voorde…." Appx90. Had it been, Voorde would have unquestionably anticipated the claims under 35 U.S.C. § 102(b). *See* Appx89 (stating in the petition that "[a]lthough Voorde does not expressly say to add the starter cultures *after* heating the vegetable, this would have been obvious") (emphasis in original); Appx90 (stating that "a POSITA would have found it obvious and routine to do so, as evidenced by Hara. [citation omitted] The combination merely adds the known step of heating the vegetable to predictably kill germs.").

Thus, the issue framed in the petition was whether this known, predictable step—heat-treating the vegetable to reduce microbial load ***prior*** to adding the starter culture—would have been obvious to a POSITA. The petition provided a wealth of evidence that this was so, including testimony from FFP's expert Dr. Baldwin and relevant portions of Voorde, Hara, and other prior art. Indeed, to the extent that Kerry argues that the petition did not assert that this step was obvious from Voorde, that is wrong. The petition and Dr. Baldwin in his declaration

***expressly cite*** the very passages in Voorde that Kerry alleges were not cited in the petition ***for the claimed purpose*** of reducing microbial load. *See* Appx89 (stating that "Voorde also teaches ***partially sterilizing the vegetable with heat to reduce the microbial load*** relative to the naturally occurring microbial load" and citing Voorde (Ex. 1003) at 6). That cited page of Voorde (Appx725) discloses that "[h]eating to a temperature higher than 50 °C, for example to 52 °C, is further preferred because ***at these temperatures undesired micro-organisms are killed*** and the material is thus (partially) sterilized." Appx725; *see also* Appx90 (the petition citing "Ex. 1003 [Voorde] at 6-7 [Appx725-726] (explaining ***sterilization*** effect); 8-9 [Appx727-728] (discussing ***reduced bacteria count***)").

Dr. Baldwin also cited these Voorde passages as evidencing the obviousness of heat-treating the vegetables to reduce microbial load prior to applying the starter culture. Dr. Baldwin testified that a "POSITA would have understood that ***Voorde*** and Hara taught 'wherein the plant material is heat treated prior to addition or [sic, of] the organism so as to have a reduced microbial load relative to a naturally occurring microbial load of the plant material.'" Appx673-674 (¶ 118). Dr. Baldwin continued that a "POSITA would understand these techniques [washing and heating, boiling, or steaming the vegetables] to be effective methods of disinfection." Appx674 (¶ 119). He cited Voorde (Ex. 1003 at 9, 10, *see* Appx728-729) as evidence of this, explaining that Voorde showed "decreased bacterial count

at higher temperatures." Appx674 (¶ 119).[8] The petition identified these paragraphs from Dr. Baldwin's declaration in the discussion of the heat-treating limitation. Appx88-91.

Kerry's argument also ignores the events taking place after institution. In its patent owner response ("POR") Kerry argued that FFP's analysis required a "substantial rewriting" of Voorde, and further that the evidence taught away from combining the Voorde and Hara disclosures. *See* Appx318-319. FFP, in its reply (Appx391-426) rebutted those specific arguments with reference to the disclosures in Voorde and Hara. *See* Appx410-418.

For example, in the POR Kerry argued that "Voorde does not teach starting with a sterile medium…. On the contrary, Voorde teaches moderately heating fresh plant material up to an 'optimal' temperature in the range of 50°C-60°C…." Appx348. FFP explained in its reply that Kerry was wrong: "the challenged claims do not require starting with a sterile medium; they only require heating the medium to a point that ***reduces*** the pre-existing microbial load before adding the starter culture." Appx411. And as it did in the petition, FFP explained that Voorde disclosed heat treating to reduce the presence of micro-organisms, noting again that

---

[8] The cited pages of Voorde disclose that due to a "partial sterilization at 52 °C, a strong decrease in the total aerobic bacterial count was observed…." Appx728. Further, "[s]terilization at 70 °C showed a greater decrease in the total aerobic bacterial count." Appx729.

Voorde teaches that "'[h]eating to a temperature higher than 50 ºC, for example 52 ºC, is further preferred because at these temperatures undesired microorganisms are killed and the material is thus (partially) sterilized,' and 'when the desired temperature is reached the whole can slowly cool down.'" Appx411.

This is the same disclosure in Voorde cited by the Board in the FWD. *See* Appx18-19. FFP's elaboration in the reply concerning how Voorde disclosed and/or rendered obvious the claim limitations was entirely proper. *See Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020) ("Apple's legal ground did not change in its reply – its reply still asserted that [the] claims … would have been obvious over [the same prior art references]."); *Chamberlain Grp. Inc. v. One World Techs. Inc.*, 944 F.3d 919, 925 (Fed. Cir. 2019) ("Parties are not barred from elaborating on their arguments on issues previously raised.").

Kerry submitted a sur-reply to FFP's reply brief and had every opportunity to address FFP's arguments. *See* Appx427-429. Kerry in fact acknowledged the very passage from Voorde identified by FFP and relied on by the Board, but ***ignored*** the portion teaching that microbial load was reduced by heat treatment. *See* Appx436-437 (admitting that Voorde teaches heating to a range of about 50°C-60°C but stating only that such heating was "primarily" for promoting the conversion of nitrate to nitrite). Kerry's refusal to meaningfully address this disclosure in its sur-reply is on Kerry, not FFP or the Board. *See Prism Techs. LLC*

*v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1373-74 (Fed. Cir. 2017) (explaining that a party must live with the consequences of the "strategic choice[s]" it makes during litigation).

In view of this record, the entire premise of Kerry's "ex-petition" argument is wrong. The petition explicitly identified the passages of Voorde discussing heat treatment of vegetables to reduce microbial load as rendering obvious the limitation of heat treating the plant material prior to adding the microorganism (starter culture) to reduce the vegetables' microbial load. FFP further cited in its reply brief these same passages in Voorde for the same reasons. The Board was thus well within its discretion to rely on those passages from Voorde in its analysis of this limitation in the FWD.

#### 2. The Board's Unpatentability Decision is Based on the Same Ground Asserted in the Petition and Was Proper

Even if the petition did not specifically cite to the passages of Voorde identified in the FWD, Kerry's "new invalidity ground" strawman argument fails.

Kerry asserts that the Board "relied on a new theory of patentability – Voorde alone." Kerry Br. at 32. Not so. Ground one in FFP's petition was that claims 1-5 were "obvious over Voorde in view of Hara." Appx84. In its Institution Decision, the Board identified the grounds set forth in the petition, including ground one. Appx273-274. The Board carefully reviewed the parties' positions concerning the Voorde/Hara ground, Appx278-283, and concluded that FFP's

petition "sufficiently sets forth reasons why a [POSITA] would have combined Voorde and Hara, and how such a combination would have disclosed the elements of claims 1–5." Appx283. Thus, "FFP has demonstrated a reasonable likelihood that at least one claim of the '304 patent is unpatentable ***on this ground of unpatentability***." *Id*.

The Board's FWD conforms to the Institution Decision. The Board focused on the petition's ground one: "FFP contends that claims 1–5 are unpatentable under 35 U.S.C. §103(a), as their subject matter would have been obvious over the combined disclosures of Voorde and Hara." Appx15. Likewise, there can be no doubt that the Board addressed the parties' arguments concerning ground one that developed during the trial. Appx16 ("We now turn to resolving the parties' dispute as developed during trial."). And the Board considered Kerry's argument that there was no evidence of a motivation to combine Voorde and Hara but rejected it. Appx16-20. Regarding Kerry's argument, the Board concluded that a POSITA:

> seeking to reduce microbial load in a plant material prior to converting nitrate to nitrite, ***would have combined Voorde and Hara's disclosures in the manner FFP suggests***. At the very least, the skilled artisan ***would have looked to Hara*** as evidence that pre-treatment using heat could be beneficial to reduce microbial load, a disclosure confirmed by Voorde. In addition, Hara could have been relied upon for its disclosure of full sterilization by boiling, followed by cooling prior to the addition of a starter culture as disclosed in Voorde. Neither of these modifications would have been beyond the ordinary level of skill in the art, nor do we agree that they would have made Voorde's process unsuitable for its intended purpose.

Appx20. As Kerry never contested that the limitations of claims 1-5 were all found in the Voorde/Hara combination,[9] the Board concluded that "FFP has met its burden of showing that claims 1-5 would have been obvious over the combined disclosures of Voorde and Hara." Appx23.

The Board therefore plainly did not "make up" a new ground of unpatentability. *See Genzyme Therapeutics Products Ltd. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016) ("The Board's final written decisions were ***based on the same combinations of references*** that were set forth in its institution decisions…. Genzyme therefore cannot argue that it lacked notice of the specific combinations of references that the Board relied on in finding the claims invalid."); *id*. at 1369 ("Genzyme was not denied notice of the [references in question] or an opportunity to respond to them."); *Novartis AG v. Torrent Pharms. Ltd*., 853 F.3d 1316, 1325-26 (Fed. Cir. 2017) ("Novartis had more than sufficient notice and opportunity to be heard on [a reference's] potential relevance….").

Kerry's argument to the contrary is based on its overly restrictive view that any analysis by the Board not found *verbatim* in the petition is *verboten*. That is

[9] *See* Appx21 ("Kerry does not dispute the disclosures of the prior art. Dr. Milkowski [Kerry's expert] also apparently agrees, testifying that Voorde discloses the elements of claim 1 except for expressly stating that heat treating would occur prior to adding a starter culture."); *id*. ("We note that Kerry does not separately address the dependent claims or argue their patentability separately from claim 1.").

contrary to this Court's precedent. Indeed, Kerry's argument was rejected by the Court in *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990 (Fed. Cir. 2023). There, the Court held that "[o]nce an issue is fairly presented in a petition and made the subject of dispute by the patent owner's response, ***the Board is free to make its own factual findings grounded in the evidence presented to it***, without being bound to choose between the specific positions the parties advocated." *Id*. at 1003; *see also id*. at 1011 ("As long as substantial evidence supported its findings … the Board may resolve an issue the parties put in dispute by making findings supported by the evidence, ***regardless of whether any party advocated for that particularly expressed finding***…. [T]he Board is ***not required to use the same words*** in explaining its findings as the petitioner uses in its proposed findings….").[10] *See Sirona Dental*, 892 F.3d at 1356 (finding that "[t]he Board did not change theories simply because the petition did not use the exact words [the Final Written Decision did]").

That analysis is applicable and dispositive here. Given that the portions of Voorde cited by the Board relating to the heat treating limitation were identified by FFP in both its petition and reply brief, the Board had discretion to make findings regarding what Voorde disclosed and how it related to the claims.

---

[10] As explained below, the Board's findings were supported by substantial evidence.

### 3. Kerry's Cited Cases Do Not Support its Argument

None of Kerry's cited law compels a conclusion that the Board wrongly adopted a new invalidity ground or violated Kerry's rights under the APA.

Kerry cites *In re Magnum Oil Tools Int'l*, 829 F.3d 1364 (Fed. Cir. 2016) for the proposition that the "Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." Kerry Br. at 35. But Kerry ignores that the Board need not constrain itself to finding facts explicitly alleged in the petition. Instead, the Board "may resolve an issue the parties put in dispute by making findings supported by the evidence, ***regardless of whether any party advocated for that particularly expressed finding***," and is not required to use the same words in explaining its findings as the petitioner uses in its proposed findings. *Corephotonics*, 84 F.4th at 1011. The ultimate criterion is whether the appellant had before the Board a "fair opportunity to react" to the evidence and arguments. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015). As explained above, there can be no doubt Kerry had that opportunity here.

Kerry cites several other cases but analyzes only a few, and they are all distinguishable. Kerry cites *Emera-Chem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341 (Fed. Cir. 2017) for the argument that it is error for the Board to rely upon a reference that was unasserted for meeting a particular claim

limitation, and that the Board relied upon Voorde alone for meeting the heat-treating step in the ’304 patent claims. The facts in *Emera-Chem* are a far cry from those here. In *Emera-Chem*, the petition identified a single reference (Saito) as disclosing limitations found in three dependent claims. The Board in the FWD relied on a ***different*** reference (Stiles) for disclosing those limitations. 859 F.3d at 1348-49. Here, as explained above, the petition identified Voorde as disclosing heat treating to reduce microbial load (*see* pp. 35-38 *supra*), and at any rate the Board stated that FFP relied on both Voorde and Hara to meet this limitation. Appx19; *see also* Appx20 (stating that a POSITA “would have combined Voorde and Hara’s disclosures in the manner FFP suggests”).

Kerry also cites *M&K Holdings, Inc. v. Samsung Electronics Co., Ltd.*, 985 F.3d 1376 (Fed. Cir. 2021), but there, the Board in the FWD held that a single reference anticipated the claims when the petition asserted only obviousness grounds. *Id*. at 1384-85. Here, FFP never asserted that Voorde anticipated, and time and time again the Board made clear that it found Voorde in combination with, or as modified by Hara, rendered the claims ***obvious***. Appx18; Appx20; Appx21 (holding that “[w]e find that the ***combined disclosures*** of Voorde and Hara would have led a [POSITA] to a process that has all the steps claimed in claim 1”); Appx23.

Kerry next cites without analysis *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1334-36 (Fed. Cir. 2020). In that case, the Board explicitly made up a new combination of prior art and stated that "we exercise our discretion and institute an inter partes review on the ***additional ground*** that claims 1–11 would have been obvious over SMIL 1.0 and Hua based on the arguments and evidence presented in the Petition." *Id.* at 1336. The Board did no such thing here.[11]

The facts here are much closer to *Anacor Pharmaceuticals, Inc. v. Iancu*, 889 F.3d 1372 (Fed. Cir. 2018) than any case Kerry cites. There, a patent owner appealed an adverse FWD and argued that "the petitioner abandoned one prior art reference in its reply [] and shifted to a new theory of invalidity [], and that the Board adopted that new theory without giving" the patent owner proper notice. *Id.*at 1379-80. This Court rejected the patent owner's argument that "the Board violated the APA or due process by adopting a new theory of obviousness not presented in the petition," because "the Board's final written decision was based on the ***same combination of references*** [] and the same series of inferences that the petition proposed." *Id.* at 1380. Such is the case here. *See* Sections IV.B.1 and IV.B.2 *supra*; Appx20 ("Voorde explicitly discusses the use of a starter culture, which would have replaced any microbes destroyed by Hara's sterilization.

[11] Kerry also cites *SAS Institute, Inc. v. Iancu*, 584 U.S. __, 138 S. Ct. 1348, 1355 (2018). But *SAS* dealt with the issue of the Board's lack of discretion in instituting trial on less than all claims or grounds and has little relevance here.

Although Voorde discloses adding this starter culture prior to heating to the medium, we disagree with Kerry's argument that a [POSITA] would not have modified the process to add the starter culture subsequent to Hara's sterilization step….").

Thus, just as in *Anacor*, the Board here relied upon the same combination specified in the petition and made the same inferences about their combination that FFP did. *See Genzyme*, 825 F.3d at 1366 ("The Board's final written decisions were ***based on the same combinations of references*** that were set forth in its institution decisions…. Genzyme therefore cannot argue that it lacked notice of the specific combinations of references that the Board relied on in finding the claims invalid."); *id*. at 1369 ("Genzyme was not denied notice of the [references in question] or an opportunity to respond to them.").

Similarly, in *Sirona Dental*, this Court held that the Board did not err when it cited to the same portions of the prior art for the same limitation as the petitioner did in the petition but used different words: "[t]he Board did not change theories simply because the petition did not use the exact words [the Final Written Decision did]." 892 F.3d at 1356.

### C. Substantial Evidence Supports the Board's Unpatentability Determination

The Board carefully considered and weighed the evidence from both parties and determined that "FFP has met its burden of showing that claims 1–5 would

have been obvious over the combined disclosures of Voorde and Hara." Appx23. Kerry's displeasure with the Board's evidentiary analysis is not grounds for overturning the obviousness determination. Substantial evidence supports the Board's findings and conclusions.

### 1. The Board's First Rationale for Combining Voorde and Hara Was Supported by Substantial Evidence

The Board found that a POSITA:

> seeking to reduce microbial load in a plant material prior to converting nitrate to nitrite, would have combined Voorde and Hara's disclosures in the manner FFP suggests. At the very least, the skilled artisan would have looked to Hara as evidence that pre-treatment using heat could be beneficial to reduce microbial load, a disclosure confirmed by Voorde.

Appx20. This led the Board to conclude that claims 1-5 were invalid. Appx21. Kerry improperly identifies this as the Board's "Voorde alone" ground. Kerry Br. at 36. This is plainly wrong, as the Board identifies Hara as part of the analysis. *See* Appx21 ("FFP contends that Voorde, ***as modified by Hara*** to heat the medium prior to adding a starter culture, teaches or suggests each element of claims 1–5. [Citation omitted] As noted above, other than disputing whether such a modification would have been made, Kerry does not dispute the disclosures of the prior art."). Kerry's "Voorde alone" argument therefore fails at least for this reason. Further, to the extent that Kerry complains that the Board's motivation-to-combine analysis is not taken word-for-word from the petition, as noted above that argument

has been rejected previously by this Court. *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1326-27 (Fed. Cir. 2019) ("Arthrex argues that … the Board crafted a new reason for combining [prior art references] and violated its procedural rights. We disagree. Though the Board used different language than the petition in its discussion of whether [a POSITA] would have been motivated to combine [the references], it did not introduce new issues or theories into the proceeding.").

Moreover, Kerry's complaint that substantial evidence does not support the Board's analysis regarding a POSITA heating the vegetables to reduce microbial load prior to adding the starter culture is also off-base. Kerry Br. at 37 ("There is no evidence supporting this interpretation."). To the contrary, there was more than substantial evidence supporting the Board's conclusion.

Kerry merely cites to its expert's testimony (*id.*), while ignoring the other evidence of record supporting the Board's analysis. The Board's determination that a POSITA viewing Voorde and Hara would have found it obvious to first heat treat the vegetable material to reduce microbial load and thereafter add the starter culture was supported by FFP's expert Dr. Baldwin. He testified:

> while Voorde does not explicitly teach that the starter culture of microbes for reducing nitrate to nitrite should be added after heating the vegetable material, ***this order of steps would have been obvious*** to a POSITA. A POSITA would have heated the vegetables and added the starter cultures after allowing the vegetables to cool, to avoid killing the starter cultures. Moreover, ***Voorde states that it sought to***

> ***improve on the prior art of Hara, so a POSITA would have retained the initial preparation steps of heating the vegetables as done throughout Hara****….*
>
> A POSITA would also have ***found it obvious to heat the vegetable material before adding the starter culture*** because the process of heating the vegetable material in order to lower the microbial load of undesired microbials would likewise kill or decrease the efficacy of any starter culture added before such treatment. Ex. 1003 [Voorde] at 6-7 [Appx725-726]. ***Adding the starter culture after such heat treatment would avoid this problem***.

Appx675 (¶¶ 121-122).

Thus, Dr. Baldwin provided an express rationale for why a POSITA would have found this modification obvious—to avoid killing the starter culture. This rationale was supported by objective evidence in the form of Voorde, which explained that heating to temperatures of higher than 70 °C would "excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate to nitrite." Appx726; *see* Appx675-676 (¶¶ 122-123). The Board was well within its discretion to credit Dr. Baldwin's testimony. *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1362 (Fed. Cir. 2018) (holding that the Court will "not find the [PTAB's] decision unsupported by substantial evidence simply because the [PTAB] chose one conclusion over another plausible alternative") (citation omitted).

Were there any doubt, additional evidence supported the Board's findings, including the testimony of ***Kerry's*** expert. As the Board found, Dr. Milkowski

"conceded on cross-examination, that, if he were adding a starter culture, he would do so after heating." Appx20; *see* Appx4440-4441, Appx4461 [86:5-89:6] (Q: "So because of that [the possibility of inactivating the starter culture], you would want to add the microorganisms after the heating; right?" A: "Well, if I were doing it, I would do that.").[12] Further support comes from the '304 patent file history, where the Examiner pointed out that "it would have been obvious that when treating a vegetable material to produce nitrite, to wash and to heat treat the vegetable material in order to prepare it for subsequent inoculation." Appx1782-1783.

This evidence—ignored by Kerry—meets this Court's requirement that the Board's factual findings be supported by substantial evidence. *See Incept LLC v. Palette Life Scis., Inc.*, 77 F.4th 1366, 1373 (Fed. Cir. 2023) (finding an expert's testimony was substantial evidence supporting the Board's decision and explaining that "[o]ur role is not to reweigh evidence or make factual findings, but to review the Board's findings for substantial evidence").

Kerry also argues that the heat treating disclosed in Voorde (in the 50-60 °C range) is "warm, but is not heat treating according to the '304 patent." Kerry Br. at 37. This argument fails for multiple reasons. First, Kerry never raised this claim construction issue until oral argument. Appx18, fn. 13 ("At oral argument, Kerry

---

[12] Given such an admission by Kerry's expert, Kerry's assertion that Dr. Milkowski's testimony was "unrebutted," Kerry Br. at 37, is not well-taken.

raised ***for the first time*** a claim construction argument that "heat treating," as recited in the claims, requires heating to a level in excess of what is required in Voorde, and a [POSITA] would have understood the term to refer to sterilization."). The Board rightly "decline[d] to address this late-arising argument fully…." *Id.*; *see Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012) ("No new evidence or arguments may be presented at the oral argument."); *Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) ("[T]he Board was obligated to dismiss Dell's untimely argument given that the untimely argument in this case was raised for the first time during oral argument.").

Second, there is no support for Kerry's claim construction argument, even if timely. As the Board held, "the '304 patent does not support such a limited interpretation of the term 'heat treating.'" Appx18, fn. 13; *see* Appx18-19 (stating that "we do not interpret anything in claim 1 or the '304 patent to require a sterile medium, and Kerry does not direct us to anything in the record that would persuade us otherwise"). The plain language of the claims requires only heat treating to "have a ***reduced*** microbial load relative to a naturally occurring microbial load of the plant material." Appx623 [12:39-40]. This does not require sterilization. This is confirmed by the '304 patent, which discloses only that the plant material "can be subjected to additional processing steps prior to conversion of nitrate to nitrite. Such processing steps can include, but are not limited to, heat

treatment, filter sterilization, or a process which reduces the initial microbial load." Appx619 [3:4-7]. Further, the record was undisputed that heat treating above 50 °C reduces the number of microbes as claimed. Appx725 ("Heating to a temperature higher than 50 °C, for example to 52 °C, is further preferred because at these temperatures ***undesired micro-organisms are killed*** and the material is thus (partially) sterilized."); Appx664-665 (¶ 97); Appx675 (¶¶ 122-123).

The Board therefore rightfully rejected Kerry's 11th hour claim construction argument as both untimely and not supported by the evidence.

#### 2. The Board's Second Rationale for Combining Voorde and Hara Was Supported by Substantial Evidence

Even if Kerry's untimely "heat treating" claim construction argument was adopted, the Board still found the claims invalid over the Voorde/Hara combination. This conclusion was also supported by substantial evidence.

##### a. The Modification of Heating to 100°C, Cooling, and Adding the Starter Culture Was Supported by Substantial Evidence

The Board's rationale for combining Voorde and Hara under a construction requiring full sterilization of the vegetable material was the same rationale discussed above with the "addition" that a POSITA would have relied upon Hara "for its disclosure of full sterilization by boiling, followed by cooling prior to the addition of a starter culture as disclosed in Voorde." Appx20. The Board further

found that these modifications were within a POSITA's capabilities and would not have made "Voorde's process unsuitable for it intended purpose." *Id*.

As above, Kerry's complaint that substantial evidence does not support the Board's alternative analysis is off-base. Kerry Br. at 57-62. Substantial evidence supported the Board's alternative analysis.

Substantial evidence supports the Board's finding that modifying Voorde with Hara's teaching of heating vegetables to 100°C and allowing them to cool before adding the starter culture is not inconsistent with Voorde. Appx20. Voorde discloses converting nitrate to nitrite by using "the natural enzymatic and/or microbiological conversion processes" and/or by adding "additional micro-organisms or, in other words, so-called starter cultures… for this purpose." Appx725. Voorde also discloses heat treating vegetable material to partially sterilize and kill unwanted micro-organisms. *Id*. ("Heating to a temperature higher than 50 °C, for example to 52 °C, is further preferred because at these temperatures undesired micro-organisms are killed and the material is thus (partially) sterilized."). Heating all the way to 100°C as taught in Hara is consistent with these teachings of Voorde, so long as the starter culture was added after heating and then cooling. Appx664-666, Appx673-677.

Heating the vegetables and then allowing them to cool was also supported by substantial evidence. *Id*. Voorde discloses allowing the vegetable material to

cool after heat treating. *Id*. ("the heating can then be stopped when the desired temperature is reached and the whole can slowly cool down"). And everyone—even Kerry—acknowledges that it would have been obvious to add the starter culture ***after*** heat treating, not before. *See* Kerry Br. at 59 ("*no one would add the starter culture and then sterilize*, because doing so would kill the required microbes.") (emphasis in original); Appx20 (citing the testimony of Kerry's expert that "if I were doing it, I would do that [add the starter culture after the heating step]"). Adding the starter culture after cooling from 100°C is, thus, also consistent with these teachings of Voorde. Appx674-677 (¶¶ 119-125).

Despite these teachings from Voorde and admissions by Kerry's expert, Kerry argued below and repeats again here that the proposed modification (heating the vegetable material to 100 °C instead of the 50-60 °C preferred by Voorde, *see* Appx725-726) would allegedly destroy Voorde's intended purpose and thus constituted teaching away. The Board disagreed. *See* Appx19-20 ("[W]e disagree that this modification is inconsistent with Voorde or [would] destroy its intended purpose, as Kerry argues."); *id*. at 20 ("Hara could have been relied upon for its disclosure of full sterilization by boiling, followed by cooling prior to the addition of a starter culture…. [This] modification[] would [not] haven been beyond the POSITA, nor … would [it] have made Voorde's process unsuitable for its intended purpose.").

Substantial evidence supports the Board's rejection of this argument. It matters not that heating to 100°C would kill whatever micro-organisms were naturally present on the vegetables, because those original micro-organisms are not essential to Voorde's process in view of the modification thereto. Voorde expressly discloses that micro-organisms ***from a starter culture*** (instead of the naturally present micro-organisms) are also available to reduce the nitrate to nitrite. Appx725 (disclosing that "so-called starter cultures can be added for this purpose"). Moreover, Kerry's expert acknowledged that the types of microorganisms naturally present on the plant-based material "would be highly variable" and would "depend on the nature of where the plant was collected, its handling, the time before it was used, and so forth." Appx4458 [75:16-78:7].

Given these teachings and admissions, a POSITA would have naturally adopted Voorde's teaching to use a starter culture, especially given that it was well-known to do so. *See* Section III.A, *supra*; Appx663-667 (¶¶ 94-99) (FFP's expert explaining with reference to prior art the process of heating or sterilizing the vegetable material and then "innoculat[ing] it with bacteria capable of reducing nitrate into nitrite…. These bacteria are added to the plant matter as a starter culture…," *see* Appx665-666, ¶ 98). As such, a POSITA would have understood that this simple modification to Voorde would not destroy Voorde's intended purpose, because the modification would not rely on the naturally present micro-

organisms in the vegetables, but rather the micro-organisms added through the starter culture. Appx673-677 (¶¶ 118-125); *see also* Appx4518 (summarizing evidence in the record as presented at oral hearing).

Kerry's argument to the contrary rests on its assumption that a POSITA is an automaton that would be unable to bring ordinary creativity to the mix when reading Voorde and Hara. That is contrary to the law. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). As FFP's expert testified:

> A POSITA would also have found it obvious to heat the vegetable material ***before adding the starter culture*** because the process of heating the vegetable matter in order to lower the microbial load of undesired microbials would likewise kill or decrease the efficacy of any starter culture added before such treatment. [citation omitted] ***Adding the starter culture after such heat treatment would avoid this problem***.

Appx675 (¶ 122); *see id*. (¶ 121) ("A POSITA would have heated the vegetables and added the starter cultures after allowing the vegetables to cool, to avoid killing the starter cultures."). Kerry's argument—that it would have been beyond the ability of a POSITA with, *e.g.*, a Ph.D. in chemistry to make this simple modification—was not credible below and is not credible now. *See Yeda Research Dev. Co. v. Mylan Pharms Inc*., 906 F.3d 1031, 1048 (Fed. Cir. 2018) (finding that a simple modification was the "natural application of the method, with a finite number of identified and predictable solutions, and requires not innovation but

ordinary skill and common sense."). Substantial evidence supported the Board's decision to reject Kerry's argument.[13]

In this regard, Kerry's quibbles that its expert had more than the ordinary level of skill in the art and that his admission that he would add the starter culture after heating is not a "major admission" do not change the conclusion that the Board's decision was supported by substantial evidence. The question is whether it would have been obvious to a POSITA to heat the vegetables before adding the micro-organisms. As explained above, substantial evidence confirmed the answer to this was yes. The evidence also shows that Dr. Milkowski's testimony was not limited to only his point of view. Appx 4461 [88:11-89:2] ("if ***you*** [*i.e.*, someone other than Dr. Milkowski] were to think about it at all, if you were going to heat ahead of time, especially at some of [Voorde's] higher temperatures in this range, you would begin to defeat the purpose of the organism"). And Kerry's own brief supports this, as Kerry admits that "*no one would add the starter culture and then sterilize*." Kerry Br. at 59 (emphasis in original). As "no one" would do so, the

[13] To be sure, the Board relied on the testimony and analysis of FFP's expert and the supporting evidence he cited. Appx15-18 (repeatedly citing FFP's petition and reply brief, which in turn cited Dr. Baldwin's declaration and supporting evidence).

Board's finding that a POSITA would have reached the same conclusion is supported by substantial evidence.[14]

Kerry's "teaching away" argument also fails. Voorde's heat-treating to temperatures in the 50-60 °C range is a ***preference***, not an unwavering requirement. Appx725-726; *see* Appx416-418. Nor does Voorde instruct the POSITA never to heat the vegetables to 100 °C. Appx726 ("***Preferably***, the heating is not higher than 80°C … in order not to excessively reduce the enzymatic and microbiological conversion processes necessary for the conversion of nitrate to nitrite."). Expressing a preference, even a strong one, is not "teaching away." *See In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012). In *Mouttet*, the Court found that a passage did not "teach away" from an alternative computing device despite describing a different computing device as preferred and describing the putatively obvious alternative as inferior. *Id*. This is so because an obvious alternative, even an inferior one, is unpatentable. *Id*.

[14] Kerry's disparagement of FFP's expert Dr. Baldwin's credentials is also misplaced. A POSITA may be someone with a Ph.D. in chemistry. Appx8-9. As of the 2007 filing date of the provisional application, Dr. Baldwin was a Ph.D. chemist who had taught chemistry at Duke University for 37 years. Appx4267-4289. The Board was free to credit his testimony, particularly given the straightforward nature of the claims. Also, Kerry never moved to exclude Dr. Baldwin's opinions. *See* 37 C.F.R. § 42.64(c) (requiring that a "motion to exclude evidence must be filed to preserve any objection").

Here, Voorde does not teach away from heating to higher temperatures under all circumstances. Voorde neither describes higher temperatures (e.g., 100 °C) as inferior, nor disparages or criticizes higher-temperature alternatives in a way that would lead POSITAs away from trying them. Instead, a POSITA knew that if a high temperature were used, it would destroy or lessen the effectiveness of the starter culture. Accordingly, a POSITA would have understood that if the vegetables were heated to 100 °C, the starter culture would be added after sufficient cooling. *See* pp. 52-56 *supra*.

Kerry's remaining arguments that the Board's alternative-construction rationale lacked substantial evidence are repetitive of those previously discussed, which all incorrectly allege that the Board's analysis offers no reason for the combination of Voorde and Hara. That is incorrect for the reasons discussed in this and the previous sections.

#### b. The Board's Individual Findings Were Supported by Substantial Evidence

Kerry identifies a laundry list of alleged Board findings that it alleges are each not supported by substantial evidence. Kerry Br. at 53-62. Many if not all of

these are duplicative of what has already been analyzed herein. Nonetheless, FFP shows below that Kerry's arguments are without merit.[15]

Finding-1: There was substantial evidence supporting the Board's findings regarding a motivation to combine Voorde/Hara and modify Voorde. *See* Sections V.C.1 and V.C.2.a *supra*.

Finding-2: *See* Section V.B.1, *supra* discussing FFP's reliance on Voorde's heat-treating disclosures.

Finding-3: Kerry's equating of the claimed requirement of heat treating to mean sterilization was untimely. *See* Section V.C.1 *supra*. Moreover, it is not supported by the evidence. *Id*.

Finding-4: Kerry's argument here is a repeat of Finding-2 and Finding-3 and is wrong for the same reasons.

Finding-5: This is another variation on Kerry's untimely "heat treating" claim construction. *See* Finding-3. Further, Kerry's argument that the heat-treating limitation was added during prosecution is found nowhere in Kerry's POR or Sur-Reply and was therefore waived. *Acoustic Tech., Inc. v. Itron Networked Sols., Inc*., 949 F.3d 1360, 1364 (Fed. Cir. 2020).

---

[15] Kerry identified the alleged deficiencies in its brief by number, *e.g.*, "Finding-1," "Finding-2," *etc*. For brevity, FFP refers to Kerry's finding numbers herein, without repeating the portions of the FWD.

Finding-6: There was substantial evidence supporting the Board's analysis of why a POSITA would have combined Voorde and Hara and would have modified Voorde's disclosures. *See* Sections V.C.1 and V.C.2.a, *supra*. Further, Kerry is wrong that Voorde's heat treatment was done only to convert nitrate to nitrite. As explained in Section V.B.1, Voorde also disclosed that the heat treatment resulted in a partial sterilization such that "undesired micro-organisms are killed." Appx725.

Finding-7: This finding regarding Voorde is supported by substantial evidence. *See* Section V.C.1 *supra*; Appx725. There also was not a "new theory" of invalidity raised by the Board. *See* Section V.B *supra*.

Finding-8: FFP did not concede that Voorde did not teach heat-treating, and the Board's finding that Voorde in combination with Hara discloses the limitation was supported by substantial evidence. *See* Sections V.B. and V.C.1 *supra*.

Finding-9: The crux of Kerry's argument is that the Board made up a new ground of unpatentability, which is not true. *See* Section V.B *supra*. Moreover, the petition expressly pointed out that Voorde teaches partial sterilization to reduce microbial load. Appx89. The petition also pointed to Hara as supporting the knowledge of a POSITA with respect to heat treatment. Appx89-90 (stating that a "POSITA would have found it obvious and routine [to heat the vegetables to kill germs], as evidenced by Hara"). Thus, oral argument was not the first time FFP

took the position that the Voorde and Hara embodiments did not need to be physically combined.[16]

Finding-10: The Board's second rationale for combining Voorde and Hara was supported by substantial evidence and would not have destroyed Voorde's intended purpose. *See* Section V.C.2.a, *supra*.

Finding-11: Substantial evidence supported the Board's finding that Voorde teaches adding a starter culture to convert nitrate to nitrite. *See* Section V.B.1 *supra*; Appx725 (stating that "so-called starter cultures can be added for this purpose"). A POSITA would have understood that the "additional micro-organisms" added by the starter culture replace the ones naturally present on the vegetable material that were destroyed by heat-treating. Appx675 (¶¶ 121-122); Appx416 (FFP reply brief citing Dr. Baldwin's declaration); Appx17-18 (Board citing FFP reply brief).

Finding-12: Substantial evidence supported the Board's finding that a POSITA would have been motivated to modify Voorde by first heat-treating the vegetable material as taught by Hara, then letting the material cool before adding the starter culture. *See* Section V.C.2.a *supra*.

---

16 At any rate, even if they did, the combination was obvious as the Board found. *See* Section V.C.2.a *supra*.

Finding-13: The Board merely confirmed Kerry's own representations that Dr. Milkowski was a POSITA and thus qualified to offer opinions. Appx20. Whether he was more than qualified is irrelevant. The Board was free to credit, or not, the testimony of both experts. *ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1384 (Fed. Cir. 2020) ("We find no error in the Board's decision to credit the opinion of one expert over another, and we do not reweigh evidence on appeal.").

Finding-14: The Board was free to draw its own conclusion regarding the impact of Dr. Milkowski's admission during his testimony. *Id.*; *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006) ("We note that the possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's findings from being supported by substantial evidence."). Moreover, other evidence supported the Board's findings regarding the obviousness of the Voorde modification. *See* Sections V.C.1 and V.C.2.a, *supra*.

Finding-15: There was substantial evidence supporting the Board's conclusion that a POSITA "would have combined Voorde and Hara's disclosures in the manner FFP suggests." Appx20; *see* Sections V.C.1 and V.C.2.a *supra*.

Finding-16: The Board's finding that a POSITA "would have looked to Hara as evidence that pre-treatment using heat could be beneficial to reduce microbial

load, a disclosure confirmed by Voorde" was supported by substantial evidence. Appx20; *see* Sections V.B.1, V.C.1, and V.C.2.a *supra*.

Finding-17: Substantial evidence supported the Board's findings regarding the second rationale for combining Voorde and Hara. *See* Section V.C.2.a *supra*.

Finding-18: Substantial evidence supported the Board's findings regarding the motivation for combining Voorde and Hara. *See* Sections V.C.1 and V.C.2.a *supra*.

Finding-19: Substantial evidence supported the Board's finding that Voorde did not teach away from the proposed modification to Voorde and would not have destroyed Voorde's intended purpose. *See* Section V.C.2.a *supra*.

Finding-20: Substantial evidence supported the Board's findings regarding heat treating the vegetable material before adding the starter culture. *See* Sections V.B.1, V.C.1, and V.C.2.a *supra*. Further, this was not a "new theory" made up by the Board.

**D. The Board's Decision Complies with the APA**

Kerry's APA argument (Kerry Br. at 62-65) is a rehash of its previous arguments. As explained above, the Board's factual findings are supported by substantial evidence, and as such the Board's obviousness conclusion complies with 5 U.S.C. § 706(2).

First, the Board did not adopt a "Voorde alone" ground. The Board's findings and conclusions were grounded in the petition and the arguments developed during the trial. Kerry had ample opportunity to respond thereto. That the Board disagreed with Kerry does not mean it violated the APA. *See* Section V.B *supra*; *TQ Delta, LLC v. Dish Network LLC*, 929 F.3d 1350, 1356 (Fed. Cir. 2019) (holding TQ's APA rights were not violated when it had notice of the issues and an opportunity to be heard).

Second, the Board provided explanation and analysis of why a POSITA would have been motivated to combine the disclosures of Voorde and Hara. *See* Section V.C, *supra*. Kerry is wrong that the Board failed to cite evidence in support of its findings. The Board's analysis spans five pages (Appx16-20), and the Board extensively cites the arguments and evidence (including expert testimony) put forth by ***both*** parties. *Id.*[17] Moreover, there is no rule that the Board must address every argument and piece of evidence cited by a party. *Yeda Research*, 906 F.3d at 1045-46 (holding that it was not error for the Board to fail to address one of patentee's arguments and stating that the Board "is not require[d] … to address every

[17] To the extent that Kerry argues that the Board did not consider its evidence, the Board repeatedly cited to Kerry's briefs, which in turn cite evidence. *See* Appx17 (citing PO Resp. 24-29, 30-31); Appx18 (again citing PO Resp. 25 and other evidence including testimony from Kerry's expert (Ex. 1037) and its expert's declaration (Ex. 2014)); Appx19 (citing PO Resp. at 25, 27); Appx20 (citing PO Resp. 34-46; PO Resp. 8, 10-12 and Kerry Sur-Reply at 12). Therefore, the Board did not fail to consider or address Kerry's evidence as it erroneously argues.

argument raised by a party or explain every possible reason supporting its conclusion").

Third, Kerry's "teaching away" argument was addressed by the Board, contrary to Kerry's contention. *See* Appx19-20 (stating that it "disagree[d] that this modification would be ***inconsistent with Voorde or destroy its intended purpose, as Kerry argues***. PO Resp. 34-36."). Those cited pages from Kerry's POR begin with a heading arguing that FFP's "modification … is ***contrary to Voorde's express teachings not to do so***"). Appx357. Thus, there can be no doubt the Board considered, but rejected, Kerry's "teaching away" argument. *See also* Section V.C.2.a, *supra*. Indeed, the Board explained why, in part because of the ***admissions*** of Kerry's expert. Appx20 ("Dr. Milkowski – who Kerry extensively argues is a [POSITA] … conceded on cross-examination that, if he were adding a starter culture, he would do so after heating."). Kerry conveniently ignores this in its brief.

Fourth, the Board's findings were supported by substantial evidence. *See* Section V.C, *supra*.

### E. Reversal is Not the Appropriate Relief

The Board's FWD should be affirmed. But if this Court disagrees, Kerry's request that the Court reverse the Board's FWD is inappropriate considering the record. Regarding the Voorde/Hara ground, at most, the decision should merely be vacated with instructions for the Board to address whatever infirmities in the

decision this Court determines may exist. *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016).

Moreover, the Board declined to address in the FWD the three other invalidity grounds FFP set forth in the petition. *See* Appx23 ("Because we have determined above that the same claims would have been obvious over the combined disclosures of Voorde and Hara, these additional challenges to the claims are moot and we decline to address them as unnecessary to our ultimate determination of unpatentability."); Appx84 (identifying in the petition grounds II-IV). Thus, at a minimum, the matter would also need to be remanded for the Board to consider these invalidity grounds if this Court does not affirm.

## VI. CONCLUSION

FFP respectfully requests that the Court affirm the Board's Final Written Decision finding claims 1-5 of the '304 patent invalid.

Date: December 15, 2023

Respectfully submitted,

*/s/ Brian E. Ferguson*
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 282-5276
beferguson@winston.com

Michael B. Johnson
Michael Bittner
Winston & Strawn LLP
2121 N. Pearl Street

Suite 900
Dallas, TX 75201
Tel: (214) 453-6500
mbjohnson@winston.com
mbittner@winston.com

Louis L. Campbell
Winston & Strawn LLP
225 Shoreline Drive Suite 520
Redwood City, CA 94065
Tel: (650) 858-6500
llcampbell@winston.com

*Counsel for Appellee*
*Florida Food Products, LLC*

## CERTIFICATE OF SERVICE

I, Brian E. Ferguson, hereby certify that on December 15, 2023, the foregoing Brief of Appellee Florida Food Products, LLC was filed using the Court's CM/ECF system and a copy was served on the parties' counsel of record via ECF.

*/s/ Brian E. Ferguson*
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 282-5276
beferguson@winston.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 34(f) and Federal Circuit Rule 32(b), this brief contains 13,972 words.

This brief complies with the typeface and type-style requirements because it was prepared in a proportionally spaced typeface using Microsoft Word Version 2309 in 14-point Times New Roman.

*/s/ Brian E. Ferguson*
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 282-5276
beferguson@winston.com